## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Keyana Wiley, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:21-cv-00599-JPG |
| | ) | |
| v. | ) | |
| | ) | |
| Wexford Health Sources, Inc., *et al.*, | ) | Hon. J. Phil Gilbert |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF'S MOTION TO COMPEL

Plaintiff Keyana Wiley, through her counsel, hereby moves the Court to compel defendant Wexford Health Sources, Inc. to produce documents in response to discovery against it. *See* **Ex. 1** (Wexford Rule 34 discovery responses). In support of her motion Plaintiff states:

### BACKGROUND

This case arises from the death of Omar McCullough, who was imprisoned by the IDOC. Mr. McCullough repeatedly told Wexford medical staff he had abdominal pain, but they failed to make serious efforts diagnose the cause of that pain. Eventually he became so fragile that in 2019 he was sent to an outside emergency room, where his cancer was diagnosed quickly. He completed his sentence shortly thereafter and went to live with his family, but he died from the cancer a few months later, in March 2020.

Plaintiff, who administers Mr. McCullough's estate, has sued several individual providers. She also has sued Wexford itself, alleging, pursuant to *Monell*, that the company has widespread practices of providing inadequate cancer care. Plaintiff has served discovery to gather evidence supporting those claims, which Wexford has objected to virtually in its entirety. *See* Ex. 1. Plaintiff certifies that the parties have met and conferred on multiple occasions to resolve Wexford's objections, but have been unable to do so. This motion follows.

1

**A. Evidence relating to the *Lippert* reports is highly relevant to Plaintiff's *Monell* claims and an appropriate subject of discovery.**

Plaintiff's discovery Request Nos. 47-60 seek to understand what Wexford knew about the information contained in the 2014 and 2018 *Lippert* reports, whether it investigated its own practices in light of the information in the two reports, and whether it made any changes to its practices in light of the information contained the reports or its subsequent investigation.[1] Wexford has refused to produce any documents in response to any of these requests.  It has refused, among other things, to search for or produce any documents or communications that relate to the *Lippert* reports, including communications among Wexford employees about the information contained in the *Lippert* reports or any consideration given to altering or at least investigating Wexford's practices in light of the information contained in the *Lippert* reports.

Wexford first objects broadly that Plaintiff's *Lippert*-related discovery is of no relevance to the claims or defenses in this case, and thus that the burden of gathering information responsive to the reports is disproportionate under Rule 26(b)(1).  *Lippert*, however, is highly relevant to this case.  *Lippert* is an injunctive case challenging the provision of medical care to all IDOC prisoners.  The 2014 report, which was authored by medical experts appointed by the *Lippert* court, concluded that the IDOC "has been unable to meet minimal constitutional standards with regards to the adequacy of its health care program for the population it serves."

---

[1]    Requests 47 and 54 seek documents and communications relating to certain persons whose medical care is discussed in the two *Lippert* reports.  Requests 48-51 and 55-58 seek communications within Wexford discussing the descriptions of certain aspects of medical care contained in the two *Lippert* reports.  Requests 52 and 59 seek communications discussing potential or actual changes to Wexford's delivery of medical care in light of the information contained in the two *Lippert* reports.  And Requests 53 and 60 seek production of discipline or similar actions imposed in light of the information contained in the *Lippert* reports.  *See* Ex. 1.

2

*Lippert v. Baldwin*, No. 10-cv-4603, 2017 WL 1545672, at *5 (N.D. Ill. Apr. 28, 2017).[2]

Among these deficiencies were "delaying and denying specialty care." *Id.* at *3. The authors

explained that during their "review of records, we found breakdowns in almost every area,

starting with delays in identification of the need for the offsite services, delays in obtaining an

authorization number, delays in being able to schedule an appointment timely, delays in

obtaining offsite paperwork and delays or the absence of any follow-up visit with the patient."

*Id.* at *3 n. 8 (quoting 2014 *Lippert* Report). In 2018, court-appointed experts from the *Lippert*

litigation issued a follow-up report, finding that the healthcare program had "not significantly

improved" since the 2014 report was issued. **Ex. 2** (2018 *Lippert* report excerpts) at 9.[3] The

experts found that clinical care was "extremely poor" and caused multiple preventable deaths.

*Id*.

Wexford is contracted to provide medical services across the IDOC, and the *Lippert*

reports were thus assessments of its delivery of healthcare to IDOC patients. Plaintiff alleges

Wexford maintained a number of problematic policies and practices across the IDOC, including

the failure to send patients offsite for evaluation and treatment even when such referrals were

appropriate or necessary, the failure to appropriately diagnose, examine, or treat patients in its

care. ECF 32 ¶¶ 56-63. The findings of the experts in the two *Lippert* reports support those

allegations, and a Wexford executive has testified at trial that Wexford's executives were aware

of the 2014 and 2018 reports and agreed that "they raised 'serious' concerns that Wexford took

---

[2] An online copy of the 2014 *Lippert* report can be found here: https://www.aclu-il.org/sites/default/files/wysiwyg/lippert_v_godinez_expert_report.pdf

[3] An online copy of the 2018 *Lippert* report can be found here: https://www.aclu-il.org/sites/default/files/field_documents/lippert_-_report_of_second_court-appointed_expert.pdf

seriously." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 227-28, 253 (7th Cir. 2021) (summarizing testimony of Wexford corporate medical director).

Documents reflecting what, if any, actions Wexford took in response to those reports goes to the heart of Plaintiff's claim that Wexford acted with deliberate indifference despite being aware of inadequate policies and practices. *See J.K.J. v. Polk County*, 960 F.3d 367, 383 (7th Cir. 2020) (affirming a *Monell* verdict based on the inaction of the municipal corporation despite notice that its inadequate policies and practices led to constitutional misconduct by one of its employees); *Daniel v. Cook County*, 833 F.3d 728, 743 (7th Cir. 2016) (holding documents from other jail-condition case were "inadmissible hearsay to the extent they are offered to prove the truth of the statements they contain" but "may be admissible to show that the defendants were on notice of their contents"). Whether and how Wexford responded to the findings of the court-appointed experts in the 2014 and 2018 *Lippert* Reports are squarely relevant to Plaintiff's claim that Wexford was deliberately indifferent, as are statements and admissions about the accuracy of the information contained in the reports. Documents reflecting efforts by Wexford to investigate and respond (including through corrective action) to the findings of the court-appointed experts in the *Lippert* reports are likely admissible as party statements, which are categorically not hearsay. Fed. R. Evid. 801(d). And, as Judge McGlynn held in overruling Wexford's objection to substantially similar discovery about its response to the *Lippert* reports, "[r]elevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible." *Reed v. Wexford Health Sources, Inc.*, No. 20-CV-01139-SPM, 2022 WL 4483949, at *3 (S.D. Ill. Sept. 27, 2022) (quotation omitted).

Wexford also objects that any documents relating to the *Lippert* reports are barred from disclosure by the *Lippert* protective orders. But Wexford made this same argument in opposing

substantively identical discovery in the *Reed* case, and Judge McGlynn rejected it out of hand, since none of the materials were covered by the *Lippert* protective orders in the first place. *See Reed*, 2022 WL 4483949, at *4. As *Reed* explained, "[d]ocuments that may relate to the *Lippert* case or communications that mention, were sent in response to, or that discuss *Lippert* and were not produced in discovery or disclosed to the experts are not covered by the orders in *Lippert*. Accordingly, the orders in *Lippert* . . . do not prevent the production of documents that . . . relate[] to or mention *Lippert*." *Id.* at *5. That reasoning applies here. The *Lippert* orders are simply irrelevant to the *Lippert*-related discovery Plaintiff seeks in this motion.

Finally, Wexford asserts two privilege objections with respect to the "*Lippert*" discovery. It claims documents going to its response to the information contained in the *Lippert* reports are protected from discovery by the peer review privilege, which is encoded in the Illinois Medical Studies Act. That argument is wrong, as Plaintiff explains below, *infra* § E. It also objects that its response to the *Lippert* reports is broadly protected by the attorney-client privilege and the work-product doctrine. As *Reed* pointed out with respect to the same argument, such objections are to be addressed by the creation of a privilege log. *See id.* *6. The assertion of a privilege is not grounds for refusing to respond to a discovery request.

### B. *Dean* does not limit the scope of *Monell* discovery to a particular prison.

Wexford also attacks the scope of Plaintiff's discovery, arguing that the scope of *Monell* discovery regarding its policies and practices must be confined to the delivery of healthcare at the Pinckneyville and Danville prisons, the facilities where Mr. McCullough was incarcerated. Wexford grounds this argument on several lines in the Seventh Circuit's *Dean* decision. But its argument misapplies *Dean*. The *Dean* decision did not concern either the scope of discovery or the widespread-practice *Monell* theory at issue in this case.

*Dean* involved a post-trial challenge to the admission of portions of the *Lippert* reports, for purposes of notice only, in support of a narrow, "as-applied" *Monell* theory relating only to the individual plaintiff himself, at a trial in which no widespread-practice evidence was presented. This narrow scope of the *Monell* evidence in *Dean* required the court to confine its analysis to the facility where the *Dean* plaintiff was housed, and made minor differences among facilities dispositive. In this case, by contrast, Plaintiff is gathering the very substantive, widespread-practice evidence that was missing in *Dean*, the evidence that makes Wexford's practices across the IDOC relevant under *Monell* and an appropriate subject of discovery.

The Seventh Circuit's *Dean* decision arose from the admission at trial of the 2014 and 2018 *Lippert* reports. *Lippert* was certified as a class of "all prisoners in the custody of the [IDOC] with serious medical or dental needs." *Lippert*, 2017 WL 1545672, at *10. As the *Lippert* court recounts, the class certification ruling was based largely on the *Lippert* reports. *See id.* at *1 & n.1. The *Lippert* court had tasked the reports' experts with "assist[ing] the Court in determining whether the state of Illinois was able to meet minimal constitutional standards with regard to the adequacy of its health care program for the population it serves." *Id.* at *5 n.15. To make this inquiry, the 2014 *Lippert* report experts visited eight facilities, *id.* at *5 & nn. 15-16, reviewed agency-level documents and communications, *id.* at *5 n.16, and reviewed a sample of slightly more than half the non-violent deaths that occurred in the IDOC over the course of 18 months, *see id.* at *5 & n.18.

In opposing class certification, the *Lippert* defendants argued that the 2014 report did not establish that "the same issues exist at all twenty-five IDOC prisons." *Id.* at *4. The *Lippert* court rejected that argument, noting that the *Lippert* experts had selected the facilities and information to sample the care provided across the IDOC, and that, based on this information,

6

they had "'concluded that the [IDOC] has been unable to meet minimal constitutional standards with regards to the adequacy of its health care program for the population it serves.'" *Id.* at *5 (quoting 2014 *Lippert* Report).  As such, the *Lippert* court held, the plaintiffs had established commonality for purposes of class certification under Rule 23(a)(2) across the entire IDOC.  *Id.*

*Dean* noted that the *Lippert* reports were based on a "comprehensive[] review of the IDOC's healthcare system." *Dean*, 18 F.4th at 225.  *Dean* held, however, that the comprehensive nature of this review was irrelevant, because the *Dean* plaintiff had failed to "introduce any substantive evidence of a pattern or practice of similar violations. . . . He only offered substantive evidence of collegial review causing unconstitutional delays in his own healthcare." *Id.* at 237. The widespread unconstitutional practices described in the *Lippert* reports therefore never came into play, because "evidence admitted only for notice cannot establish that a municipality acted with deliberate indifference unless the plaintiff also has substantive proof that the 'noticed' problems actually existed." *Id.* at 238.  Since the *Dean p*laintiff introduced substantive proof only about *his own* care, and nothing more, any notice in the *Lippert* reports had to focus, at a granular level, only on the very specific care that the *Dean* plaintiff received. *Id.* at 237.

Put differently, while the *Lippert* report authors identified widespread failures in providing care across the IDOC, the *Dean* plaintiff did not support his *Monell* claims on any substantive evidence of those widespread failures.  Instead, he introduced the reports only for notice about the specific care at issue in his case.  Because the *Lippert* reports were admitted for such a narrow purpose, they had to "link . . . problems [identified in the reports] to [the *Dean* plaintiff's] personal experience"— *not* to a *de facto* custom that would make widespread-practice evidence relevant. *Id.* at 238.  This required the *Dean* plaintiff to "focus[his *Monell* claim] on Wexford's *express* policy of collegial review—not on its informal customs or practices."  *Id.* at

7

239 (emphasis added). Because the *Dean* plaintiff could not base his *Monell* theory on a widespread practice claim, widespread practice evidence was not relevant. As such, minor variations among the *Lippert* report's descriptions of collegial review in different facilities, and the fact that the *Dean* plaintiff's prison was not among those reviewed in the reports, took on dispositive significance. *Id.* at 238. Because that facility was not among those described in the *Lippert* reports, moreover, the reports could not provide notice of the specific problems the *Dean* plaintiff claimed had caused the inadequate care that he received. *Id.*

Wexford seeks to export *Dean*'s holding to this case, arguing that *only* Wexford's policies and practices at Pinckneyville and Danville, the prisons where Mr. McCullough was housed, can permissibly give rise to a *Monell* claim—and that discovery regarding Wexford's delivery of care to other inmates can *only* be gathered from medical care provided at those two prisons. Wexford makes this argument not only with respect to information relating in some way to the *Lippert* reports, but for *all* evidence relating to Plaintiff's *Monell* claim. Thus, on the strength of the language in *Dean*, Wexford has objected to the scope of discovery—and to a *Monell* theory at all—to the extent it includes evidence outside Pinckneyville and Danville.

*Dean*'s point, however, is exactly the opposite: by failing to "introduce any substantive evidence of a pattern or practice of similar violations," the *Dean* plaintiff *obligated* the court to ignore widespread-practice evidence about the delivery of defective healthcare across the IDOC, and instead forced the court to consider the *Dean* plaintiff's immediate experience only. *Dean*, 18 F.4th at 237. The very point of Plaintiff's *Monell* discovery is to discover "substantive evidence of a pattern or practice of similar violations," the very thing that *Dean* held was missing at the *Dean* plaintiff's trial, and whose absence circumscribed the scope of the court's *Monell* analysis to the facility where the *Dean* plaintiff was imprisoned. *Id.*

8

Wexford thus tries to use *Dean*'s holding about the *absence* of widespread practice evidence—at trial—to prevent Plaintiff here from *gathering* such evidence in discovery.  But in this case, and in this discovery motion, Plaintiff seeks to gather the very evidence that was missing in *Dean*: substantive evidence that Wexford has widespread policies and practices, throughout the IDOC, pursuant to which its employees fail to diagnose or treat cancer in a timely manner, driven by the widespread failure to refer patients offsite for diagnosis and treatment of serious medical conditions.  That is the policy and practice Plaintiff alleges in her complaint, *see* ECF 32 ¶¶ 56-63, and it is constitutive of *Monell* widespread-practice claims in the Seventh Circuit.  *See, e.g.*, *Broaddus v. Wexford Health Sources, Inc.*, No. 15-CV-1339-SCW, 2018 WL 1565603, at *6 (S.D. Ill. Mar. 30, 2018) (identifying inadequate care at multiple facilities as "evidence a well-established and widespread policy" by Wexford).  In the case of private correctional healthcare providers like Wexford, such evidence is relevant for Monell claims even where the facilities are in different jurisdictions.  *See, e.g.*, *Shields v. Prince George's Cnty.*, No. 15-cv-1736, 2016 WL 4581327 (D. Md. Sept. 1, 2016) (holding that because the defendant (Corizon) was a national prison healthcare vendor, "complaints regarding Corizon employees in 14 different states" supported a *Monell* claim because "Corizon . . . provides [correctional] healthcare services . . . nationwide.  Thus, its activities in a variety of states can be, and in this case are, relevant to the issue of custom and policy here."  *Id*. (quotations omitted)).  This Court, in fact, has already rejected the core conceit of Wexford's argument in this very case.  In its motion to dismiss, Wexford argued that Mr. McCullough's transfer from Pinckneyville to Danville cut off its liability under the statute of limitations. In rejecting that argument, this Court explained that "Plaintiff alleges that Wexford maintained a de facto policy/practice . . . of providing inadequate health care to IDOC inmates throughout the state, which amounted to

deliberate indifference.  In this context, McCullough's transfer from Pinckneyville to Danville has no effect on Plaintiff's claim against Wexford."  ECF 43 at 7.

Plaintiff's claim is not that Wexford staff at Pinckneyville or Danville are particularly bad at diagnosing or treating cancer.  Rather, she alleges that in performing on its contract to deliver healthcare to people imprisoned by the IDOC, Wexford has adopted widespread customs of providing inadequate healthcare, particularly the diagnosis of cancer.  The authorities outlined above make plain that evidence of Wexford's practices across the IDOC is relevant to proving that claim, and Plaintiff's discovery is targeted at gathering substantive evidence to support the existence of such a widespread practice.  The Court should reject Wexford's effort to restrict this discovery only to the particular prisons where Mr. McCullough was housed.

### C.   Wexford refuses to respond to discovery about its policies and practices by ignoring Plaintiff's discovery requests as they are written.

Plaintiff has served Wexford with a trifecta of discovery requests (Request Nos. 30, 38, and 39) that seek production of documents relating to Wexford's written policies about the delivery of medical care, its actual practices regarding the delivery of medical care, and its efforts to identify any deficiencies in its written policies or actual practices.

The three discovery requests operate as follows:  Request 30 lists 15 "subjects," set out in subparagraphs, concerning the delivery of medical care. Ex. 1 ¶¶ 30(a)-(o).[4]  Referring to these 15 subjects, Request 30 asks Wexford to produce certain written policy documents, training materials, and similar written "policies" concerning the 15 subjects. *Id.* ¶ 30.  Next, Request 38 refers to the same 15 subjects, and asks Wexford to produce documents "identifying any

---

[4] The list includes subjects such as "Communications amongst and between medical staff regarding a prisoner's health, including any Complaints," ¶ 30(e); "Diagnosis, evaluation, and treatment for cancer," ¶ 30(*l*), and "Differential diagnosis," ¶ 30(o).  *See* Ex. 1 ¶¶ 30(a)-(o).

policymaker who was responsible for or had final policymaking authority for any policy, procedure, or practice on any of the [15] subjects". *Id.* ¶ 38. Finally, Request 39 asks Wexford to produce documents relating to any effort by such policymakers "to review, investigate, analyze, uncover, prevent, or determine the prevalence of any misconduct, deficiency, shortcoming, or other problem relating to any policy, procedure, or practice on any of the [15] subjects". *Id.* ¶ 39. Wexford has agreed to produce certain written policies, but otherwise has substantively refused to respond to these requests. It does so on two grounds.

*First*, Wexford adopts an obtuse reading of the three discovery requests, refusing to produce documents relating to its practices—or its efforts to identify potential problems with those practices—because, Wexford claims, it cannot produce a document relating to an "unwritten practice". As best as Plaintiff understands it, Wexford takes the position that as a conceptual matter, documents relating to "unwritten practices" cannot exist.

That position is nonsensical. Wexford is a private corporation. Its business is to sell a service. As relevant here, Requests 30, 38, 39 ask Wexford to produce documents concerning its efforts to determine whether there are problems with its delivery of that service. This type of discovery is familiar to any corporate litigant.[5] And there is a well-worn path for gathering documents responsive to such discovery: the personnel within the corporation are identified who are likely to possess documents, usually because their work concerned or they communicated about the subject matter. The parties then negotiate methodologies by which documents in the possession of those custodians should be searched, including the development of a search protocol using keyword search terms. Using these methodologies, the corporate litigant gathers

---

[5] Such discovery is also commonplace in any *Monell* widespread-practice case, which the courts distinguish from *Monell* claims based on a defendant's written policies. *See Rossi v. City of Chicago*, 790 F.3d 729, 737 (7th Cir. 2015) (describing different *Monell* theories).

documents (emails, internal memorandums, text messages, voicemails, etc.), reviews them for responsiveness to the discovery requests, and produces them.  This type of discovery is routine.

Wexford has refused to do any of this.  Plaintiff has proposed identifying custodians and developing a search protocol, but Wexford has refused to begin that process because—as best Plaintiff can understand it—Wexford takes the position that because these requests concern "unwritten practices," they *cannot*, as a conceptual matter, ask for actual documents.[6]

This approach to discovery is flatly improper.  "A party responding to a discovery request should exercise reason and common sense to attribute ordinary definitions to terms and phrases utilized in the discovery requests." *Sols. Team v. Oak St. Health, MSO, LLC*, No. 17 CV 1879, 2021 WL 3022324, at *4 (N.D. Ill. July 16, 2021).  Here, Request 39 asks for production of documents relating to efforts by Wexford policymakers to investigate, prevent, or determine the prevalence of "any misconduct, deficiency, shortcoming, or other problem relating to any policy, procedure, or *practice* on any of the [15] subjects identified in [Request 30]." (emphases added)).  Notably, there is every reason to believe such documents exist.  To take one example, as Plaintiff noted *supra*, Wexford's medical director testified during the *Dean* trial that Wexford's executives were aware of the 2014 and 2018 reports and agreed that "they raised 'serious' concerns that Wexford took seriously," *Dean*, 18 F.4th at 227-28, 253—and that "Wexford

---

6  In discovery negotiations over an identical discovery request in *Reed*, Wexford counsel stated that the only potentially responsive documents in its possession are its own "quality improvement" studies, since "Quality Improvement Program" is listed as a subject in Request 30(k).  That offer, if Wexford means to apply it to this case as well, is insufficient.  Wexford often appears to design such studies to be exculpatory.  The author of the 2014 *Lippert* report noted that "although his team found a high rate of lapses of care in mortality review, internal mortality review identified no lapses in care," *see* Ex. 2 at 118, while the author of the 2018 report found that "[m]any [quality improvement] 'studies' were . . . . meaningless . . . , as there was no effort to improve the program; instead, a study was designed so that it yielded a good result." *Id.* at 120.  They are not a substitute for other, those more candid documents like internal emails and voicemails that are responsive to Request Nos. 30, 38, 39.

disagreed with many of their findings." *Id.* at 228.  Documents relating to the inquiry suggested by this testimony would plainly be responsive to Request 39.  Yet Wexford has professed a conceptual inability to search for or produce them.

Wexford should not be allowed to evade discovery by discarding common sense and raising abstruse objections to entirely conventional discovery requests.

**Second**, Wexford objects that the requests are vastly overbroad and therefore unduly burdensome.  To make this argument, it focuses on certain subparagraphs of Request 30.  For example, Wexford has highlighted ¶ 30(b), which concerns "Provision of medical and care to prisoners."  Wexford argues that requests concerning such subjects effectively demand that Wexford produce "everything" in its possession, since provision of medical care to prisoners is Wexford's entire business.  *Cf.* ECF 55 at 12 (Wexford motion for protective order). Based on this objection, Wexford has broadly refused to respond to Request Nos. 30, 38, and 39.

A refusal to respond to the discovery on the strength of this objection is improper as well. Rule 34(b)(2) instructs that "[a]n objection to part of a request must specify the part and permit inspection of the rest," Fed. R. Civ. P. 34(b)(2)(C), and that "[a]n objection may state that a request is overbroad, but if the objection recognizes that some part of the request is appropriate the objection should state the scope that is not overbroad." Fed. R. Civ. P. 34(b)(2)(B) Advisory Committee Note (2015) (emphasis added).  A number of subject matters in Request 30 go specifically to Plaintiff's claims, including "Communications amongst and between medical staff regarding a prisoner's health," *see* Ex. 1 ¶ 30(e), "Diagnosis, evaluation, and treatment for cancer," *id.* ¶ 30(*l*), "Differential diagnosis," *id.* ¶ 30(o), and the like.

Plaintiff pointed this out in the meet-and-confer process, and offered to have Wexford narrow its objections,[7] but Wexford has refused.  Request Nos. 30, 38, and 39 seek discovery of documents that are relevant to this case, are likely to be found in Wexford's possession, and can be gathered and produced in a proportional manner conforming with Rule 26(b)(1).  The Court should overrule Wexford's objections and order it to produce responsive documents.

### D.  Wexford's claimed time limitation misreads the Court's dismissal opinion.

In its motion to dismiss Wexford argued that Plaintiff's *state law* claims it should be barred to the extent that they arose from conduct before June 16, 2017 (four years before the action was filed).  *See* ECF 43 at 13 (summarizing Wexford argument).  Plaintiff did not offer opposition this part of Wexford's motion, *id.*, and the Court granted it, holding that "Plaintiff's state law claims against Wexford in Counts 3 and 4 will be limited to events beginning with June 16, 2017.  *Id.* at 13-14.  Relying on this ruling, Wexford has objected that all *discovery* must be limited to conduct or events occurring after June 16, 2017.

This is incorrect on its own terms—even if Wexford were only liable for events after June 16, 2017, discovery of events occurring before that date is relevant to Wexford's culpability for events occurring after the date.  For example, in 2014, two years before Mr. McCullough started reporting abdominal pain, Wexford was warned via the 2014 *Lippert* report that its practices with respect to cancer diagnosis were inadequate.  Its indifference to those warnings may have been the driving force behind its failure to diagnose Mr. McCullough's cancer a few years later, and thus its response to those 2014 warnings is an appropriate subject of discovery.

Wexford, furthermore, *is* liable for events occurring before June 16, 2017.  The Court's opinion cut off *state* claims for that date—but Plaintiff has asserted *federal* claims against

---

[7]  That is also what Plaintiff suggested the parties should do in response to Wexford's motion for protective order.  *See* ECF 65 at 6.

Wexford as well, pursuant to Section 1983.  And the Court rejected Wexford's effort to limit any part of those federal claims, explaining that under the federal continuing violation doctrine Plaintiff's claims against Wexford did not accrue until June 22, 2019, when Mr. McCullough was transferred from the IDOC to a local hospital.  ECF 43 at 7.  No other limitation or start date was placed on Plaintiff's federal claims.  *Id.*  The Court's Rule 12 opinion set the parameters of permissible discovery, and Plaintiff's requests fall squarely within it.

### E.  Wexford's assertion of a "peer review" or Medical Studies Act privilege is improper because this is a federal question civil rights case.

Wexford has refused to produce or search for documents in response to multiple requests on grounds that all responsive documents are protected by a "peer review" privilege, encoded in the Illinois Medical Studies Act, 735 ILCS 5/8-2101 ("IMSA").  The requests include: Request 25, which seeks documents relating to deaths of prisoners from cancer, including mortality reviews; Request 39, which seeks documents relating to Wexford's efforts to identify potential deficiencies or shortcomings in its provisions of medical care; and Request Nos. 48-53 and 55-60, which concern Wexford's responses to the assessments in the *Lippert* reports that criticized Wexford's delivery of healthcare, including the company's inquiry into its delivery of healthcare in light of the criticisms in the *Lippert* reports.

Wexford asserts that documents responsive to these requests are all protected from disclosure by the peer review / IMSA privilege.  That argument is wrong.  This is a federal-question case brought pursuant to laws designed to vindicate rights secured under the United States Constitution.  The Supreme Court and the Seventh Circuit—and every other Court of Appeals to consider the issue—have determined that a peer-review privilege does not exist in litigation over federal civil rights.  In *University of Pennsylvania v. EEOC*, the Court refused to recognize a peer-review privilege that was substantively identical to the state-law privilege that

Wexford asserts here. 493 U.S. 182, 189-90 (1990). *University of Pennsylvania* recognized that confidentiality is "important to the proper functioning of [a] peer review process" in any institution, yet it held that rooting out violations of federal law outweighed any interest in maintaining confidentiality of the peer-review process, and that "if there is a 'smoking gun' to be found . . . it is likely to be tucked away in peer review files." *Id.* at 193. The Seventh Circuit has said the same thing. In *Memorial Hospital for McHenry County v. Shadur*, 664 F.2d 1058 (7th Cir. 1981), decided before *University of Pennsylvania*, the Seventh Circuit had expressly declined to recognize any state-law peer-review privilege in a federal-question case. Anticipating the Supreme Court, *Memorial Hospital* ruled that the public interest in enforcing federal claims outweighs the interest in maintaining confidentiality of a peer-review process. *Id.* at 1063. As the Court of Appeals later put it in *Hamdan v. Indiana University Health North Hospital, Inc.*, "[t]his court has declined to recognize a federal peer-review privilege, reasoning that the need for truth outweighs the state's interest in supplying the privilege." 880 F.3d 416, 421 (7th Cir. 2018) (collecting cases, including *Memorial Hospital*). *Hamdan*, to say nothing of *University of Pennsylvania*, is binding on this Court. And *Hamdan*'s holding is in line with every circuit court to have considered the issue. *See Bost v. Wexford Health Sources, Inc.*, No. 15-cv-3278, 2017 WL 3084953, at *4 (D. Md. June 19, 2017) ("Every circuit court that has addressed the issue of a federal medical peer review privilege has flatly rejected the assertion." (collecting cases)). The point, by now, is settled law.

Courts issuing these various decisions have afforded due consideration to the interests served by the peer review privilege, but they have held, unequivocally, that the need for discovery in Section 1983 cases involving unconstitutional denials of medical care outweighs the policy interests advanced by the states in creating these state-law privileges. *See, e.g., Dunn v.*

16

*Dunn*, 163 F. Supp. 3d 1196, 1206-08 (M.D. Ala. 2016) (explaining that the "importance of public scrutiny of medical and mental-health care . . . in the prison and jail contexts" overrides the peer review privilege); *Johnson v. Cook Cnty.*, No. 15-cv-741, 2015 WL 5144365, at *5 (N.D. Ill. Aug. 31, 2015) ("Congress used the power of the Fourteenth Amendment to set aside concerns over state sovereignty and authorize the federal courts to vindicate deprivations of liberty carried out under color of state law. . . .  Should the Court recognize the Illinois peer review privilege here, it would come at a substantial cost to federal policy. The Court declines to extend the IMSA privilege to this federal cause of action." (quotation and brackets omitted)). What is more, as the courts have noted, Congress has repeatedly considered whether to recognize the peer review privilege under federal law but declined to do so, indicating that Congress does not intend a peer-review privilege to be recognized as a matter of federal law.  *See Agster v. Maricopa Cnty.*, 422 F.3d 836, 839 (9th Cir. 2005).

The balance of interests in this case strongly favors discovery notwithstanding Wexford's peer review / IMSA privilege claim.  As a prisoner, Mr. McCullough was protected from the imposition of cruel and unusual punishment by the Eighth Amendment.  Plaintiff has alleged that he died as a result of Wexford's inadequate care, and that his death was the result of *de facto* unconstitutional policies pursuant to which Wexford and its employees, acting under color of law, violated the constitutional rights of incarcerated people like him.  Discovery of peer review documents is critical in this case, which not only concerns claims related to Mr. McCullough individually, but also a *Monell* claim charging that Wexford was on notice that its employees broadly provided inadequate medical care, but was indifferent to that fact.  Repeatedly, courts have permitted discovery in such cases over the peer review claim Wexford has asserted. *See, e.g., Bost*, 2017 WL 3084953, at *2; *Johnson*, 2015 WL 5144365, at *4-5; *McLaughlin v. Tilden*,

No. 13-CV-1600, 2015 WL 888921, *2 (C.D. Ill. Feb. 27, 2015).  Binding precedent, and the consensus of federal courts, flatly rejects Wexford's assertion of a federal peer-review privilege. This Court should do the same.

### F.   Wexford has objects to producing third-party PHI notwithstanding the Court's entry of a HIPAA-qualified protective order.

Over Wexford's objection, the Court has entered a HIPAA-qualified protective order in this case.  *See* ECF 84.  That order protects the private health information ("PHI") of third parties, in this case other people imprisoned by the IDOC who were under Wexford's care.  *Id.* Despite the Court's entry of the HIPAA-qualified protective order, Wexford objects to production of third-party PHI, arguing that HIPAA order notwithstanding, discovery regarding the PHI of other prisoners intrudes into their privacy, and as such production of third-party PHI is not unduly burdensome.[8]

Plaintiff agrees that these third parties have an important interest in the confidentiality of their PHI.  But that interest is protected by the HIPAA-qualified protective order that the Court has entered in this case, which forbids their identities from being revealed, and confines the use of their PHI to this case only.  In *Reed*, Wexford had objected to substantively identical discovery on grounds that it "stripped" the confidentiality of third-party prisoners, but Judge McGlynn rejected that argument, noting, "Defendants have not offered any arguments for why the Protective Order in this case, which designates all protected health information as 'Attorneys' Eyes Only,' is insufficient to protect the privacy interests of inmates who are not parties to this action."  *Reed*, 2022 WL 4483949, at *4.  Indeed.  The HIPAA protective order entered in this

---

[8]   This objection affects Request Nos. 23, 25, 27, 29, 31, 39, 41, 46, and 47-60, all of which potentially call for Wexford to produce PHI of other prisoners.

case protects the privacy of other Wexford patients whose PHI is responsive to Plaintiff's

discovery.  As such, discovery of third-party PHI is not a basis for objecting to discovery.

### G.  Wexford should be compelled to produce documents relating to *Dean*.

Plaintiff's Request 46 asks Wexford to produce certain documents relating to the *Dean*

litigation (documents exchanged in discovery, deposition transcripts and recordings, exhibits

offered at trial, and the like).  *Dean* involved a claim that Wexford failed to provide cancer care,

and it included testimony by Wexford executives about Wexford's reaction to the *Lippert*

reports.  *See Dean*, 18 F.4th at 227-28, 253 (summarizing Wexford medical director's testimony

about senior executives' reaction to *Lippert*).  That evidence is relevant to this case.

Wexford objects that Request 46 targets privileged communications, but that is

demonstrably untrue—it seeks only trial and deposition transcripts, and documents that would

have been exchanged between the opposing parties in the case.  Wexford also objects that the

"Plaintiff is attempting to essentially double the discovery burden on Defendant by seeking the

entirety of discovery in another case."  *See* Ex. 1 ¶ 46.  That objection is hard to understand,

since the documents Plaintiff seeks will already be organized for litigation and easy to produce.

(Certainly, Wexford does not claim otherwise.)  Wexford finally objects that Plaintiff is

effectively seeking inadmissible character evidence—an objection that is not just unsubstantiated

but irrelevant, since evidence that may be inadmissible at trial is still within the appropriate

scope of discovery.  The Court should order production of responsive documents.

### H.  Wexford should be compelled to produce personnel files.

Plaintiff has asked Wexford to produce the personnel files of the individual defendants.

*See* Request Nos. 17-19.  Wexford has objected that such documents are irrelevant.  But "[i]t is

well-established that, in § 1983 cases involving allegations of police misconduct, personnel files

of the defendant officers are discoverable, as they may lead to evidence admissible under Federal

Rule of Evidence 404(b)." *Clark v. Ruck*, No. 13-cv-03747, 2014 WL 1477925, at *2 (N.D. Ill. Apr. 15, 2014) (collecting cases)).  *Accord Smith v. Portwood*, No. 19-cv-5329, 2021 WL 4318076, at *3 (N.D. Ill. Sept. 23, 2021) (same; applying *Clark* in IDOC / Wexford case).  The same rule applies here.  Wexford also objects that producing such documents will pose a safety risk.  It provides no support for that claim.  There is a protective order in place, and Plaintiff has offered to discuss other measures (such as redactions) to address any purported security concern.

### Conclusion

For the reasons set forth above, Plaintiff respectfully requests this Court to grant her motion to compel.

Dated: November 30, 2022                                          Respectfully submitted,


                                                                 /s/ *Stephen H. Weil*
                                                                 Stephen H. Weil
                                                                 Counsel for Plaintiff

Jon Loevy
Steve Weil
LOEVY & LOEVY
311 North Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900
weil@loevy.com