IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Keyana Wiley, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 3:21-cv-00599-DWD |
| | ) | |
| v. | ) | Hon. David W. Dugan |
| | ) | |
| Wexford Health Sources, Inc., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION TO COMPEL**

Pursuant to Federal Rule of Civil Procedure 37, Plaintiff Keyana Wiley, through her undersigned counsel, moves the Court to compel defendant Wexford Health Sources, Inc. to respond to Plaintiff's interrogatories.

**BACKGROUND**

This motion concerns Plaintiff's years-long efforts to gather evidence showing how Wexford policymakers responded to the information in the *Lippert* reports. The *Lippert* case is an injunctive class action charging that the IDOC—through its healthcare vendor, Wexford—provides inadequate healthcare to IDOC prisoners. The *Lippert* court has appointed several correctional healthcare experts to examine the delivery of healthcare in the IDOC, and beginning in 2014 those experts have issued periodic reports to inform the *Lippert* court of their findings. The reports have pointed out numerous, widespread problems with Wexford's delivery of healthcare to its patients—including delays in the diagnosis of serious conditions, like the cancer that killed Omar McCullough (the decedent in this case).

The *Lippert* reports constitute powerful evidence that Wexford had notice of serious problems with its delivery of medical care in the IDOC. Such notice is highly probative in a *Monell* case like this one. *Cf. J.K.J. v. Polk Cnty.*, 960 F.3d 367, 378 (7th Cir. 2020) (en banc)

1

("*Monell* liability can arise from [a failure to act,] because a [municipality's] policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the [municipality] itself to violate the Constitution." (quotations omitted)).  For years now, Plaintiff has pursued discovery to gather evidence showing how Wexford responded to the *Lippert* reports.  The critical question has been whether evidence about Wexford's response to the *Lippert* reports is discoverable.  For the purposes of discoverability, there are two basic scenarios.

*Scenario #1:*  Wexford policymakers treated the reports as strictly a litigation matter—providing them to Wexford's lawyers to defend the company (and the IDOC, through joint-defense) in the *Lippert* litigation, but never examining the information in the reports for the purpose of identifying and preventing deficiencies in its delivery of medical care going forward. This would mean that all of Wexford's communications about the reports are privileged under the attorney-client and work-product doctrines. But it would expose Wexford to the claim that it effectively ignored the reports, *see J.K.J. supra*, since it never considered the information in the reports with an eye to identifying and thereby preventing deficient medical practices going forward.

*Scenario #2:*  In addition to defending itself in the *Lippert* litigation, Wexford *did* examine the information in the reports for the purpose (at least in part) of identifying and preventing potential future deficiencies in the delivery of medical care going forward.[1] This

---

[1] Wexford has deployed this defense at trial already.  In a trial about another *Monell* case against it, one Wexford executive testified "that Wexford was aware of the [*Lippert*] reports and that they raised 'serious' concerns that Wexford *took seriously*. He added, however, that Wexford *disagreed with many of their findings*." *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 227–28 (7th Cir. 2021) (emphasis added).  *See also id.* at 253 (Wood, J., dissenting) (quoting from the Wexford executive's testimony, including that he "and other Wexford executives were aware of" the Wexford reports," and that they "t[ook] the concerns raised in the Reports seriously." (brackets adopted)).

2

scenario would permit Wexford to argue that it was not indifferent to the problems noticed in the reports, but it would mean that at least parts of Wexford's response to and communications about the reports are not privileged, and are therefore discoverable.

Wexford desires a third option: it claims that its policymakers *did* "assess[]" the problems identified in the *Lippert* reports, and thus Wexford cannot be charged with indifference to the information in those reports—but those "assessments" were done "in defense of litigation," and so any Wexford executive's "assessment[]" of the problems identified in the *Lippert* reports is privileged from discovery. *See* **Ex. 1** (December 8, 2023 Joint Status Report) at 6. Wexford, in essence, appears prepared to defend itself at trial by asserting that it was not indifferent to the risks identified in the *Lippert* reports, while at the same time preventing Plaintiff from investigating the factual basis for that defense.

So far this maneuver has all but shut down Plaintiff's efforts to gather documents reflecting Wexford's response to the *Lippert* reports. Pursuant to an ESI protocol agreed to between the parties, Wexford has gathered thousands of internal communications relating to the reports. But aside from a handful of anodyne emails that post-date Mr. McCullough's delayed diagnosis, Wexford has claimed that all these thousands of communications are covered by the attorney-client and work-product privileges—an assertion that Plaintiff has had no way to test.

\*     \*     \*

The present motion concerns a different discovery device: Rule 33 interrogatories designed to identify instances in which Wexford executives communicated about the relevant parts of the *Lippert* reports at meetings. During a Rule 37 conference on September 14, 2023 concerning Plaintiff's document requests, Wexford's counsel told Plaintiff counsel, for the first

3

time, that Wexford executives did not communicate about the *Lippert* reports in writing, but rather held meetings to discuss them instead. *See Reed* ECF 146 at 8–9.[2]

Shortly thereafter, on September 26, 2023, the *Reed* court held a status conference. At the conference, Plaintiff counsel advised Judge McGlynn of Wexford counsel's revelation about the meetings. Judge McGlynn suggested that, in light of that new information, Plaintiff counsel should focus the *Lippert* discovery on deposing the participants of these meetings. Plaintiff took that suggestion to heart: the next day, on September 27, 2023, Plaintiff served four interrogatories about the meetings to identify the attendees for depositions. The interrogatories were served on Wexford in both *Wiley* (**Ex. 2**) and in *Reed*. The purpose of the interrogatories is to identify participants in relevant meetings, along with related information, so that Plaintiff can identify targets to conduct informed depositions.

The interrogatories are phrased similarly. Each asks, in essence, for Wexford to identify meetings among its policymakers that related to deficiencies identified in the *Lippert* reports relating (in whole or in part) to the untimely diagnosis of serious conditions; to identify the participants in each such meeting; and to state whether the meeting had a "legal" purpose (*i.e.*, responding to the *Lippert* litigation) and/or a "business" purpose, such as "assuring and improving the quality of services provided, protecting future patients and/or customers from inadequate care," as well as "protecting against adverse publicity," and "improving prospects for future contracts to provide services offered by the company."[3] Here is an example:

---

[2] As the Court is aware, this case and *Reed v. Wexford Health Sources, Inc.*, Case No. 3:20-cv-1139-SPM (S.D. Ill.) share the same *Monell* counsel for plaintiff and defense. The plaintiffs in *Reed* and *Wiley* have brought functionally identical *Monell* claims against Wexford, and *Monell* discovery in the two cases has effectively been consolidated.

[3] The interrogatories define "legal purpose" and "business purpose." *See* **Ex. 2** ("Definitions and Instructions").

15. Did any Wexford employees or agents hold meetings to review, investigate, analyze, uncover, prevent, or determine the prevalence of deficiencies described in the 2014 *Lippert* report relating in whole or in part to the untimely diagnoses of cancer and other life-threatening conditions for IDOC inmates? If your answer is anything other than an unqualified No, please:

   a) state the date, time, place, and duration of each such meeting;

   b) state the identities of each person who attended each such meeting, including the person's name and job title;

   c) for each meeting identified in response to this interrogatory, state whether the meeting had a legal purpose;

   d) for each meeting identified in response to this interrogatory, state whether the meeting had a business purpose;

   e) identify every Document or Communication (including copies and drafts of same) prepared for or in anticipation of each such meeting, provided for or distributed to attendees of each such meeting, created by any attendees at each such meeting (including notes), describing or discussing any part or component of each such meeting;

   f) for each Document or Communication identified in response to this interrogatory, state whether said Document or Communication had a legal purpose; and

   g) for each Document or Communication identified in response to this interrogatory, state whether said Document or Communication had a business purpose.

Wexford submitted a response on October 19. *See* **Ex. 3**. Those responses reveal multiple of conflicting positions. Wexford first objected that it had numerous employees who had held numerous meetings, such that identifying all responsive meetings would be unduly burdensome. Nevertheless, Wexford was able to claim that every responsive meeting had a "legal purpose"—even though Wexford *also* objected that the interrogatories were unduly burdensome because they "demand[] an assessment of each document and communication *for its purpose* (and *improperly assumes that a meeting can only have one purpose*)." *Id.* (emphasis added).

Wexford's October 19 response did not state whether any of the responsive meetings also had a "business" purpose, as the interrogatories requested. Plaintiff counsel initiated a Rule 37

5

conference, at which he explained to Wexford's counsel that under existing precedent a meeting (or communication, etc.) could have both a "legal purpose" and a "business purpose," which would render it a "dual purpose" communication. Plaintiff also offered to address Wexford's overbreadth objection by confining the interrogatories to meetings in which senior executives participated, and discussed confining the responsive meetings to those meetings with electronic calendar "invitations" that Wexford had already gathered as part of the ESI protocol.

A mere two weeks later, Wexford supplemented its response. **Ex. 4.** While incorporating on all its existing burden objections—including its objection the interrogatories demanded "an assessment of each . . . communication for its purpose"—Wexford nevertheless claimed that *none* of the meetings (or related communications) had a "business" purpose or a "dual" purpose, and thus all the meetings and communications had only a "legal" purpose. *Id.* Wexford also refused to identify any responsive meetings or related communications on privilege grounds—but none of its assertions were accompanied by the privilege log required under Rule 26(b)(5).

As recounted in the parties' December 8, 2023 Joint Written Discovery Report to the Court, Plaintiff certifies that the parties have met and conferred on multiple occasions to resolve Wexford's objections, but have been unable to do so. **Ex. 1**. This motion follows.

## ARGUMENT

Plaintiff's interrogatories are designed to carry out Judge McGlynn's recommendations made at the September 26 hearing in *Reed:* by serving interrogatories to identify participants in responsive meetings, Plaintiff intends to identify when responsive meetings occurred and who participated in them, so that Plaintiff will know who to depose. Wexford's refusal to respond to

6

the interrogatories is its latest step towards evading any discovery about how it responded to *Lippert*, but Wexford's blanket objections are unavailing.

***The information Plaintiff seeks is not privileged***.  As an initial matter, the requested information about the meetings is not privileged. The attorney-client privilege "protects from disclosure confidential communications made for the purpose of obtaining a lawyer's professional advice and assistance." *Condon v. Petacque*, 90 F.R.D. 53, 54 (N.D. Ill. 1981). "The privilege does not foreclose inquiry into the fact of representation itself or the dates upon which services are rendered as long as the substance of the attorney-client relationship is shielded from disclosure." *Id.*  Thus while the "substance" of communications might remain confidential, "the structural framework" of the attorney-client relationship is discoverable. *Id.* (declining to extend the attorney-client privilege to "the dates upon which services are rendered").  Nor is the meeting information protected by the work product doctrine, which protects an attorney's thoughts and mental impressions made in anticipation of litigation. *See Condon*, 90 F.R.D. at 54 ("The documentation of the date upon which Condon initiated his relationship with his attorney regarding this lawsuit and the dates of subsequent communications can hardly be considered to have been prepared in anticipation of litigation within the meaning of the rule in *Hickman*.").  On these grounds alone, Wexford should be compelled to identify responsive meetings.

***Wexford has not demonstrated undue burden***.  Despite voluble protest, Wexford also has not provided any actual reason why gathering this information would be particularly burdensome. Wexford continues to repeat the mantra—too many years of meetings, too many employees.  On the strength of this objection, all Wexford will offer is a witness who will "testify generally how often reoccurring meetings [about *Lippert*] occurred and who was typically present," Dec. 8 Discovery Status Report at 13—nothing more.  This is as good as no

7

discovery at all, and it is based on objections that simply ignore the various ways Plaintiff has offered to narrow down the universe of meetings.  Plaintiff has limited the meetings to senior Wexford executives, and has confined the topics of the meetings to those germane to the *Monell* claims in this case.  Wexford claims this is not enough, but Plaintiff has also offered to confine the meetings to the various electronic "invitations" that Wexford's counsel reviewed (but did not produce) as part of the ESI discovery in this case.  And Plaintiff has remained open to other means by which Wexford might narrow down or identify responsive meetings.

      Of course Wexford might simply search through meeting agendas written agendas, notes, or written materials were prepared for the meetings. Those materials—even if privileged—can be used to identify meetings that are responsive.  Plaintiff has raised this means of searching for meetings with Wexford, but the company has expressed no interest in identifying responsive meetings in this way.   Notably, for example, Wexford has never reported on any effort to conduct word searches through meeting invitations, agendas, or notes to determine how many responsive meetings those might indicate.  Wexford simply has not demonstrated that responding to the interrogatories is unduly burdensome.

      ***Wexford cannot shield "dual purpose" evidence***.  That leaves Wexford's have-it-both-ways position:  Wexford's rejoinder is that there is no point to gathering information about meetings among its policymakers regarding the *Lippert* reports because the *substance* of each meetings will be privileged—each one was done for a "legal" purpose only.  Wexford makes this point explicitly in its portion of the December 8 report, claiming that the substance of any meeting or communication about *Lippert* will be privileged—even if the meeting or communication had a "dual" purpose as well.

> Documents that have a "dual purpose" of both an investigative nature and preparation for litigation can be work product privileged where the primary

8

> motivating purpose behind the creation of a document or investigative report is to aid in possible future litigation. *Binks Mfg. Co. v. National Presto Industries, Inc.*, 709 F.2d at 1119; *Webster Bank, N.A. v. Pierce & Assocs., P.C.*, 2018 U.S. Dist. LEXIS 18653, *13-14, 2018 WL 704693 (N.D.Il. Feb. 5, 2018). "Where a document is prepared because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection because it is also created in order to assist with a business decision." *NRDC, Inc. v. Ill. Power Res. Generating, LLC*, 2018 U.S. Dist. LEXIS 9854, *14, 2018 WL 497066 (C.D.Il. Jan. 22, 2018).

December 8 Discovery Status Report at 17. This passage, and Wexford's other arguments, fundamentally misunderstands the dual purpose rule. Wexford relies on a passage from *NRDC, Inc.*, that "[w]here a document is prepared because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection because it is also created in order to assist with a business decision." *NRDC, Inc.*, 2018 WL 497066, at *5. That misses the point: the "business" decision at issue in *NRDC* was a business decision about the litigation itself: the *NRDC* "business" document "was information collected and created to assist [the business] in negotiating settlement and litigating this case." 2018 WL 497066, at *5. The "business" documents in *NRDC* were thus created to help the company develop a "settlement strategy," and as the *NRDC* court explained, "[t]he details of settlement strategy are exactly the kind of attorney mental impressions and opinions that the work product privilege is designed to protect." *Id.* The examples Wexford gives of "dual purpose" information are similar: "Wexford [has] an interest in succeeding in the underlying *Lippert* lawsuit, as well as complying with the court's orders, appointing experts, etc." December 8 Discovery Status Report (Ex. 1) at 17. None of these other purposes would defeat the privilege, but that is because they are all arise from *litigation* and *legal* purposes, as well.

The relevant "dual purpose" at issue in Plaintiff's discovery is different: it concerns a purpose *independent of litigation*. *See, e.g.*, *Phoenix Techs. Ltd. v. VMware, Inc.*, 195 F. Supp.

9

3d 1096, 1105 (N.D. Cal. 2016) (holding that dual purpose documents were not protected work product because they served a business purpose *independent of litigation*). Plaintiff's interrogatory instructions explain that a document

> has a "business purpose" if it is made or prepared for a non-legal purpose, including but not limited to assuring and improving the quality of services provided, protecting future patients and/or customers from inadequate care, protecting against adverse publicity, promotion of a company's economic interests, and improving prospects for future contracts to provide services offered by the company.

**Ex. 2**. Plaintiff's definition of "business purpose" is drawn directly from *In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989*, 133 F.R.D. 515 (N.D. Ill. 1990) (**bold** text *infra*). In that case, the court rejected an airline's claim that virtually all documents generated after an airplane crash were protected attorney work-product or attorney-client communications:

> In *Air Crash*, the airline company immediately implemented its own investigation of the airplane crash and the first lawsuit surrounding the incident was filed the next day. *See Air Crash*, 133 F.R.D. 515. The airline's purpose in the crash investigation was two-fold: **one was to find the cause of the accident, improve aircraft products, protect future pilots and passengers, protect against adverse publicity, promote its own economic interests, and improve its prospects for future contracts with the manufacturer of the aircraft.** *Id*. at 519–20. The other purpose was defense of the lawsuits filed. *Id*. at 519. Complicating matters, the airline assigned their attorneys overall responsibility for everything concerning the accident, so that nearly every communication regarding the investigation was sent through an attorney or sent with a copy to an attorney. *Id*. at 520.
>
> Given the dual purposes of the investigation, the court considered whether all internal investigation and analysis following an event becomes work product once a lawsuit has been filed. *Id*. at 524. . . . [T]he court concluded that it did not, and ordered documents produced that would have been prepared in the same way even if no suit was ever filed or expected. *Id*. at 525.

*Caremark, Inc. v. Affiliated Computer Servs., Inc.*, 195 F.R.D. 610, 615 (N.D. Ill. 2000) (summarizing *Air Crash*).

In this case, Wexford has identified a plainly legal purpose for many of its internal communications about *Lippert*: defending itself and the IDOC in that litigation. But Wexford

has also indicated that some of these communications and documents served an independent, non-legal purpose: "t[aking] seriously" the criticisms by the *Lippert* experts and assessing them to ensure that the company was providing adequate care, even if Wexford ultimately "disagreed with many of [the *Lippert* report] findings." *Cf. Dean*, 18 F.4th at 227–28. *See also* December 8 Discovery Status Report (Ex. 1) at 6 (quoting Wexford's claim to have "assessed" the criticisms in the *Lippert* reports). This secondary purpose, notably, will provide Wexford with a powerful defense at trial to the claim that it was indifferent to the criticisms in the *Lippert* reports.

Wexford also focuses on the fact that its assessment of the information in the *Lippert* reports occurred while the *Lippert* litigation was active. *Id.* at 17-19. That argument is a red herring. The relevant question is not whether or not a document was prepared as part of active or merely anticipated litigation. The first lawsuit in *In re Air Crash* was filed the day after the accident, *see Air Crash*, 133 F.R.D. 515, and that fact did not affect the court's analysis of the dual-purpose test in the least. That is so because the *relevant* question is not whether litigation is merely anticipated or has already begun, but rather whether the document or communication in question had an additional, non-legal purpose independent of the legally protected purpose.

In short, Wexford's assertions of privilege over even "dual purpose" documents and communications will likely require a nuanced assessment by the Court. *See, e.g.*, *Air Crash*, 133 F.R.D. at 520-27 (describing detailed methodology for assessing attorney-client and work-product claims); *Pyour BV v. Ingredion Inc.*, No. 15-cv-8690, 2017 WL 11569211, at *4 (N.D. Ill. Oct. 23, 2017) (drawing distinctions between strictly legal and dual-purpose documents in a company's attorney-led investigation of a *salmonella* outbreak). That nuanced assessment is not possible right now, however, given Wexford's blanket assertion that every internation

communication about *Lippert*—meeting, email, or otherwise—must be privileged, even if it admittedly had a dual purpose.

***The interrogatories seek relevant information***.  As to Wexford's relevance objections, Plaintiff respectfully submits that this discovery is entirely germane to Plaintiff's claims in this case.  With information from the interrogatory responses in hand, Plaintiff intends to depose one or more participants in the meetings to understand Wexford executives' response to the information in the *Lippert* reports. This should help Plaintiff gather evidence about whether Wexford merely treated the *Lippert* reports as a battle to be won in litigation, or whether it took the reports' identification of numerous deficiencies seriously and investigated them to ensure that it was delivering adequate medical care going forward.

Wexford's responses to the interrogatories are highly likely to result in the discovery of evidence relevant to Plaintiff's *Monell* claims.

## Conclusion

For the reasons set forth above, Plaintiff respectfully requests this Court to grant her motion to compel.

Dated: March 1, 2024                               Respectfully submitted,

                                                   /s/ *Stephen H. Weil*
                                                   Stephen H. Weil
                                                   Counsel for Plaintiff

Jon Loevy
Stephen Weil
Maria Makar
LOEVY & LOEVY
311 North Aberdeen St., 3rd Fl.
Chicago, IL 60607
(312) 243-5900
weil@loevy.com

12