# Exhibit 1

### IN THE UNITED STATES DISTRICT COURT FOR THE
### SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| Keyana Wiley, | |
| Plaintiff, | |
| v. | Case No. 3:21-cv-00599-JPG |
| Wexford Health Sources, Inc., *et al.*, | |
| Defendants. | |

## PARTIES' JOINT WRITTEN DISCOVERY REPORT

COME NOW Plaintiff KEYNA WILEY, through her attorneys; and Defendants WEXFORD HEALTH SOURCES, INC., CYNTHIA ROSS, R.J. DUPREY, COURTNEY WALKER, JUSTIN YOUNG, and ANGELICA WACHTOR, by and through their attorneys, CASSIDAY SCHADE LLP; and respectfully submit this Joint Written Discovery Report.

### I.    The Parties' Discovery Conferences.

The parties met and conferred on the following dates via telephone: October 5, 2023 for over an hour; October 26, 2023 for approximately an hour and a half; November 14, 2023 for half an hour; and December 4, 2023 for approximately an hour.  The parties have also exchanged numerous email communication in between their calls.

### II.    Proposed Schedule.

The Court has instructed the parties to propose a schedule for the remainder of discovery in this case.  *See* ECF 152.  Subsequent orders have contemplated that the proposed schedule would be included in this joint status report.  Plaintiff seeks to review a set of production from the IDOC before proposing a schedule for the remainder of the case.  The production was scheduled to be completed on November 22, 2023, but remains incomplete with substantial production occurring on December 7, 2023.  In light of this delay, Plaintiff seeks an extra week, to December 15, 2023,

1

to review the production and propose a schedule. Defendants do not oppose this request. A separate motion will be filed seeking this relief.

### III.    The Discovery Areas/Issues Discussed by the Parties at the Discovery Conferences.

Pursuant to the Court's September 27, 2023 Order (*Wiley* ECF 148), the parties have met and conferred, and corresponded, regarding the matters raised in Plaintiff's September 26, 2023 motion to compel. (*Wiley* ECF 146). Plaintiff's motion to compel raised three discrete issues, as set forth in Plaintiff's motion: ***first***, "Wexford's selective responsiveness review," *see Wiley* ECF 146 at 6-7, ***second***, "Wexford's refusal to search for meeting notes," ECF 146 at 7-8, and ***third***, "Wexford's refusal to produce *Lippert* meeting invitations," *Wiley* ECF 146 at 8-9.[1]

### IV.    Discovery Areas/Issues Resolved During the Discovery Conferences.

**1.    The parties have resolved the "*first*" dispute ("Wexford's selective responsiveness review," *see* ECF 146 at 6-7).**

This dispute focused on whether Wexford's review of the universe of approximately 2,000 documents gathered pursuant to an ESI protocol. As Plaintiff's motion explains, it has been Plaintiff's understanding that Wexford's counsel confined her responsiveness review to documents reflecting Wexford's efforts to fix problems identified in the *Lippert* reports, instead of Wexford's discussions of criticisms contained in the *Lippert* reports. *Wiley* ECF 146 at 4-5.

**Resolution**: Wexford's counsel has represented to Plaintiff's counsel, in Wexford's filings in response to the parallel motion to compel in *Reed*, that Wexford has "has considered responsive any substantive communication concerning cancer care practices or deficiencies and will either

---

[1]  Plaintiff's counsel filed an essentially identical motion in *Reed v. Wexford Health Sources, Inc.*, Case No. 3:20-cv-01139-SPM (S.D. Ill.). *See Reed* ECF 139. Wexford filed a response in opposition, *Reed* ECF 143, and the Court issued a ruling granting in part and denying in part the motion to compel. *See Reed* ECF 147.

produce them or identify them in the forthcoming updated privilege log." *Reed* ECF 143 at 13-14. Based on this representation, Plaintiff considers this dispute to be resolved.

> **2. The parties have resolved the "*second*" dispute ("Wexford's refusal to search for meeting notes," ECF 146 at 7-8).**
>
> **3.**

This dispute concerned Plaintiff's request that Wexford search for notes taken at meetings concerning Lippert.

**Resolution**: In *Reed*, Judge McGlynn granted this portion of Plaintiff's motion in part. *See Reed* ECF 147 at 9-10. Plaintiff considers this portion of the motion to be resolved.

## V.    The Discovery Areas/Issues that Remain in Dispute.

Despite attempting to resolve their disputes during the discovery conferences, the parties were unable to resolve the following discovery areas/issues:

> **1. The parties have been unable to resolve the *third* dispute in Plaintiff's motion to compel ("Wexford's refusal to produce Lippert meeting invitations," *Wiley* ECF 146 at 8-9).**

Documents submitted for consideration:  **Ex. 1**: Plaintiff's motion to compel, Wiley ECF 146 at 8-9. **Ex. 2**: Plaintiff's September 27, 2023 interrogatories to Wexford. **Ex. 3**: Wexford's October 19, 2023 responses. **Ex. 4**: Wexford's November 13, 2023 supplemental interrogatory responses. **Ex. 5**: Plaintiff counsel's October 26, 2023 email to Wexford counsel. **Ex. 6**: the parties' July 31, 2023 Joint Status Report to the Court.

**Plaintiff's position**: During the parties' September 14, 2023 telephone conference, Wexford's counsel told Plaintiff that Wexford's executives did not communicate in writing about the *Lippert* reports, but instead had communicated about *Lippert* by holding meetings. *See Wiley* ECF 146 at 8-9. Plaintiff's motion to compel, which was filed on September 26, included a request

for production of electronic invitations to those meetings.  *Wiley* ECF 146 at 8-9.[2]  On September

27, however, Plaintiff supplemented her discovery regarding the meetings by serving four

interrogatories.  *See* **Ex. 1**.  The interrogatories are phrased similarly.  Here is an example:

> 15.    Did any Wexford employees or agents hold meetings to review, investigate, analyze, uncover, prevent, or determine the prevalence of deficiencies described in the 2014 *Lippert* report relating in whole or in part to the untimely diagnoses of cancer and other life-threatening conditions for IDOC inmates?  If your answer is anything other than an unqualified No, please:
>
> a)  state the date, time, place, and duration of each such meeting;
>
> b)  state the identities of each person who attended each such meeting, including the person's name and job title;
>
> c)  for each meeting identified in response to this interrogatory, state whether the meeting had a legal purpose;
>
> d)  for each meeting identified in response to this interrogatory, state whether the meeting had a business purpose;
>
> e)  identify every Document or Communication (including copies and drafts of same) prepared for or in anticipation of each such meeting, provided for or distributed to attendees of each such meeting, created by any attendees at each such meeting (including notes), describing or discussing any part or component of each such meeting;
>
> f)  for each Document or Communication identified in response to this interrogatory, state whether said Document or Communication had a legal purpose; and
>
> g)  for each Document or Communication identified in response to this interrogatory, state whether said Document or Communication had a business purpose.

Among other things, the interrogatories focus on whether any responsive meetings had a "legal

purpose"—essentially, covered by the attorney client privilege or work-product doctrine, *see* **Ex.

1** (Definitions and Instructions), or whether it had a "business purpose," such as "assuring and

improving the quality of services provided, protecting future patients and/or customers from

---

[2]  Judge McGlynn denied this portion of Plaintiff's motion to compel in Reed, on grounds that the *Reed* Plaintiffs' underlying Rule 34 requests did encompass such invitations, *see* Reed ECF 147 at 9.  Plaintiff does not seek to revisit that ruling with respect to her Rule 34 requests.

inadequate care," as well as "protecting against adverse publicity," and "improving prospects for future contracts to provide services offered by the company," *see* **Ex. 1** (Definitions and Instructions).

Wexford submitted a response on October 19, *see* **Ex. 2**.  Among other things, Wexford objected that had numerous employees who had held numerous meetings, such that identifying all responsive meetings would be unduly burdensome.  Nevertheless, Wexford was able to respond that every meeting had a "legal purpose"—yet also objected that the interrogatories were unduly burdensome because they "demand[] an assessment of each document and communication for its purpose (and improperly assumes that a meeting can only have one purpose)."  **Ex. 2**.

Wexford's October 19 response did not state whether any of the meetings also had a business purpose.  Plaintiff's initiated a Rule 37 conference, at which he explained to Wexford's counsel that under existing precedent a meeting (or communication, etc.) could have both a "legal purpose" and a "business purpose," which would render it a "dual purpose" meeting.  *See* **Ex. 3**.  Plaintiff also offered to address Wexford's overbreadth objection by confining the interrogatories to meetings in which senior executives participated, *see* **Ex. 3**.  Two weeks later, Wexford provided a supplemental response in which it asserted that all responsive meetings had only a "legal purpose," and that no meeting by senior Wexford executives regarding *Lippert* had a "business purpose" or even a "dual purpose."  **Ex. 4**.  Wexford still refused to identify any responsive meetings, or other information or documents relating to responsive meetings that are sought in the interrogatories.  The parties have attempted to compromise on this matter, but ultimately they have not been able to come to agreement.

Plaintiff seeks identification of meetings that senior Wexford executives attended where the *Lippert* reports' criticisms of Wexford's delay in diagnosis and treatment of serious medical

conditions (including cancer) was discussed.  These meetings are of central importance to Plaintiff's contention that Wexford executives were indifferent to these problems, even after they received notice of them from two court-appointed experts in the *Lippert* case.

Wexford's defense to this charge seeks to have it both ways.  As Plaintiff explained in the parties' July 31, 2023 Joint Status Report to the Court, Wexford asserts that its executives *did* "assess[]" the problems identified in the *Lippert* reports, and thus they cannot be charged with indifference to them—but those "assessments" were done "in defense of litigation," and so any Wexford executive's "assessment[]" of the problems identified in the *Lippert* reports—which Wexford has since indicated occurred in meetings—is privileged, and need not be disclosed.  *See* **Ex. 6** at 16.  Wexford, in essence, appears prepared to assert at trial that it was not indifferent to the risks identified in the *Lippert* reports, while at the same time preventing Plaintiff from investigating the factual basis for that defense.

Whether Wexford can truly have it both ways in this case and others will likely be contested in this case going forward. For the moment, Plaintiff simply seeks to gather evidence to understand what she can about the contours of these meetings, and test Wexford's assertion—made by its lawyers on a few days' time—that every single meeting among executives had only a "legal purpose," and not a "business purpose."  Notably, a company's claim of a "legal purpose" in these circumstances does not end the matter.  Consider the district court's analysis in

*In re Air Crash Disaster at Sioux City, Iowa on July 19, 1989*, 133 F.R.D. 515 (N.D. Ill. 1990), which ultimately rejected an airline's claim that virtually all documents generated after an airplane crash were protected attorney work-product or attorney-client communications:

> In *Air Crash*, the airline company immediately implemented its own investigation of the airplane crash and the first lawsuit surrounding the incident was filed the next day. *See Air Crash*, 133 F.R.D. 515. The airline's purpose in the crash investigation was two-fold: one was to find the cause of the accident, improve aircraft products,

protect future pilots and passengers, protect against adverse publicity, promote its own economic interests, and improve its prospects for future contracts with the manufacturer of the aircraft. *Id*. at 519–20. The other purpose was defense of the lawsuits filed. *Id*. at 519. Complicating matters, the airline assigned their attorneys overall responsibility for everything concerning the accident, so that nearly every communication regarding the investigation was sent through an attorney or sent with a copy to an attorney. *Id*. at 520.

Given the dual purposes of the investigation, the court considered whether all internal investigation and analysis following an event becomes work product once a lawsuit has been filed. *Id*. at 524. Using the test as set forth in *Loctite* and Professor Moore's definition, the court concluded that it did not, and ordered documents produced that would have been prepared in the same way even if no suit was ever filed or expected. *Id*. at 525.

*Caremark, Inc. v. Affiliated Computer Servs., Inc.*, 195 F.R.D. 610, 615 (N.D. Ill. 2000)

(summarizing *Air Crash*).

The airline's actions in *Air Crash* are closely analogous to Wexford's reaction to the *Lippert* reports and their identification of numerous risks to Wexford's patients arising from its practices in the delivery of medical care, and its assertions of privilege will likely require a similarly nuanced assessment by the Court. *Cf. Air Crash*, 133 F.R.D. at 520-27 (describing detailed methodology for assessing attorney-client and work-product claims). For the moment, Plaintiff's interrogatories seek to gather information to test the basis for Wexford's privilege claims as best she can—by putting them in context and interviewing their participants. It is for this reason that Plaintiff has served the September 27 interrogatories at issue in this dispute. Plaintiff respectfully submits that this discovery is entirely germane to Plaintiff's claims in this case. With information from the interrogatory responses in hand, Plaintiff intends to depose one or more participants in the meetings to understand Wexford executives' response to the information in the *Lippert* reports. Wexford's responses to the interrogatories are highly likely to result in the discovery of evidence relevant to Plaintiff's *Monell* claims.

Aside from their central relevance to Plaintiff's *Monell* claims, Wexford gives little reason
to believe that identifying responsive meetings and other information is likely to be particularly
burdensome. Plaintiff has limited the meetings to senior Wexford executives, and has confined
the topics of the meetings to those germane to the *Monell* claims in this case. Doing so should
dramatically reduce the number of responsive meetings. Furthermore, to the extent written
agendas, notes, or written materials were prepared for the meetings, those materials—even if
privileged—can be used to identify meetings that are responsive. Plaintiff has raised this means
of searching for meetings with Wexford, but the company has expressed no interest in identifying
responsive meetings in this way. It should, and should take other common-sense steps like simply
interviewing senior executives or have them look through their calendars. In an age of ubiquitous
email communication it is simply implausible that the burden of identifying responsive meetings
is insurmountable.

**Wexford's position**:

## I.    Efforts Taken by Defendant to Resolve this Issue

The remaining issue in dispute is Plaintiff's request for answers to her interrogatories
concerning dates and attendees for meetings "to review, investigate, analyze, uncover, prevent, or
determine the prevalence of deficiencies described in the 2014 [and 2018] Lippert report relating
in whole or in part to the untimely diagnoses of cancer and other life-threatening conditions for
IDOC inmates." Plaintiff is not seeking to compel document production at this time as Judge
McGlynn in *Reed*, discussed *supra*, denied plaintiffs' Motion to Compel on this issue as plaintiffs'
requests (nearly identical to the ones in this case) did not seek meeting invitations.

Here, Defendant engaged in many communications to try to resolve this issue without
Court intervention. For example, the parties spent numerous months developing an ESI protocol

to identify documents Plaintiff sought in this case.  Defendant objected to the ESI protocol and the Court, in ruling on Plaintiff's first Motion to Compel, did not order an ESI protocol. (Doc. 107). Nonetheless, Plaintiff persisted, and Defendant complied to avoid further Court intervention, including three search terms specifically targeting *Lippert* communication.[3]

After spending months preparing the ESI protocol, Defendant reviewed 3,817 emails, not including attachment.  The review constituted 2GB of information and production was made on July 13, 2023.  In resolution of other discovery disputes, Defendant reviewed this universe of communications a second time in November 2023 (without identifying any additional responsive documents).   In the recent discovery dispute conferences related to meeting invitations/dates/attendees, Plaintiff asked Defendant to review the ESI a third time to locate any *Lippert* meeting invitations concerning the scope of Plaintiff's (September 27, 2023) interrogatories and, if there were any, to supplement the interrogatory answers with the dates, attendees, and subject of the meeting in the invitation.  Defendant was originally hesitant to perform the same review a third time, not just because of the duplicative efforts and costs, but also

---

[3] Plaintiff's proffer that Defendant did not inform him until September 2023 that email review was an ineffective tool to discover the information he seeks is demonstrably untrue.  Nearly a year ago, Defendant's briefed this exact issue, including "Given the nature of *Lippert* being a decade's long class-action, the documents and communication, including their response to the monitors' reports are privileged, as outlined in Defendant's objections to Plaintiff's Request for Production, incorporate by reference as if fully state herein.  Plaintiff's response is that Defendant can create a privilege log, yet this misses the issue entirely.  Review for attorney-client privilege is not a search function that can be conducted without detailed review of each hit. Such review alone, not including logging thousands of emails and documents, is disproportionate to the needs of this case, a grossly ineffective means to identify information, and can only serve to increase the cost of litigation and delay this case.  Thus, discovery into *Lippert,* will be exponentially more time and cost intensive to the extent that it is not reasonably accessible and would likely result in a delay in this case of more than a year for Defendant to prepare a privilege log and very likely nothing else.  FRCP 26(b)(2)(B)."  (Doc. 90).  In fact, the repeated pattern in this case and *Reed* is Defendants express that Plaintiffs' demand is unreasonable or unlikely to advance the matter, and then when Defendants comply, they are chastised that the results did not advance the matter.  This pattern disincentivizes continued cooperation in discovery.

because it seemed that each time Defendant agrees to take action to resolve a discovery dispute, the results are unsatisfactory and Plaintiff raises new disputes, not previously requested.  However, significant time has been undertaken concerning Plaintiff's *Lippert* requests and, in an effort to move forward, on December 6, 2023, Defendant sent the following to Plaintiff:

> For the Lippert meetings invitations issue, I want to confirm your offer to resolve this issue. If we conduct a third review of the Lippert ESI protocol results for meeting invitations responsive to interrogatories #15-18 in Wiley and #16-19 in Reed, and supplement these interrogatories with the date, subject, and invitees for each meeting, will this resolve written discovery on meeting invitations/meeting dates.  In other words, there will be no further written request or demand by Plaintiff to review/conduct Lippert ESI again or conduct further investigation/production as to the dates, subject, invitees, etc. related to Lippert meetings.
> If so, we may be able to come to an agreement to avoid additional briefing on the issue and move forward in discovery but I need to be clear on the agreement to confirm with my client.

Despite Plaintiff's original optimism that this proposal "would go a long way to resolving this," last night Plaintiff declined continued discussed of this proposal and seeks Defendant conduct further investigation into when *Lippert* meeting occurred and who was in attendance/invited.  This begs the question if the *Lippert* ESI that Plaintiff requested is not sufficient to resolve this issue, why did Plaintiff insist on a *Lippert* ESI protocol (with terms Plaintiff selected).

As addressed below, Plaintiff's request is overbroad, disproportionate to the needs of this case, and unduly burdensome to the point that it is likely impossible.  Further, in the face of undue burden, Plaintiff's request is not likely to reveal substantive information as meetings for the purpose of defending active litigation and at the direction of counsel are privileged.  Given these are privileged meetings, the date and attendees are probative of nothing.  Nonetheless, should the Court compel further answer to the (already lengthy) answers already provided by Wexford, the most efficient, least burdensome way to obtain this information is laid out in Defendant's

December 6th correspondence, which would still require duplicative work of Defendant (because Plaintiff did not timely request Defendant to look for meeting invitations during the original ESI review). If the Court orders a third review of the *Lippert* ESI protocol results for meeting invitations to assist in answering the interrogatories, Defendant respectfully request the Court order no further review of the *Lippert* ESI results for the above reasons.

## II. Dates and Attendees of *Lippert* Meetings is Not Readily Accessible and Defendant has Conducted a Reasonable Investigation

The threshold issue here is Plaintiff's request is overly broad, unduly burdensome, and disproportionate to the needs of this case. Defendant objected as such (reserving the privilege objections for below):

> In addition to the privilege objections, Plaintiff's request is fundamentally overbroad, and unduly burdensome as it is not limited in time, thus it is not proportional to the needs of this case. FRCP 26; *Little v. JB Pritzker for Governor*, 2020 WL 1939358, *6 (N.D. Ill. 2020)(citing *Earthy LLC v. BB&HC, LLC*, 2017 WL 4512761, *3 (N.D. Ill. 2017), also citing *Builders Ass'n of Greater Chicago v. City of Chicago*, 2002 WL 1008455, *5 (N.D. Ill. 2002)). Plaintiff also seeks all documents which cannot be said to be proportional to the needs of the case. See, e.g., *M. McGee Design Studio v. Brinson*, 1994 U.S. Dist. LEXIS 9789, *28, 1994 WL 380613 (N.D. Ill. July 18, 1994). Of note, although Plaintiff appears to set a scope concerning untimely diagnosis and other life-threatening conditions, it also seeks any meetings that addressed these issues even in part. In effect, there truly is no scope at all.
>
> Furthermore, Defendant does not maintain such meeting logs and Plaintiff's request demands an expansive investigation into all meetings over a decade, including each date, each attendee, and all documents created or provided therein. This information is not readily available and such efforts are unduly burdensome and disproportionate to the needs of this case. It further demands an assessment of each document and communication for its purpose (and improperly assumes that a meeting can only have one purpose).
>
> Defendant also objects that this request is not crafted to seek information that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit. FRCP 26(b)(1). It is also compound, several times over, in an apparent attempt to avoid the limitations of FRCP 33.
>
> The Court's Order (Doc. 107) outlines the scope of discovery set by the Court concerning these topics. To the extent Plaintiff seeks to expand upon that Order, her Motion to Compel was denied.

11

Plaintiff's position gives the impression that Defendant performed no investigation and lodge these objections with no basis.  This is patently untrue.  A simple reading of the interrogatory answers shows that a reasonable investigation was performed into whether information concerning these meetings was readily accessible to assist in identifying when they occurred over the past decade.  Additionally, in review of the ESI results the first time, Defendant either produced or logged correspondence and documentation concerning changes/deficiencies in cancer care, including meeting agendas.  The privilege log also contains certain dates of meetings and certain individuals included on email correspondence.  Furthermore, Wexford attested, subject to objections,

> Defendant has conducted numerous internal meetings and meetings with IDOC over the past decade to address the 2014 Lippert report.  Inasmuch as cancer and life-threatening conditions are addressed in the Lippert report, these  meetings may have related in part to diagnoses of cancer and other life-threatening conditions for IDOC inmates.  Defendant does not maintain lists of such meetings and, therefore, cannot confirm which of the numerous meetings particularly discussed the untimely diagnoses of cancer and other life-threatening conditions.  However, such meetings were conducted for the purpose of defending litigation, in anticipation of litigation, and with/at the direction of counsel.  Additionally, any meetings that were conducted with the IDOC relating to reviewing, investigating, analyzing, uncovering, preventing, or determining the prevalence of deficiencies described in the 2014 Lippert report were done pursuant to the joint defense – common interest- agreement with the IDOC; thus, any subjects discussed or documents discussed/prepared at (or as the result of) the meetings are privileged.
>
> During an ESI search, Defendant located two agendas that do not contain privileged information and Defendant is producing them subject to the protective order in this matter (Wiley/Reed Case No. 3:21-cv-00599-DWD and 3:20-cv-01139-SPM 0059-0060).  See also Defendant's prior production bates labeled Wiley/Reed Case No. 3:21-cv-00599-DWD and 3:20-cv-01139-SPM 0007-0021.  Defendant expressly does not waive the privileges addressed above to the content of the discussions at said meetings or any documents reviewed or prepared as a result.  In addition, Wexford assisted the IDOC in drafting a response to the 2014 Expert Report. That Report, which was authored by IDOC Chief Counsel, William Barnes, on November 3, 2014, is protected from disclosure under the order appointing the expert and cannot be released absent permission from the Lippert court. Doc. 244, par. 6b.

This detailed answer outlines 1) the number of meetings over a decade is voluminous, 2) there is no way of knowing which meetings addressed cancer care or life-threatening conditions "in part," 3) the meetings were not logged so there is no singular document or set of documents that can answer further, and 4) when agendas were uncovered in the ESI review that fell within the scope of Plaintiff's request, they were produced. These answers were not only attested to by Wexford, but they were also reviewed and approved by Wexford's counsel in *Lippert*.

Defendant is confused by Plaintiff's request for Defendant to inquire with individuals, as Plaintiff was informed that **Defendant has inquired with numerous Wexford employees** (at least six) concerning this issue and Plaintiff's request for meeting notes from these meetings in forming their answer. Undersigned counsel has also proffered several times that, while a deponent may be able to testify generally how often reoccurring meetings occurred and who was typically present, it is beyond the expectation of human memory, and based on the investigation here, that any individual will have a memory of the dates, subject matter and content, and attendees for each meeting over a decade.

While Plaintiff professes to only seek meetings about cancer care and life-threatening conditions if discussed "in part," Defendant has no way of knowing whether any meeting discussed (or did not discuss) these issues "in part" and Plaintiff is essentially demanding Defendant investigate and answer for every meeting concerning *Lippert* over a decade. Yet, it is "fundamental" that discovery requests which "encompass an unlimited range of information" are overly broad. *Little v. JB Pritzker for Governor*, 2020 WL 1939358, *6 (N.D. Ill. 2020)(citing *Earthy LLC v. BB&HC, LLC*, 2017 WL 4512761, *3 (N.D. Ill. 2017), also citing *Builders Ass'n of Greater Chicago v. City of Chicago*, 2002 WL 1008455, *5 (N.D. Ill. 2002)).

Plaintiff's request is patently overbroad, unduly burdensome, and disproportionate to the needs of the case.  Nonetheless, Defendant has conducted a reasonable investigation, including communication with pertinent counsel and employees.  What remains is truly a demand for a very expensive fishing expedition with no good faith that such efforts will advance the case.  The Court's previous explanation regarding Plaintiff's Requests for Production also holds true here, "Plaintiff's requests were so overly broad that even to the extent *some* relevant information was responsive to the requests, it would be impossible for Wexford to respond in any meaningful fashion." (Doc. 127, p. 2, emphasis in original).  Accordingly, the Court should find Defendant's Interrogatory Answers to be sufficient and deny Plaintiff's requested relief.

### III.    *Lippert* Meeting are Privileged

Plaintiff is not seeking to compel responses to her requests for production.  Since Plaintiff is not seeking to compel such responses or documents logged on Defendant's privilege log, the issue of privilege here should be another factor weighing on the assessment whether locating and answering for every *Lippert* meeting for a decade is proportionate to the needs of this case and advances it in any way.  Undersigned counsel has explained that the content of the *Lippert* meetings is privileged and, if asked, Wexford and its employees would be advised accordingly.

This is not the first time this issue has been before the Court.  In discussing *Monell* discovery and *Lippert* documents, the Court previously held:

> As previously noted, the Court expects that Wexford has many, many documents from its outside attorneys that refer to the Lippert reports because those reports were made during litigation and have been the subject of multiple discovery disputes in subsequent cases. Any documents or communications written or produced by Wexford's outside counsel on this specific issue for Wexford employees' eyes only would clearly fall under the attorney client privilege and the Court sees little use in defense counsel adding countless entries to a privilege log for every document written or produced by Wexford's counsel for Wexford that mentions this specific issue. **Thus, communications between outside counsel (meaning, attorneys that work at law firms retained by Wexford) and Wexford that "memorialize or discuss Wexford's efforts (if any) prior to July 1, 2019 to address the**

> **deficiencies in the Lippert reports regarding the untimely diagnoses of cancer and other life-threatening conditions for IDOC inmates" need not be produced or included on the privilege log.** The Court acknowledges that Wexford may have other potentially privileged documents responsive to this Order, and those documents will need to be listed on a privilege log unless the parties agree otherwise.

(Doc. 107, p. 4-6, citations omitted, emphasis in original).

However, Plaintiff's position in this report could be read to be seeking the Court commit to an advisory opinion about whether the content of the *Lippert* meetings or discussions are privileged.  This is not properly brought before the Court at this time, but in an abundance of cautious, and in order to expand on the assessment of burden, breadth, and proportionality since the content of the meetings are privileged, Defendant outlines these privileges here and, should the Court have any question about the applicability of said privileges, given the importance of the privileges,[4] Defendant would seek a hearing on the matter before any privilege is overruled or deemed waived.

### A. Work Product Privilege

In federal court, privileges are governed by federal common law, except that privileges are determined by state law for an element of a claim or defense as to which state law provides the rule of decision.  *See* Fed. R. Evid. 501; *Babych v. Psychiatric Solutions, Inc.*, 271 F.R.D. 603, 608, 2010 U.S. Dist. LEXIS 132577, *9-10.  In cases such as this one, where both federal and state claims are asserted, at least where the federal claims are primary, federal law applies to work product and attorney-client privileges.  *See Memorial Hospital for McHenry County v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981).  Where the federal jurisdiction is based on federal question,

---

[4] Further, despite numerous extensions of time, Defense counsel first received a draft joint report from Plaintiff's counsel this morning (which was sent on December 7, 2023 at 11:29pm) and did not know definitively, prior to this morning, which compromises Plaintiff accepted and which issues remained.

federal law governs the application of privileges. *See Babych v. Psychiatric Solutions, Inc.*, 271 F.R.D. 603, 608-610, 2010 U.S. Dist. LEXIS 132577, *14.

The work product doctrine, announced in *Hickman v. Taylor*, 329 U.S. 495, 67 S. Ct. 385, 91 L. Ed. 451 (1947), protects from discovery otherwise discoverable documents and things, including an attorney's thoughts and mental impressions, made in anticipation of litigation. The work product doctrine has been codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure. Per Rule 26(b)(3)(A), the privilege applies to "documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative." Such documents are not discoverable unless, per Rule 26(b)(3)(A), they are otherwise discoverable and a party shows that it has "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." And even if such a need is shown, if the court is to order production of such materials, "it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B).

The work product doctrine has been recognized as a qualified privilege, which is distinct from and broader than the attorney-client privilege. *U. S. v. Nobles*, 422 U.S. 225, 238, fn. 11, 95 S. Ct. 2160, 2170, 45 L. Ed. 2d 141 (1975); *Caremark, Inc. v. Affiliated Computer Servs., Inc.*, 195 F.R.D. 610, 613, 2000 U.S. Dist. LEXIS 11579, *6-7 (N.D.Il. Aug. 10, 2000). In *Nobles*, the Court extended the work product doctrine to protect material prepared by investigators for the lawyer. *Id.*, 422 U.S. at 238, 95 S. Ct. 2170; *Caremark, Inc. v. Affiliated Computer Servs., Inc.*, 195 F.R.D. 610, 613, 2000 U.S. Dist. LEXIS 11579, *6-7. The U.S. Supreme Court in *Upjohn Company v. U. S.*, 449 U.S. 383, 400, 101 S. Ct. 677, 688, 66 L. Ed. 2d 584 (1981) reaffirmed the strong public policy underlying the work product doctrine, stating that "forcing an attorney to

disclose notes and memos of witness oral statements is particularly disfavored because it tends to reveal the attorney's mental processes." *Id.*, 449 U.S. at 399, 101 S. Ct. at 687; *Caremark, Inc. v. Affiliated Computer Servs., Inc.*, 195 F.R.D. 610, 613, 2000 U.S. Dist. LEXIS 11579, *6-7 (N.D.Il. Aug. 10, 2000).

In order to invoke the protection of the work product privilege, a party must show that the materials sought to be protected were prepared "in anticipation of litigation. . . ." Fed. R. Civ. P. 26(b)(3). *Binks Mfg. Co. v. National Presto Industries, Inc.*, 709 F.2d 1109, 1118, 1983 U.S. App. LEXIS 27488, *28-29 (7th Cir. 1983). "Thus, the threshold determination in any case involving an assertion of the work product privilege… is whether the materials sought to be protected from disclosure were in fact prepared in anticipation of litigation." *Binks Mfg. Co. v. National Presto Industries, Inc.*, 709 F.2d at 1118.

Documents that have a "dual purpose" of both an investigative nature and preparation for litigation can be work product privileged where the primary motivating purpose behind the creation of a document or investigative report is to aid in possible future litigation. *Binks Mfg. Co. v. National Presto Industries, Inc.*, 709 F.2d at 1119; *Webster Bank, N.A. v. Pierce & Assocs., P.C.*, 2018 U.S. Dist. LEXIS 18653, *13-14, 2018 WL 704693 (N.D.Il. Feb. 5, 2018). "Where a document is prepared because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection because it is also created in order to assist with a business decision." *NRDC, Inc. v. Ill. Power Res. Generating, LLC*, 2018 U.S. Dist. LEXIS 9854, *14, 2018 WL 497066 (C.D.Il. Jan. 22, 2018).

Here, as attested to by Wexford, the IDOC and Wexford both have an interest in succeeding in the underlying *Lippert* lawsuit, as well as complying with the court's orders, appointing experts, etc. As *Lippert* was a class-action lawsuit where Wexford was a party at certain times and

remained an interested party, Wexford had both counsel and a joint defense agreement with the

IDOC (defendant).  It is "well established that attorneys facing a common litigation opponent may

exchange privileged communications and attorney work product in order to prepare a common

defense without waiving either privilege." *Schachar v. Am. Acad. of Ophthalmology, Inc.*, 106

F.R.D. 187, 191–92 (N.D. Ill. 1985).  Applying that doctrine to "the full range of communications

otherwise protected by the attorney-client privilege" encourages parties "with a shared legal

interest to seek legal assistance in order to meet legal requirements and to plan their conduct

accordingly." *United States v. BDO Seidman, LLP*, 492 F.3d 806, 816 (7th Cir. 2007).  As a result,

those communications between Wexford and the IDOC are protected by a common interest

privilege.

Wexford has conducted numerous internal meetings and meetings with IDOC over the past

decade to address the 2014 *Lippert* report.  However, such meetings were conducted for the

purpose of defending litigation, in anticipation of litigation, and with/at the direction of counsel.

Thus, any subjects discussed, or documents discussed/prepared at (or as the result of) the meetings

are privileged.

After receiving Wexford's answer, Plaintiff's counsel asked for further testimony from

Wexford about the purpose of the meetings.  Despite Defendant's belief that the answer was clear,

Wexford supplemented the answer stating:

> Subject to and without waiving the above objections but in an attempt to alleviate discovery
> disputes with Plaintiff, Defendant submits the following additional answer, the meetings
> concerning the *Lippert* monitors' reports were conducted for the primary purpose of
> defending active litigation and securing legal advice.  The meetings were not conducted
> for a non-legal or business purpose.  The documents generated at or as a result of the
> meetings would not have been created in the normal course of business and came into
> existence because of the *Lippert* litigation.  In short, the *Lippert* meetings were not dual-
> purpose meetings or conducted for another purpose other than to assist and defend the

active litigation in which Wexford's interests were at issue and in furtherance of the Joint Defense Agreement.

Nonetheless, Plaintiff asserts, without any evidence, that the meetings could be for a dual purpose and incorrectly argues that a dual purpose investigation is not entitled to protection. "According to the Seventh Circuit, a dual purpose document, one prepared in anticipation of litigation and for another purpose as well, is work product only if the primary motivating purpose behind [its] creation is to aid in possible future litigation." *Smith-Brown v. Ulta Beauty, Inc*., No. 18 C 610, 2019 U.S. Dist. LEXIS 108021, 2019 WL 2644243, at *1 (N.D. Ill. June 27, 2019) (citing *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1119 (7th Cir. 1983)). Here, these meetings were not just conducted for the purpose of responding to anticipatory litigation but were conducted for the primary purpose of responding to ***active*** litigation.

Plaintiff cites *Caremark, Inc. v. Affiliated Computer Servs., Inc*., 195 F.R.D. 610, 615 (N.D. Ill. 2000) for the proposition that if there is a two-fold purpose of an investigation then it is not privileged work product. That is not the holding of the court. The court was looking at an investigation in anticipation of litigation, not responding directly to allegations made by court monitors in active litigation. As such, the questions the court looked at were: "More specifically, the questions presented in this case are as follows: Which documents between ACS employees, including those documents that were routed through or copied to an attorney, are documents that would have been prepared even if litigation was never filed or expected, and which are those prepared in anticipation of litigation? And at what stage of the renegotiation of the Caremark/ACS contract was there reasonable anticipation of litigation?" *Id.* Plaintiff's argument would be more properly made in seeking internal reviews of adverse events where the company anticipates litigation, but none has yet been brought. This is not the situation here as the meetings were directly in response to active litigation and Wexford has answered "[t]he documents generated at

or as a result of the meetings would not have been created in the normal course of business and came into existence because of the *Lippert* litigation."

Again, no documents are being sought at this time, but the caselaw undisputedly applies protection to meetings in defense of active litigation with or at the direction of counsel to defend the litigation.  To the extent Plaintiff seeks to know Wexford's response to the *Lippert* monitors' reports, she has already intervened in *Lippert* and can seek the formal IDOC response that Wexford assisted in.[5]

## B. Attorney-Client Privilege

The purpose of the attorney-client privilege "is to encourage full and frank communication between attorneys and their clients . . . [because] sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client."  *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S. Ct. 677, 682, 66 L. Ed. 2d 584 (1981).  "Open communication assists lawyers in rendering legal advice, not only to represent their clients in ongoing litigation, but also to prevent litigation by advising clients to conform their conduct to the law and by addressing legal concerns that may inhibit clients from engaging in otherwise lawful and socially beneficial activities." *United States v. BDO Seidman, LLP,* 492 F.3d 806, 815 (7th Cir. 2007) (*citing United States v. Frederick,* 182 F.3d 496, 500 (7th Cir. 1999)).

The attorney-client privilege protects communications made in confidence by a corporation's employees to the corporation's attorney, when acting as an attorney and not a

---

[5] Plaintiff's concerns about asking at trial what Wexford discussed related to defending the *Lippert* monitors' reports rests on the assumption that the *Lippert* reports are not only admissible but also admissible for the truth of the matter asserted, which would be error as the reports are hearsay. See *Dean v. Wexford Health Sources, Inc.,* Nos. 20-3058, 20-3139, 2021 U.S. App. LEXIS 33423, at *24-25 (7th Cir. Nov. 10, 2021).

business advisor, for the purpose of obtaining legal advice for the corporation. *Upjohn*, 449 U.S. at 394-99; *see also Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2009).  The privilege extends to factual investigations made by the attorney in order to provide legal advice to the client, and any factual statements made by the employee to the attorney pursuant to such an investigation are privileged.  *Sandra T.E.*, 600 F.3d at 619-20; *Babych v. Psychiatric Solutions, Inc.*, 271 F.R.D. 603, 608-610, 2010 U.S. Dist. LEXIS 132577, *14.  The privilege protects "not only the giving of professional advice to those who can act on it but also the giving of information to the lawyer to enable him to give sound and informed advice." *Upjohn*, 449 U.S. at 390; *Babych v. Psychiatric Solutions, Inc.*, 271 F.R.D. 603, 608-610, 2010 U.S. Dist. LEXIS 132577, *14.

Again, as addressed above, the *Lippert* meetings were either conducted with counsel or at the direction of counsel (as confirmed by counsel for Wexford in *Lippert* and attested to by Wexford) and these meeting discussions or documents are covered by the attorney-client privilege. Additionally, as Plaintiff's interrogatories uses the term "agent" for its requests for meetings, Plaintiff may be directly seeking work product or communication with counsel, either in *Lippert* or in other matters and/or expert reviews/reports that are privileged under FRCP 26(b)(4)(C).  To the extent Plaintiff seeks communication with Wexford's legal counsel or at the direction of legal counsel in furtherance of ongoing litigation, or from retained experts, they are privileged, the request is vague, overbroad, unduly burdensome, and disproportionate to the needs of this case and  Plaintiff's requested relief should be denied.

[SIGNATURES ON FOLLOWING PAGE]

Date: December 8, 2023                                      Respectfully submitted,


s/ Jaclyn Kinkade [by consent]                             s/*Stephen H. Weil*

Jaclyn Kinkade | Partner                                   Jon Loevy
Cassiday Schade LLP |                                      Stephen Weil
Phone: 314.655.4709 | Fax: 314.241.1320                    Maria Makar
100 N. Broadway, Suite 1580,                               LOEVY & LOEVY
St. Louis MO 63102 | www.cassiday.com                      311 North Aberdeen St., 3rd Floor
                                                           Chicago, Illinois 60607
*Attorneys for Defendants Wexford Health*                  (312) 243-5900
*Sources, Inc., Cynthia Ross, R.J. Duprey,*                weil@loevy.com
*Courtney Walker, Justin Young, And*                       *Attorneys for Plaintiff*
*Angelica Wachtor*