Homer Venters
September 25, 2024

EXHIBIT B

```
----------------------------------------X

REED ET. AL,

                        Plaintiff,


    - against -



WEXFORD HEALTH SOURCES, INC., ET AL.

                        Defendants.

----------------------------------------X
```

                        100 Garden City Plaza
     Garden City, New York

                        September 25, 2024
                        8:00 a.m.


     EXAMINATION BEFORE TRIAL OF HOMER VENTERS,

a Witness herein, taken Pursuant to

Order, and held at the above-mentioned time

and place, before Kimberly Dean, a

stenographer and Notary Public within and

For the State of New York.

```
 1                    Dr. Homer Venters

 2    files.  And again, unless they were reflected in

 3    some of the items that I've listed, I don't recall

 4    reviewing them.

 5        Q.    I'm talking about a separate batch, and

 6    I say 12,000 because that's how I remember it.  It

 7    takes a very long time to get there.  There is a

 8    separate document.  It was 12,000 pages long and

 9    it was just a string of different emails.

10           Do you recall reviewing that?

11        A.    I don't, again, unless there's an email

12    as part of one of these documents, I don't recall

13    a separate review of emails.

14        Q.    In this case, the medical records of 25

15    different prisoners were subpoenaed.

16           Were you aware of that?

17        A.    I didn't know how many were subpoenaed,

18    but I understood that there were subpoenaed or

19    they were provided to the plaintiffs.

20        Q.    Were you involved in selecting the 25

21    people who the records were subpoenaed from the

22    IDOC?

23        A.    No.

24        Q.    Did you know that there were additional

25    medical records of other incarcerated individuals
```

Homer Venters
September 25, 2024

```
 1              Dr. Homer Venters
 2  that were subpoenaed that you did not review?
 3       A.    Besides those 25 or?
 4       Q.    I will back up.
 5            You reviewed 16.  Is that right?
 6       A.    Yes.
 7       Q.    Were you aware there were more sets of
 8  medical records of other incarcerated people in
 9  addition to the 16 that you reviewed?
10       A.    Yes.
11       Q.    Why didn't you review the others?
12       A.    I was provided a list of names, and some
13  Bates for encounters that the patient had, and I
14  looked at the -- I looked for patients who had
15  more chronic care, or I looked for patients who
16  had types of encounters in the 14.
17            So, the first two patients, obviously, I
18  was retained to review their records,
19  Mr. McCullough and Mr. Reed.  So, that was two.
20  And then of the other pool of patients that was
21  25, I looked for patients that had lots of
22  encounters or encounter types listed, just simply
23  Bates number and encounter type that would be
24  relevant to chronic care, oncology care.
25            Things where the three cardinal problems
```

Homer Venters
September 25, 2024

```
 1                Dr. Homer Venters
 2   that I identified with Mr. Reed and
 3   Mr. McCullough, the failure to address abnormal
 4   labs, the delays specialty care and the failure to
 5   note or act on weight loss were, I thought those
 6   would be more likely to be represented.
 7       Q.    I will make sure I understand.
 8            It sounds like you were sent the medical
 9   records of all 25 different individuals.
10            Is that correct?
11       A.    It may be.  And I was not sent medical
12   records.  I was sent basically a list of medical
13   records of people.  And then I can see the types,
14   the Bates numbers for different medical records.
15            So those other patients it could be that I
16   had access to their medical record and I never
17   clicked on any links to see.  And I selected these
18   14 because they seemed like patients who had
19   either chronic care or oncology care encounters.
20            And so I wanted to look that seemed more
21   similar to the certifications of Mr. Reed and
22   Mr. McCullough.  And so those records, I clicked
23   on those patients.  I got those medical records
24   downloaded.  And I can not recall if I even
25   downloaded or accessed the other records.
```

Homer Venters
September 25, 2024

```
 1              Dr. Homer Venters

 2      Q.    Tell me about this document with Bates

 3 numbers with encounters.  I haven't been produced

 4 that.

 5          So, what is it that you are referring to?

 6      A.    I was given a list of patients, and the

 7 links to their records and types of encounter

 8 types.  And that was something that was used by

 9 the counsel to communicate with me about how to

10 access records.  And so I used that as a way to

11 access the records.

12      Q.    And that document is what you used to

13 determine which of the 25 individuals that you

14 were going to look at the entirety of the records

15 for your review in this case?

16      A.    Yes.

17      Q.    Did the document contain, when you say

18 that the documented had Bates numbers, was it like

19 in your report where it just give you the range of

20 what the Bates numbers are, or was it directing

21 you to certain pages in the records to review?

22      A.    I think it was a link to the whole

23 record.  So anytime that I clicked on a link, I

24 would open up the entire record.  And it would --

25 the reason that I selected some patients and not
```

Homer Venters
September 25, 2024

```
1              Dr. Homer Venters
2  others is because I would see just there was a tab
3  for each person and it would say chronic care or
4  chronic care or oncology care.
5         And so it was just a very brief glance at
6  these types of encounters people had helped me
7  identify the patients that I thought would be most
8  relevant to Mr. Reed and Mr. McCullough's care.
9     Q.   Did the document contain information
10 about what occurred at those appointments?
11    A.   It might have.  I don't recall.  And
12 sometimes it would say chronic care, and sometimes
13 it might say, it is actually kind of hard for me
14 to.  It was just an Excel sheet, and each field is
15 very small.
16         So it would only show the first few words.
17 So, there could be more there, but my use of this
18 was exclusively to look for encounter types.  And
19 when I saw that there were encounter types that
20 seemed relevant, I would click on the record and
21 then download and open up the entire record.
22    Q.   How did this document tell you which
23 encounter types seemed relevant?
24    A.   Well, I reviewed it, now, as I've said,
25 a few times.  I reviewed the care of
```

Homer Venters
September 25, 2024

```
 1              Dr. Homer Venters
 2  Mr. McCullough and Mr. Reed first.
 3        And so I found that there were these three
 4  concerning deficiencies in their care.  And so I
 5  know from my own experience that when we are
 6  talking about weight loss that is not picked up or
 7  abnormal labs or specialty care, then it's
 8  relatively straightforward for me to look at
 9  encounter types and see if somebody who has lots
10  of chronic care encounters or has specialty care
11  encounters, those types of encounters then, when I
12  see them, those are the patient I selected.
13        If somebody just had -- I don't know, an
14  emergency encounter or had some kind of care, a
15  mental health encounter or something that didn't
16  seem relevant or wasn't so obvious to me, I
17  wouldn't have selected them.
18     Q.    Did the document tell you what type of
19  condition the patient was being seen for
20  chronically?
21        MS. MAKAR:  I'm going to object to any
22     more questions about the document as
23     protected by the attorney-client privilege
24     and attorney work product.
25        And I would instruct you not to
```

Homer Venters
September 25, 2024

```
 1                  Dr. Homer Venters

 2       answer.  And I can talk to you more about it

 3       on the breaks, Jaclyn, more about what the

 4       document was that he is talking about and

 5       what it was.

 6            MS. KINKADE:  Let's call the Judge.

 7       Q.    Then I will ask, first off, are you

 8  taking her advice and refusing to answer the

 9  question?

10       A.    Certainly I'm taking her advice.

11       Q.    I do have to continue to ask questions

12  because I will be seeking the court to demand

13  answers to these questions, and so I can not give

14  up and waive them.  So, I will back up for a

15  second.

16       You understand that Chronic Clinic is a

17  type of appointment where an incarcerated person

18  is seen for a condition for multiple different

19  conditions; right?

20            THE WITNESS:  Is it okay to answer

21       these questions, Maria?

22            MS. MAKAR:  I didn't hear the

23       question.

24       Q.    Your understanding is, is that Chronic

25  Clinic is a type of appointment that could cover a
```

Homer Venters
September 25, 2024

```
 1                    Dr. Homer Venters

 2  variety of different conditions?

 3            MS. NEW:  Objection.  Leading.

 4            MS. KINKADE:  This is a deposition,

 5      Maria, leading is not a proper objection.

 6            MS. MAKAR:  Yes, it is.  It is a form

 7      objection.

 8      Q.    Go ahead.

 9      A.    I understand somebody could be seen for

10  one or multiple types of problems in a chronic

11  care encounter.

12      Q.    If a patient, you know, a patient has

13  been seen in Chronic Clinic, how would you know

14  what condition they were seen for?

15      A.    I wouldn't.  I would open up the records

16  to look.

17      Q.    When you were selecting, who of the 25

18  that you were going to examine for your report is

19  it true that you opened each prisoner's documents

20  to see what type of chronic clinic they were in,

21  and what condition they were seen for?

22            THE WITNESS:  Okay to answer that?

23            MS. MAKAR:  Yes.

24      A.    I'm just saying my process was, I looked

25  at a list of encounters.
```

Homer Venters
September 25, 2024

```
 1                   Dr. Homer Venters

 2            And patients that seem to have a lot of

 3     encounters that were relevant to what I found in

 4     the cases of Mr. Reed and Mr. McCullough, I opened

 5     up those records.  And it wouldn't have been

 6     exclusively because they had a chronic care.

 7            It could be they had a specialty

 8     encounter, but I looked at the list of encounters,

 9     and I didn't make a record or keep notes about why

10     I opened some cases and not others, but that was

11     my process.

12        Q.    Right, I understand that.

13            I'm trying to understand, how did you

14     determine that an encounter was relevant to

15     Mr. Reed and Mr. McCullough's care?

16        A.    By looking at the list of types of

17     encounters they had.  And then using my training

18     and expertise as A correctional health physician,

19     the cases that had a list of encounters that

20     seemed like they might be relevant are the ones

21     that I opened the records for.

22        Q.    Did the document tell you what condition

23     was being treated at these encounters?

24        A.    I think sometimes, yes, and sometimes,

25     no.  Because sometimes it could have said chronic
```

Homer Venters
September 25, 2024

```
1                   Dr. Homer Venters
2    care, but other times it might have had more
3    information.  And most of that information, I
4    never looked at because I just was looking at the
5    encounter types.
6           So, it is possible there is lots more
7    information there that I never -- by not clicking
8    on the individual fields, if there was more
9    written there, I wouldn't have seen it.  I just
10   looked for the encounter types that seemed
11   relevant and then I opened those records.
12   Q.    Is one of the things that you looked at
13   to determine if the case was relevant whether
14   there was weight loss?
15          MS. MAKAR:  Objection.  We have got to
16      talk about it, Jaclyn, if you are going to
17      ask any more questions, this document was
18      prepared by an attorney.
19          You can ask questions about any facts
20      that he relied on to form his opinion, and
21      any thoughts and impressions that were an
22      attorney or protected by privilege and
23      anything that was a fact that was produced
24      to you.
25          You can call the Judge if you want.  I
```

Homer Venters
September 25, 2024

1              Dr. Homer Venters

2       promise you it will not be worth your time,

3       because I have seen the document.  And I

4       know what he looked at.

5            He purely used it link to the records

6       that he listed in his report.  So I know you

7       have limited time and I wouldn't use it on

8       this if I were you, but if you want to, we

9       can, but I wouldn't.  I would just end here,

10      but if you want to keep going, let's do it.

11           MS. KINKADE:  I know what I'm doing.

12      You can make your objections.

13           MS. MAKAR:  I didn't say you don't

14      know what you're going, but I'm just telling

15      you because it is attorney work product, I

16      have seen it.  And you won't be able to, but

17      let's keep going then.

18      Q.    So, I have a pending question.

19           Do you recall what it is?

20      A.    No.

21           MS. KINKADE:  Can you read it back?

22      A.    Weight loss is something that I would

23  have looked for in any encounter I reviewed.

24      Q.    I am specifically asking about whenever

25  you were determining which of the 25 that you were

Homer Venters
September 25, 2024

```
 1                    Dr. Homer Venters
 2   going to examine for your report, was one of the
 3   things that you were looking at in that document
 4   was whether there was weight loss?
 5           MS. MAKAR:  Objection.  Asked and
 6       answered.
 7           THE WITNESS:  Should I answer?
 8           MS. MAKAR:  I think you already did.
 9           And go ahead.
10   A.      Weight loss is something that I would
11   have looked for in the encounters once I actually
12   examined them.  And most of the time, I couldn't
13   see or I didn't look at a description of what
14   happened in the encounter, but certainly if I
15   opened a Chronic Clinic or a specialty encounter,
16   I was looking for weight loss.
17         That was before I started looking at these
18   records, one of the things I would be looking for
19   would be weight loss.
20   Q.      So we are on the same page, what I am
21   looking at right now is kind of what was your
22   sampling methodology that you used to create the
23   subsection of the pool of individuals that you
24   looked at.
25         So it sounds to me that you looked at a
```

1              Dr. Homer Venters

2    document, and based on that document, you

3    determined who of the 25 individuals had relevant

4    chronic care appointments.

5         Is that correct?

6      A.    No.  I looked at the encounter types,

7    and based on the encounter types, I looked at a

8    subset of the 25 or 24, and the totality of the

9    encounter types wouldn't just be chronic care

10   because specialty care, for instance, is another

11   one.  It might list specialty care, or it might

12   listed something like that.

13        And this was my -- it was an informal

14   process to go from the 25 to the 14 that involved

15   me looking at this list of encounter types, and

16   then selecting on my own to get the records of a

17   subset of them.

18      Q.    And I'm taking this, in part, on

19   purpose.

20        So, it sounds like you did review the

21   document for relevant chronic care appointments,

22   but you also looked at additional things.

23        Is that true?

24      A.    I would look at the encounter types.

25   And I actually couldn't say today that it was, I

Homer Venters
September 25, 2024

```
 1                    Dr. Homer Venters
 2   don't believe it was ever exclusively chronic
 3   care, and it could have.
 4          So it was the -- I would, the truest
 5   answer to your question is, I looked at the list
 6   of encounter types, and then the encounter types
 7   that struck me as being relevant to the cases of
 8   Mr. Reed and Mr. McCullough.  I picked those sets
 9   of medical records to open up and examine on my
10   own.
11      Q.   Did you select the individuals to review
12   within that 25 pool based on your suspicion that
13   they had weight loss?
14          MS. MAKAR:  Objection.  Asked and
15      answered.
16      A.   I would be looking at these records to
17   determine whether or not they had any of these
18   three things, these three areas of deficiency.
19      Q.   And again, I'm not yet asking you about
20   your review of those, you know, 16 pages.  I'm
21   looking at your sampling methodology.
22          So whenever you were sampling, I'm
23   going to review ████████, he's going to be
24   one of the 16 that I am going to look at, did you,
25   when you made that decision, know whether or not
```

Homer Venters
September 25, 2024

```
 1                    Dr. Homer Venters

 2    ███████████  had lost weight?

 3       A.    I would say of the three areas, some of

 4    that might have been reflected in an encounter

 5    type, but some might not.  So, I think there may

 6    have been some encounters, whether it's in the

 7    medical record or in the list.  It says, weight

 8    loss, or it says abnormal labs.

 9            For instance, that's a type of encounter,

10    I think Wexford uses and that might be.  So, when

11    I just scanned this column on the encounter types,

12    I may have seen that.  I don't recall how often.

13            For me, what was most important was

14    looking for patients that might have had these

15    issues, and might have had lots of labs or might

16    have had, you know, weight loss issues.

17            And certainly a lot of these are cancer

18    patients.  So, any patient, for instance, who had

19    oncology appointments, then I would be looking for

20    those cases.

21       Q.    I believe all 25 were patients that had,

22    or at least most that had cancer; right?

23            MS. MAKAR:  Objection.  Form.

24       A.    I don't know.  I haven't opened up the

25    other records.
```

Homer Venters
September 25, 2024

```
 1                  Dr. Homer Venters

 2      Q.     One of the records that you didn't

 3  review was a patient who had colon cancer.

 4          Were you aware of that?

 5          MS. MAKAR:  Objection.  Form.

 6      A.     No.  I looked at these 14 records.  I

 7  haven't looked at the other records.

 8      Q.     When you said, I want to examine the

 9  records of              , did you know that already

10  that you believe there was a delay in specialty

11  care for Mr.          ?

12      A.     No.  Not that I recall.  I think that I

13  looked for encounter types.  And I don't know how

14  many times I can say this.  I looked for the

15  encounter types.  And this spreadsheet.

16          Again, I was not clicking on, this

17  spreadsheet could have had other information in

18  it.  But for me, my use of this was to look for

19  encounter types that struck me as relevant, and

20  then also, open up those records and examine them.

21          So, if I was not trying to be, I also did

22  not have time to review 25 patients.  It's many,

23  many pages.  So, I was looking for sets, lists of

24  encounter types that seemed most relevant to the

25  cases of Mr. Reed and Mr. McCullough.
```

Homer Venters
September 25, 2024

```
 1                  Dr. Homer Venters
 2      Q.    So, if the reason that you were looking
 3 for multiple encounter types for the individuals
 4 that you wanted to examine, because you suspected
 5 that might indicate a delay in specialty care?
 6      A.    I don't know about the delay.  It would
 7 indicate certainly if someone had chronic care and
 8 oncology care, and then went to the hospital or
 9 something, those are like encounter types, like a
10 hospital return, those are encounters that I want
11 to look at to assess whether or not one of three
12 problems existed.
13      Q.    Is it true that you had already reviewed
14 the records of Lenn Reed and Omar McCullough
15 before you decided which other individual's
16 records you would review?
17      A.    I believe I had done some of the record
18 review for Mr. Reed and Mr. McCullough.
19         I am not sure I completed it.  And I
20 believe I started their record review before I
21 started the other review.
22      Q.    You had in your mind already those
23 deficiencies that you believe were present in the
24 care that was provided to Mr. Reed and
25 Mr. McCullough?
```

1                    Dr. Homer Venters

2       A.    I don't know how, if I had absolutely

3   come to that conclusion, but I had reviewed some.

4   I believe I had reviewed some of the records for

5   Mr. Reed and Mr. McCullough before I dug into the

6   additional patient records.

7       Q.    When you were selecting which of the 25

8   to review, you were looking specifically for cases

9   that you believe would have the same deficiencies?

10      A.    I don't know about deficiencies, it

11  would be relevant where I could assess for a

12  deficiency is one thing.

13          So, for instance, if a patient, so I made

14  a table in my report for these 14 patients.  And

15  of these three problems, it's not that every

16  patient had every problem every time.

17          So I did not, no.  I think the answer to

18  your question is no, I didn't open up a record

19  because I suspected that all three things were

20  wrong.  But I wanted to look at all three things.

21      Q.    You can do that in all 25 of the

22  records, though, right?

23      A.    I could.  It was also very practical.  I

24  told the attorney I simply didn't have time to

25  review all 25.  So I would pick a sample that

Homer Venters
September 25, 2024

```
 1                  Dr. Homer Venters
 2  seemed by the encounter type to be most relevant.
 3          I could have done another 15 hours or
 4  something of review.  And these, based on the
 5  encounter types, these seemed like the encounters
 6  that were from patients that were most relevant.
 7      Q.    What about the encounters made them the
 8  most relevant?
 9      A.    Just looking at the encounter types and
10  the collection of encounter types, these are the
11  ones that struck me as the most relevant to
12  Mr. Reed and Mr. McCullough.
13      Q.    Did you count how many encounter types
14  they had?
15      A.    No.
16      Q.    What about the encounter types made them
17  most relevant to Mr. Reed and Mr. McCullough?
18      A.    Again, my recollection is that by having
19  lots of encounters around chronic care and
20  oncology, and maybe hospital transfers also, those
21  would be relevant.
22      Q.    The ones that you did not select, did
23  you determine that those would not be relevant?
24      A.    No.  I don't know how to say this
25  anymore.  I picked the patients that seemed most
```

Homer Venters
September 25, 2024

1                    Dr. Homer Venters

2   relevant.

3        It doesn't mean that there wouldn't be any

4   relevance at all to the other patients.  But given

5   my limited time and the capacity to review some

6   patients, I picked, just based on encounter types,

7   the ones that seemed most relevant.

8        I could also go do, as I said, another 15

9   or 20 hours on the other patients and assess them

10  for all of these same things.  But I was very

11  clear I didn't have time to do that.  That would

12  have doubled my time almost because they are very

13  voluminous records.

14      Q.    It would have doubled your 18-hour time?

15      A.    I don't know.  I haven't made an

16  estimate of it, I haven't looked at those records.

17       My process was to look at the encounter

18  types patients had.  And based on my training and

19  expertise, the patients that I seemed by encounter

20  type to be the most relevant to what I found with

21  Mr. Reed and Mr. McCullough were these 14

22  patients, and so I examined those records.

23      Q.    When you're talking about you reviewed

24  the encounter types, you are referring to that

25  document that was provided to you by counsel?

Homer Venters
September 25, 2024

1                      Dr. Homer Venters

2        A.     Yes.

3        Q.     Any other factors that you can give us

4   that determine for you -- let me back up.

5             You agree with me that all 25 of the

6   incarcerated people had encounters with medical

7   staff?

8        A.     Yes.

9        Q.     Other than having oncological care and

10   hospitalization, what other factors did you

11   determine made these 14 that you selected more

12   relevant to Mr. Reed and Mr. McCullough's care?

13       A.     I don't recall anything besides looking

14   at the encounter types that I used to determine

15   that.

16       Q.     I'm asking about when you are looking at

17   the encounter types.

18             Was there any other factors about those

19   encounter types other than it seemed that they had

20   oncological care and hospitalization that made

21   them, to you, based on your expertise, more

22   relevant to Mr. Reed and Mr. McCullough's care?

23       A.     Not that I recall.

24       Q.     Did you review the IDOC death

25   spreadsheet that lists the names and causes of

Homer Venters
September 25, 2024

1                    Dr. Homer Venters

2     were involved in selecting at the beginning at

3     all.  Is that right?

4         A.    Yes.

5         Q.    Do you know now that at least the first

6     17 sets of records were patients whose care was

7     reviewed by the Lippert monitors?

8         A.    As I sit here today, I don't know which

9     patients were reviewed by them.  And where those

10    fall into the patients I reviewed.

11          I don't actually know the answer to that

12    question.

13        Q.    In your report several times at the end

14    of your paragraph on the specific patient, you

15    will reference what patient they were in the

16    Lippert Report?

17        A.    Yes.  So I know that those in the

18    instances where I did that, I know that they were

19    reflected in the Lippert Reports.  And like I can

20    not recall, for instance.  I don't think that is

21    all of the patients in those 14 additional.

22          And so I think there might have been some

23    that I reviewed that Lippert didn't.

24        Q.    You know that at least the first batch

25    of records were intentionally identified because

Homer Venters
September 25, 2024

```
 1                    Dr. Homer Venters
 2   they were patients that were discussed in Lippert?
 3        A.    I don't know about how that came to be.
 4   And I just literally know that some of the
 5   patients I've reviewed records for were also
 6   reviewed or mentioned in the Lippert Report, and
 7   some were not.  And I don't know what went into
 8   finding the different groups.
 9        Q.    How did you determine that the patients
10   that you reviewed were the ones discussed in
11   Lippert?
12        A.    The review of the patients when I put
13   the spreadsheet that I use to review the care
14   encounters, I think there was a designation, was
15   it in Lippert or not.
16        Q.    Is this document the one that you were
17   talking about before that counsel prepared for
18   you?
19        A.    Yes.
20        Q.    You said it reflected whether they were
21   in the Lippert or not.
22             If the patient was in Lippert, did it
23   direct you to where they were in the Lippert
24   Report?
25        A.    I think I had a separate, I think in one
```

Homer Venters
September 25, 2024

```
 1              Dr. Homer Venters
 2  of the Lippert addendums or of some appendix to
 3  one of the Lippert Reports, there was a list of
 4  patients.
 5          And that's what I used to say, like, as I
 6  recall, there like was a single page that listed,
 7  I don't know, these are the names and these are
 8  the numbers.  And I don't know where that came
 9  from.
10      Q.    Whenever you determined that a patient
11  that you reviewed is a specific patient number
12  identified in Lippert, that is from you looking at
13  the list of patient names and searching and
14  finding it in the reports yourself?
15      A.    I think that would be one way.
16          There might have been times where I
17  reviewed a patient's record.  And then, I can't
18  remember if that is the only way.  I don't know if
19  I ever read something in the Lippert Report and
20  thought, this sound like one of the patient's
21  records, I just I don't recall.
22          And certainly the using just the yes-or-no
23  as the patient in the Lippert Report allowed me to
24  go look at this sheet.  And I think that, as I
25  recall, just looking at that one piece of paper,
```

Homer Venters
September 25, 2024

1                    Dr. Homer Venters

2    and I don't know who it is from, if it's from

3    Lippert or the attorneys, it had listed these

4    patients.  And then I was able to confirm who I

5    had records for that had been reviewed by Lippert

6    and who had not.

7         Q.    Did the list of patients names say where

8    they were identified in the Lippert Report?

9         A.    I don't recall.

10        Q.    Did you come to believe that because you

11   were specifically informed that some of these

12   patients were discussed in the Lippert Report that

13   the Lippert Report was involved in the decision of

14   whose records to review?

15        A.    I don't know.

16        Q.    You didn't have any conversations about

17   that?

18        A.    I just don't recall being aware of that.

19        Q.    Did you ever ask, like, where did these

20   25 names come from?

21        A.    I don't recall.

22        Q.    Sitting here today, do you have any

23   understanding of the methodology that was used in

24   identifying those 25 patients?

25        A.    I don't recall.

Homer Venters
September 25, 2024

```
 1              Dr. Homer Venters

 2      Q.    Is it fair to say that in the case with

 3  Mr. McCullough, the delay we are looking at is a

 4  month?

 5            MS. MAKAR:  Objection.  Form.

 6      A.    I would say what we have just been

 7  talking about, this delay from May until when he

 8  goes in, in June, is a month.

 9      Q.    Is there any other delay?  I thought we

10  already agreed it started in May?

11      A.    I specifically commented when he first

12  had this acute event in 2016, and we didn't -- you

13  didn't ask for that.  But he had an X-ray.  The

14  radiologist recommended a CAT scan and he didn't

15  get it.

16        He also had not just pain, but also an

17  inability to defecate.  It was just also very.

18      Q.    Where did you see that in 2016?  I

19  didn't see that anywhere.

20      A.    I don't recall up the top of my head.

21  But my critique is in here of the failure to get a

22  CAT scan.  I don't know or have the expertise to

23  know if that failure to get a CAT scan would have

24  seen or detected his cancer, his GI cancer.

25      Q.    You said you don't know?
```