UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

KEYANA WILEY, Administrator of the
Estate of OMAR MCCULLOUGH #K77858,
                    Plaintiff,

v.

JUSTIN YOUNG, C. WALKER, ANGELA
WACHTOR, JUSTIN DUPREY, JANE DOE,
WEXFORD HEALTH SOURCES, INC., and
NURSE CYNTHIA,
                    Defendants.

Case Number  3:21-cv-00599-DWD

Judge David W. Dugan

## DEFENDANTS' MOTION TO BAR DR. SCHMIDT

COME NOW Defendants WEXFORD HEALTH SOURCES, INC., CYNTHIA ROSS, R.J. DUPREY, COURTNEY WALKER, JUSTIN YOUNG, and ANGELICA WACHTOR, by and through their attorneys, CASSIDAY SCHADE LLP, and pursuant to Federal Rules of Civil Procedure 26(2)(B) and Federal Rules of Evidence 702 and 703, hereby submit their Motion to Bar Dr. Schmidt, stating as follows:

## BACKGROUND AND INTRODUCTION

Plaintiff produced a report from Dr. Judy Schmidt, an oncologist. (Exhibit D, Report of Dr. Schmidt).[1] Dr. Schmidt was deposed on her opinions, her qualifications to provide such opinions, and what data and methodology she used in coming to her opinions. Her report and testimony should be barred for a variety of reasons. As an initial matter, Dr. Schmidt is not qualified to provide an opinion as to the merits of each claim.  Second, Dr. Schmidt's opinions should be barred as they are not held to a reasonable degree of medical certainty. Generally, Dr. Schmidt holds her medical opinions to a more likely than not standard, which cannot meet the standard for Plaintiff's state law claims and should not meet the standard for any of her claims. Third, Dr. Schmidt did

---

[1] Defendants cite to their Exhibit List and Exhibits, which is being utilized for their Memorandum of Law in Support of Motion for Summary Judgment and remaining *Daubert* motions.

not review sufficient data or apply reliable methodologies to provide expert opinions on Mr. McCullough's care, and, as such, her opinions are not helpful to the trier of fact.  Dr. Schmidt's opinions are contradicted by the medical journals she relies on, are inconsistent with Mr. McCullough's clinical course, and relate largely to allegations against non-defendants, wholly irrelevant to this case. Finally, Dr. Schmidt offered new opinions at her deposition that were not contained in her written report derived from undisclosed publications, which should be struck.

In sum, Dr. Schmidt's report and testimony must be barred as she lacks qualifications to offer opinions on the merits of Plaintiff's claims, does not provide her opinions within a reasonable degree of medical certainty, failed to review sufficient facts and data to come to reliable opinions, and failed to utilize reliable methodology. Additionally, Dr. Schmidt offered new opinions at her deposition based on undisclosed publications, and these opinions must likewise be barred. Dr. Schmidt's report and testimony should be barred for any one of these reasons, as her opinions and cannot pass the gatekeeping requirements of Rule 702. Accordingly, Defendants' Motion to Bar should be granted.

## LEGAL STANDARD

"A district court's decision to exclude expert testimony is governed by Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)." *Brown v. Burlington Northern Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014); see also *Lewis v. Citgo Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). Federal Rule of Evidence 702, governing the admissibility of expert testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and
(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.[2]

Rule 702 requires that the trial judge ensure that any and all expert testimony or evidence admitted "is not only relevant, but reliable." *Manpower, Inc. v. Ins. Co. of Pa*, 732 F.3d 796, 806 (7th Cir. 2013) (citing *Daubert*, 509 U.S. at 589); see also *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011) (explaining that ultimately, the expert's opinion "must be reasoned and founded on data [and] must also utilize the methods of the relevant discipline"); *Lees v. Carthage College*, 714 F.3d 516, 521 (7th Cir. 2013) (explaining the current version of Rule 702 essentially codified *Daubert* and "remains the gold standard for evaluating the reliability of expert testimony").  "The district court functions as a gatekeeper with respect to testimony proffered under Rule 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004), citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).

The scope of an expert's qualifications is limited to the subject area(s) in which he possesses expertise. See *United States v. Hall*, 93 F.3d 1337, 1344 (7th Cir. 1996). "Whether a witness is qualified as an expert can only be determined by comparing the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witnesses' testimony." *Gayton v. McCoy*, 592 F.3d 610, 616 (7th Cir. 2010) (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)).

"To determine reliability, the court should consider the proposed expert's full range of experience and training, as well as the methodology used to arrive [at] a particular conclusion." *United States v. Pansier*, 576 F.3d 726, 737 (7th Cir. 2009). Courts must "make the following

---

[2] Federal Rule of Evidence 702 was amended as of December 1, 2023.

inquiries before admitting expert testimony: first the expert must be qualified as an expert by knowledge, skill, experience, training, or education. Second, the proposed expert must assist the trier of fact in determining a relevant fact at issue in the case. Third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods." *Lees*, 714 F.3d at 521-22. And fourth, the expert's opinion must reflect "a reliable application of the principles and methods to the facts of the case." FRE 702. The court "…must look at each of the conclusions [an expert] draws individually to see if he has the adequate education, skill, and training to reach them." *Hall v. Flannery*, 840 F.3d 922, 929-930 (7th Cir. 2016), citing *Gayton*, 593 F.3d at 617.

The issue of reliability of an expert's opinion focuses not on the witness' qualifications as an expert in the field, but rather on the methodology the expert used to reach the proffered opinion. *Clark v. Takata Corp.,* 192 F. 3d 750, 756-57 (7th Cir. 1999). "*Daubert* offers a non-exclusive list of factors to aid judges in determining whether [a] particular expert opinion is grounded in reliable scientific methodology," which are: "(1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review; (3) whether the theory has been evaluated in light of potential rates of error; and (4) whether the theory has been accepted in the relevant scientific community." *Winters v. Fru-Con Inc.,* 498 F.3d 734, 742 (7th Cir. 2007) (quoting *Dhillon v. Crown Controls Corp*., 269 F.3d 865, 869 (7th Cir. 2001).

"The goal of *Daubert* is to assure that experts employ the same 'intellectual rigor' in their courtroom testimony as would be employed by an expert in the relevant field." *Jenkins v. Bartlett*, 487 F.3d 482, 489 (7th Cir. 2007), quoting *Kumho Tire Co.*, 526 U.S. at 152); *Lapsley v. Xtek Inc.,* 689 F.3d 802, 805 (2012). The "'measure of intellectual rigor will vary by the field of expertise and the way of demonstrating expertise will also vary." *United States v. Conn*, 297 F.3d 548, 556 (7th Cir. 2002), quoting *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996)). When

the opinions contain "nothing more than a bare conclusion that adds nothing of value to the judicial process" exclusion is proper. *Clark v. River Metals Recycling, LLC*, No. 3:15-cv-00447-JPG-RJD, 2018 U.S. Dist. LEXIS 105828, 2018 WL 3108891, at *6 (S.D. Ill. June 25, 2018) (quoting *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998). In determining the relevance and reliability of the proposed expert's testimony, the party offering the expert bears the burden of proof. *Brown*, 765 F.3d at 772. If the potential expert does not possess the requisite qualifications to opine about a particular issue, the court need not address the expert's methodology. *Hall*, 840 F.3d at 930.

## ARGUMENT

### I.    Dr. Schmidt is not qualified to provide an opinion as to the merits of each claim.

For any action in which the plaintiff seeks to recover damages for injuries or death due to medical, hospital, or other healing art malpractice, the plaintiff or their attorney must file an affidavit to the initial complaint. 735 ILCS 5/2-622. The affidavit must satisfy one of three options. *Id.* The first option requires the affidavit declare that the affiant, plaintiff or their counsel, has consulted with a health professional concerning the facts of the case, and the affiant reasonably believes that the healthcare professional:

(i)     is knowledgeable in the relevant issues involved in the particular action;

(ii)    practices or has practiced within the last 6 years or teaches or has taught within the last 6 years in the same area of health care or medicine that is at issue in the particular action; and

(iii)   is qualified by experience or demonstrated competence in the subject of the case; that the reviewing health professional has determined in a written report, after a review of the medical record and other relevant material involved in the particular action that there is a reasonable and meritorious cause for the filing of such action; and that the affiant has concluded on the basis of the reviewing health professional's review and consultation that there is a reasonable and meritorious cause for filing of such action.

*Id.*

The requirement that the healthcare professional must have practiced within the last six years has been interpreted to mean that they have "actively practiced." *See Cuthbertson v. Axelrod*, 282 Ill. App. 3d 1027 (referencing the affidavit, which states the practitioner has "actively practiced within the last six years," and explaining that the physician needs to state they have recent experience in the area of healthcare at issue); *see Cutler v. Northwest Suburban Cmty. Hosp., Inc.*, 405 Ill. App. 3d 1052 (citing *Cuthbertson* and reiterating that the physician needs to state they have had recent experience in the field at issue). The entire purpose of this requirement is to ensure the professional has had recent experience in the area of health care at issue, rather than a career in consulting work, such that they can provide a current and informed opinion on the merits of the state law claim.

Plaintiff has not provided a 735 ILCS 5/2-622 affidavit.  However, should she seek to utilize Dr. Schmidt's report in lieu of the affidavit, Dr. Schmidt is not a healthcare professional qualified to provide an opinion on the merits of Plaintiff's state law claims as she has not actively practiced since 2011. Dr. Schmidt admitted she only performs second opinions and consults, and she does *not* practice as the patient's primary oncologist. (Exhibit G, Dr. Schmidt's Deposition, 14:5-15:19). Thus, even if Dr. Schmidt talks to a patient, the patient has a different primary oncologist who provides all treatment. Dr. Schmidt admitted that her practice of providing secondary opinions and consults began in March 2011. (Ex. G, 14:22-15:5). Accordingly, by her own admission, she has not actively treated cancer patients since 2011. The same is reflected in her curriculum vitae, which reflects she left medical practice in 2011 and currently works for Quality Cancer Care as a "Medical Consultant and Legal Expert." (Exhibit H, Dr. Schmidt's CV, 2). Given that her CV and testimony reflects she has not actively treated patients since 2011 or

taught, it is clear she has not actively practiced within the last six years as required to qualify her to provide an opinion on the state law claims in this case.

Furthermore, Dr. Schmidt is not a healthcare professional qualified to provide an opinion on the merits of Plaintiff's federal claims. Although the federal claims at issue do not have this express requirement, the Court should apply the same reasoning to the federal claims in addition to the reasons set forth below, even if not necessarily dispositive on its own. The requirement serves to ensure that the consulting healthcare professional has had recent exposure to the area of health care at issue. Of particular note, Dr. Schmidt reviewed the primary medical care provided to Mr. McCullough in 2016 through June 2019. She was not treating patients at this time. Further, she reviewed some of the oncology records for Mr. McCullough in 2019 and 2020. She was not practicing at this time. As discussed below, Dr. Schmidt also conducted no research to advise her as to community practices at these times. Instead, Dr. Schmidt did not know community practices, including first-line imaging for kidney stones or oncological utilization, if any, for the doubling time theory for cancer growth. As Dr. Schmidt lacks foundation to give opinions as to the state of medicine during the relevant times as she was not treating, teaching, or researching, Dr. Schmidt's opinions are not specialized or relevant and will not help the jury understand the issues in this case. FRE 702. Given Dr. Schmidt has been involved only in consulting work since 2011, Plaintiff has failed to establish her foundation to provide a current and informed opinion on the merits of the claims against current practitioners. For these reasons, Dr. Schmidt is not qualified to provide an opinion as to the merits of each claim or to provide expert opinions in this case.

## II. Dr. Schmidt's opinions should be barred as they are not held to a reasonable degree of medical certainty.

As it relates to Plaintiff's state law claims, "[t]o prove a claim of medical malpractice a plaintiff must show that (1) there was a standard of care by which to measure the defendants'

conduct, (2) the defendant negligently breached that standard of care, and (3) the defendant's breach was the proximate cause of the plaintiff's injury." *Cummings v. Jha*, 394 Ill. App.3d 439, 451 (5th Dist. 2009)(quoting *Alm v. Loyola University Medical Center*, 373 Ill.App. 3d 1, 6, 866 N.E.2d 1243, 310 Ill. Dec. 641 (2007). Proximate cause defined as "a cause that, in the natural or ordinary course of events, produced the plaintiff's injury." Illinois Pattern Jury Instruction, Civil, No. 15. Proximate cause in a medical malpractice case must be established by expert testimony to a reasonable degree of medical certainty, and the causal connection must not be contingent, speculative, or merely possible." *Ayala v. Murad*, 367 Ill. App. 3d 591, 601, 855 N.E.2d 261, 305 Ill. Dec. 370 (2006); see also *Johnson v. Ingalls Memorial Hospital*, 402 Ill. App. 3d 830, 846, 931 N.E.2d 835, 341 Ill. Dec. 938 (2010) ("The mere possibility of a causal connection is not sufficient to sustain the burden of proof of proximate causation.").

During her deposition, Dr. Schmidt defined opining within a "reasonable degree of medical certainty" as a "more likely than not" standard. (Ex G, 260:7-11).[3] As such, according to Dr. Schmidt, a "51 percent probability is [within] a reasonable degree of medical certainty," and using the "more likely than not" standard has been her practice for "many, many years." (Exhibit I, Dr. Schmidt's Deposition in *Reed v. Wexford Health Sources, Inc., et al.*, Case No. 3:20-cv-01139-SPM, 337:21-338:7). Yet, as discussed below, when deposed, Dr. Schmidt failed to even apply a more likely than not standard, but instead provided opinions that outcomes would have occur, when her research showed that the outcome was less than 50% likely to occur, i.e. when a CT scan will depict a 6mm mass. Dr. Schmidt repeatedly made it clear that she did not come to opinions

---

[3] "Q. We talked yesterday about how the way you calculate a reasonable degree of medical certainty is based on a more-likely-than-not standard; is that right?
A. That's correct." (Ex. G, Dr. Schmidt's Deposition, 260:7-11). Counsel's reference to "yesterday" is the deposition of Dr. Schmidt that occurred in *Reed v. Wexford Health Sources, Inc., et al.,* Case No. 3:20-cv-01139-SPM.

within a reasonable degree of medical certainty, but instead to a much lower standard and, as such, Dr. Schmidt's opinions as to medical malpractice must be barred.

As it relates to the federal claims, "[i]t is axiomatic that under general principles of tort law a plaintiff may recover monetary damages 'only when a defendant breaches a duty owed to [the] plaintiff, and the breach causes cognizable legal harm to the plaintiff.'" *Henderson v. Sheahan*, 196 F.3d 839, 848 (7th Cir. 1999), citing *Babcock v. White*, 102 F.3d 267, 271 (7th Cir. 1996); see also *Carey v. Piphus*, 435 U.S. 247, 255-58, 55 L. Ed. 2d 252, 98 S. Ct. 1042 (1978) ("reasoning that damages are available under §1983 for actions found to have violated constitutional rights and to have caused compensable injury"). "Ordinarily, to obtain an award of compensatory monetary damages under §1983, a plaintiff must demonstrate both that he has suffered an 'actual' present injury and that there is a causal connection between that injury and the deprivation of a constitutionally protected right caused by a defendant." *Id.* Here, Dr. Schmidt's opinions should not be held to a lower standard than the medical malpractice claims. In fact, Plaintiff's deliberate indifference claims hold Plaintiff to an even higher standard than medical malpractice, and it would be illogical to allow Dr. Schmidt to offer opinions on a "more likely than not standard" for the federal claims when the same opinions are insufficient for the state law claims based on the same medical allegations. Thus, as Dr. Schmidt's opinions on Plaintiff's state law claims must be barred, her opinions on Plaintiff's federal claims should likewise be barred.

## III.   Dr. Schmidt did not review sufficient data or apply reliable methodologies to provide expert opinions on Mr. McCullough's care.

A trial judge has the "task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. "To do so, the district court must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the

evidence or to determine a fact in issue.'" *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011), quoting Fed. R. Evid. 702.  This task requires the district court to rule out "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 597; *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 (7th Cir. 1993).

### a. Dr. Schmidt did not review sufficient data to provide expert opinions on Mr. McCullough's care.

Expert opinions must be barred when formed without sufficient review of the relevant records.  In *Sommerfield*, the Court found the methodology of an expert lacking where he failed to exhaust the records and independently verify the accuracy and *completeness* thereof prior to forming his opinion.  *Sommerfield v. City of Chi.*, 254 F.R.D. 317, 327 (N.D. Ill. 2008).  Furthermore, ignoring evidence that does not fit the expert's opinion is improper and is grounds for exclusion.  *Barber v. United Airlines, Inc.,* 17 Fed. Appx. 433, 437 (7th Cir. 2001) (excluded expert opinions because he "did not adequately explain why he ignored certain facts and data, while accepting others"); *A.H. by Holzmueller v. Illinois High Sch. Ass'n*, 263 F. Supp. 3d 705, 714 (N.D. Ill. 2017, aff'd 881 F.3d 587 (7th Cir. 2018); *see also Makor,* 02 C 4356, 2010 U.S. Dist. LEXIS 62114, at *15-16.

Here, Dr. Schmidt provided a list of records she claims were unavailable for her review prior to the preparation of her report. (Ex. D, 7). Specifically, Dr. Schmidt did not review hospital records from Carle Hospital, including records from chemotherapy Mr. McCullough received on July 25, 2019 or records from the colonoscopy performed in June 2019. (Ex. D, 7); (Ex, G, 8:4-20). These are records Dr. Schmidt would normally review in preparation of a report in a case, which is why she specifically outlined that they were not available. (Ex. G, 9:11-23). Yet, these records were available, years beforehand, but apparently were not provided to Dr. Schmidt by

Plaintiff.  Dr. Schmidt's failure to review these records is particularly important with respect to the claims against Dr. Young.

For context, on June 19, 2019, Mr. McCullough was admitted to infirmary for nausea, a new cough, and right and left upper quadrant pain.  He reported soft and light brown stool.  Dr. Young was called to his bedside.  His recent labs showed abnormalities, including an elevated white blood count.  He was given fluids and Dr. Young ordered medication, laboratory tests, a chest x-ray, an abdominal x-ray, and nothing by mouth.  Dr. Young was monitoring Mr. McCullough for potential cholecystitis (inflamed gallbladder) or appendicitis.  Mr. McCullough's symptoms started to resolve, including on June 21, 2019, when he saw NP Duprey and reported no abdominal pain, no chest pain, and had a normal abdominal exam. (Exhibit B, Mr. McCullough's IDOC Medical Records, 126-140).  However, on June 22, 2019, Mr. McCullough declined, and Nurse Walker observed him shaking in pain.  She contacted Dr. Young and Mr. McCullough was sent to the ER.  (Ex. B, 141-142).

In the ER, like Dr. Young, the physician also suspected Mr. McCullough had an inflamed gallbladder, but a chest x-ray for his new cough revealed potential metastatic cancer.  Similarly, the chest x-ray Dr. Young ordered on June 19, 2019, revealed potential metastases, but the radiologist report was not received until June 24, 2019, after Mr. McCullough was in the hospital. (Ex. B, 201); (Exhibit C, Mr. McCullough's Carle Medical Records, 000416-000423); (Ex. E). In the hospital, the CT scan demonstrated a thickening of the hepatic flexure, instead of a mass in the colon.  The colon mass was not obstructing, bleeding, or perforated.  The physicians determined that Mr. McCullough's right upper quadrant pain was most probably related to hepatic capsular stretch and gallbladder irritation.  He was treated for cholecystitis based on the right upper quadrant pain, leukocytosis, and mild gallbladder wall thickening.  (Ex. C, 000459-000460).

Plaintiff has no excuse for failing to provide material medical records, evidencing the medical judgment and opinions of the ER physicians and Mr. McCullough's clinical course of care, to Dr. Schmidt. The records were available and, in fact, were produced by Plaintiff in this case two years ago. Importantly, the medical records directedly related to opinions Dr. Schmidt attempted to draw.

First, as a reminder, Dr. Schmidt was not treating patients or ordering imaging in 2019. These records showed what other physicians, who were treating patients, found to be reasonable and appropriate. Particularly, here, Dr. Young's medical judgment was consistent with the physicians at Carle. Although Dr. Schmidt's report did not opine that Dr. Young (or the other Danville Defendants) deviated from the standard of care, any such argument is based on the false assumption that Mr. McCullough's abdominal pain was not caused by his gallbladder, as Dr. Young suspected. If she had been provided with the relevant medical records, Dr. Schmidt would have learned that his abdominal pain *was* caused by his inflamed gallbladder.

Second, Dr. Schmidt's opinion that a CT scan in 2016 or 2017 would have diagnosed Mr. McCullough's cancer is unsupported. Even in 2019, the diagnostic testing that revealed metastatic cancer was a chest x-ray, as, by then, his cancer had spread to his lungs. The CT scan in 2019 revealed some thickening of the hepatic flexure, but not the 6-centimeter mass, and it was the chest x-ray (which Dr. Young had already ordered), which lead to the diagnosis. Importantly, Dr. Schmidt knows that it is *not* likely that a CT scan would have revealed a mass under 2-centimeters (Dr. Schmidt believes the mass would have been 6-*millimeters* in 2016). (Ex. D, 27, 30). However, she reviewed no evidence as to how or if the CT scan diagnosed the cancer in 2019, let alone if it would have years beforehand. In her deposition, Dr. Schmidt was confronted with the fact that the CT scan did not observe the 6-centimeter colon tumor, and she conceded she did not

12

review the Carle records and did not know whether the CT imaging showed the tumor in Mr. McCullough's cecum. (Ex. G, 210-213). As these records are material to the patient's clinical history and care, to the standard of care, and to any opinions on how Mr. McCullough's cancer was diagnosed or could have been diagnosed, Dr. Schmidt did not review sufficient data to come to her opinions in this case.

Here, like in *Sommerfield*, Dr. Schmidt's opinions must be barred as, admittedly in her own report and based on her testimony, she failed to completely and meaningfully review all available records prior to forming her opinions. *Sommerfield v. City of Chi.*, 254 F.R.D. at 327. Further, it begs the question why Dr. Schmidt did not review these records. Plaintiff and/or Dr. Schmidt cannot ignore evidence that does not fit her opinion. *Barber*, 17 F.App'x at 437. Had Dr. Schmidt reviewed and meaningfully considered the full medical records, she would have learned that the ER physician also suspected Mr. McCullough had an inflamed gallbladder and worked him up accordingly, like Dr. Young's assessment. She also would have learned that the CT scan in 2019 did not reveal a 6-centimeter cecum tumor, which undermines her claim that a CT scan in 2016 or 2017 would have revealed a much smaller tumor (assuming *arguendo* it was present). Thus, Dr. Schmidt's opinions are foundationally flawed as they are based on an incomplete review of the material records and must be barred under FRE 702.

**b. Dr. Schmidt did not apply reliable methodologies to provide expert opinions on Mr. McCullough's care.**

Even if the Court finds Dr. Schmidt laid sufficient foundation to establish she is qualified to provide these opinions and reviewed sufficient data, Dr. Schmidt's opinions must nonetheless be barred because she failed to apply reliable methodology in forming his opinions. "[T]he district court must ascertain whether the expert is qualified, whether his or her methodology is scientifically reliable, and whether the testimony will 'assist the trier of fact to understand the

evidence or to determine a fact in issue.'" *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 893 (7th Cir. 2011), quoting Fed. R. Evid. 702. This task requires the district court to rule out "subjective belief or unsupported speculation." *Daubert,* 509 U.S. at 597; *Porter v. Whitehall Labs., Inc.*, 9 F.3d 607, 614 (7th Cir. 1993). Even if the court finds a witness is a "supremely qualified expert," that witness "cannot waltz into the courtroom and render opinions unless those opinions are based upon some recognized scientific method and are reliable." *Clark v. Takata Corp.,* 192 F.3d 750, 759 n.5 (7th Cir. 1999). The courtroom is not the place for guesswork. *See Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 645 (7th Cir. 2010). Furthermore, when the opinions contain "nothing more than a bare conclusion that adds nothing of value to the judicial process" exclusion is proper. *Clark v. River Metals Recycling, LLC*, No. 3:15-cv-00447-JPG-RJD, 2018 U.S. Dist. LEXIS 105828, 2018 WL 3108891, at *6 (S.D. Ill. June 25, 2018) (quoting *McMahon v. Bunn-O-Matic Corp.*, 150 F.3d 651, 658 (7th Cir. 1998).

A witness's methodology is unreliable and should be barred when the witness "uniformly treated all evidence that undermined his underlying conclusion: unwarranted dismissal of the evidence or outright blindness to contrary evidence." *Fail-Safe, L.L.C. v. A.O. Smith Corp*., 744 F. Supp. 2d 870, 889-890 (E.D. Wis. 2010)(citing *Cf. Minasian v. Standard Chtd. Bank, P.L.C.*, 109 F.3d 1212, 1216 (7th Cir. 1997)(finding that an expert's submission to the court exemplified "everything that is bad about expert witnesses in litigation" because it was "full of vigorous assertion ... carefully tailored to support plaintiffs' position but devoid of analysis.")). "Cherry pick[ing]" the data is "another strong reason to conclude that the witness utilized an unreliable methodology." *Id.* (citing *Barber v. United Airlines, Inc.*, 17 Fed. Appx. 433, 437 (7th Cir. 2001) (holding that a "selective use of facts fails to satisfy the scientific method and *Daubert.*")).

Similarly, "experts cannot offer opinions based merely on their say-so." *Smith v. Nexus RVs, LLC*, 472 F. Supp. 3d 470, 480 (N.D. Ind. 2020) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (citation omitted)).  The expert's opinion must offer more than a 'bottom line.'" *Minix v. Canarecci*, 597 F.3d 824, 835 (7th Cir. 2010) (quoting *Wendler & Ezra, P.C. v. Am. Int'l Group*, Inc., 521 F.3d 790, 791 (7th Cir. 2008) (per curiam)). "An expert who supplies nothing but a bottom-line supplies nothing of value to the judicial process." *Wendler & Ezra, P.C. v. Am. Int'l Grp., Inc.*, 521 F.3d 790, 791–92 (7th Cir. 2008) (internal citations omitted); see also *Mamah*, 332 F.3d at 478 ("As we have observed, 'experts' opinions are worthless without data and reason.'") (citation omitted).[4]

> i. **Dr. Schmidt's opinion that the standard of care in 2016-2017 required a CT scan for initial assessment of suspect kidney stones is unsupported, irrelevant, and can only confuse and mislead the jury.**

Mr. McCullough presented with pain in June of 2016, which was thought to be caused by a renal calculus (kidney stone). (Ex. B, 42). An ultrasound was scheduled instead of sending Mr. McCullough off-site for a CT scan. (Ex. B, 48-54). As it relates to the 2016-2017 care rendered by NP Rector and Dr. Scott, Dr. Schmidt opined it was not within the standard of care to order an ultrasound as initial imaging. (Ex. D, 29). Rather, Dr. Schmidt opined that the standard of care in 2016 demanded a CT scan for initial assessment of suspect kidney stones. Her opinion is based on a publication from May 2024 titled "Kidney stones in adults: Dx and acute management of

---

[4] Rather, the expert's report must be "complete and detailed" and set forth the "basis and reasons" for their opinions and conclusions. *Ciomber v. Cooperative. Plus*, 527 F.3d 635, 641 (7th Cir. 2008) (citing FED. R. CIV. P. 26(a)(2)(B)(i)); *see also Salgado v. General Motors*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) ("A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor . . . . [It] must include 'how' and 'why' the expert reached a particular result, and not merely the expert's conclusory opinions.").

suspected nephrolithiasis" from a website called UpToDate. According to Dr. Schmidt's report, this source states "[f]or most non-pregnant adults, we prefer non-contrast low-RT dose CT AP. Noncontrast CT 97% sensitive and 95% specific. In one clinical trial, US sensitivity for stone detection was 54% and CT 88% (2759 patients in an ED)." (Ex. D, 22).

First, this opinion rests on an article from 2024, not from 2016-2017. Dr. Schmidt admitted at her deposition that the 2024 UpToDate guidelines on this issue were not available in 2016-2017. (Ex. G, 58:15-18). As such, Dr. Schmidt purports to hold NP Rector and Dr. Scott to these alleged guidelines available eight years ***after*** their care to Mr. McCullough. Science and technology are constantly evolving and to hold these practitioners to an alleged standard of care formed eight years after they treated Mr. McCullough cannot be a reliable methodology. Even worse, Dr. Schmidt either did not read or understand the 2024 UpToDate as it found, "[i]f low-radiation-dose CT is not available, ultrasound of the kidneys and bladder, sometimes in combination with abdominopelvic radiography, is a reasonable alternative." (Exhibit E, Report of Dr. Pennington). Thus, her opinion on the standard of care in 2016-2017 for assessment for kidney stones is wholly unsupported and is inadmissible as it fails to meet the gatekeeping requirements of Rule 702.

In *O'Connor v. Commonwealth Edison Co.*, the plaintiff retained an ophthalmologist to offer the opinion that radiation exposure could have caused plaintiff's cataracts. *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1388 (C.D. Ill. 1992). Specifically, the ophthalmologist opined that a radiation induced cataracts "cannot be mistaken for anything else." *Id.* at 1392. The court ordered the plaintiff to provide the court with information supporting this opinion and reviewed the same. *Id.* The court found that the supporting articles were inconsistent with the expert's opinion: "posterior subcapsular cataracts have a characteristic appearance in that radiation induced cataracts are of the posterior subcapsular type, but not all posterior subcapsular

cataracts are radiation induced." *Id.* at 1393. Accordingly, the court stated that the expert "misinterpreted and cited the wrong sections of the very reference upon which he himself relies," and in fact, his opinion supported Defendants' position. *Id.* Ultimately, the court struck this opinion, holding it was "wrong as a matter of medical science," and granted the *Daubert* motion on this ground. *Id.* at 1398.

Here, when Dr. Schmidt was confronted with a medical journal from 2017, she refused to consider it and stated it was unreliable without reading it or providing any meaningful response. (Ex. G, 58:19-70:9). Instead, Dr. Schmidt testified that all reliable medical journals in 2017 demanded a CT scan to assess kidney stones. (Ex. G, 70:4-12). As Dr. Schmidt failed to conduct any research into this opinion, she was then caught testifying falsely. At her deposition, Dr. Schmidt testified the New England Journal of Medicine stated in 2016-2017 that a CT scan was the standard of care for first-line imaging for kidney stones. (Ex. G, 68:8-17). Yet, when counsel provided a copy of the article, Dr. Schmidt admitted that she had not read it. (Ex. G, 74-79). The New England Journal of Medicine published an article after examining a 2014 study comparing the usage of either ultrasound or CT scan in patients presenting to the emergency room with suspected kidney stones. (Exhibit J, New England Journal of Medicine Article). The study found that an ultrasound *was* an appropriate first-line modality for suspect kidney stones as the patient care and outcome was ***the same with either imaging*** for initial assessment. *Id.* The authors then stated in the discussion section that "ultrasonography should be used as the initial diagnostic imaging test with further imaging studies performed at the discretion of the physician on the basis of clinical judgment." *Id.* However, her opinion that the standard of care in 2016-2017 required a CT scan is contradicted by the sources she references.

Second, Dr. Schmidt's opinion as to the standard of care for assessment of kidney stone is irrelevant. This case does not involve medical negligence for treating Mr. McCullough's kidney stones in 2016-2017. Neither Dr. Scott nor Ms. Rector are defendants in this case. Instead, Dr. Schmidt, without any methodology or support, argues that a CT scan for kidney stone would have revealed Mr. McCullough's colon cancer. In other words, Dr. Schmidt demands imaging should have been ordered, not for the assessment of kidney stones, but in case of an asymptomatic incidental finding. Yet, a CT scan is not the diagnostic test for colon cancer. According to resources in her own report, a CT scan had *less than a 50%* likelihood of capturing the cancer, if it was even there. For this, and other reasons, most colon cancers are not discovered in the early stages.[5] (Ex. G, 42:21-44:3). Dr. Schmidt opined, incorrectly as discussed below, that Mr. McCullough's colon tumor would have been 6-millimeters in 2016. She conducted no analysis that a CT scan in 2016 or 2017 **could** have detected his tumor, let alone that it **would have**. (Ex. G, 206-207). Instead, as discussed above, even in 2019, the CT scan did **not** reveal the 6-cemtimeter cecum tumor.

In sum, Dr. Schmidt did not apply any methodology in drawing her opinion that the standard of care in 2016-2017 demanded a CT scan as the modality of initial imaging. Instead, her opinion is contradicted by the literature she relies on. Again, as Dr. Schmidt has no clinical experience as to the standard of care for assessing kidney stones in 2016-2017, her opinion is wholly unsupported. Her opinion is further irrelevant and unsupported by any methodology as, regardless of the statistics, Mr. McCullough's cecum tumor in 2019 was not depicted on the CT scan and no scientific or reliable methodology has been presented to support that it would have been revealed on CT imaging any earlier. Finally, her criticisms of how non-defendants worked

---

[5] Dr. Schmidt believes the colon cancer would have been Stage 1 in 2016. (Ex. D, 27, 30).

up a condition other than cancer is wholly irrelevant and can only confuse and mislead the jury. Thus, her opinions are inadmissible for failure to meet the gatekeeping requirements of Rule 702 and must be barred.

### ii. Doubling Time

The expert's report must be "complete and detailed" and set forth the "basis and reasons" for their opinions and conclusions. *Ciomber v. Cooperative, Plus*, 527 F.3d 635, 641 (7th Cir. 2008) (citing FED. R. CIV. P. 26(a)(2)(B)(i)); see also *Salgado v. General Motors*, 150 F.3d 735, 741 n.6 (7th Cir. 1998) ("A complete report must include the substance of the testimony which an expert is expected to give on direct examination together with the reasons therefor . . . . [It] must include 'how' and 'why' the expert reached a particular result, and not merely the expert's conclusory opinions."). Again, "experts cannot offer opinions based merely on their say-so." *Smith*, 472 F. Supp. 3d at 480.

There is no reliable way to post-date colon cancer and, importantly, there is no reliable way to determine when cancer metastasizes. (Ex. E). Dr. Schmidt, however, opined that she could post-date Mr. McCullough's cancer by determining the doubling time of his cancer. Dr. Schmidt's attempt to calculate the size of Mr. McCullough's cancer prior to its clinical presentation using a method call "doubling time" is the foundation for Dr. Schmidt's opinion as to the size and staging of Mr. McCullough's tumor before 2019 and the foundation for her opinion as to Mr. McCullough's life expectancy if he had been diagnosed prior to 2019. For the reasons set forth below, Dr. Schmidt's opinions on doubling time must be barred for lack of reliable methodology and so too must her opinions that flow from it.

Doubling time is the time that is required for a tumor to double in size. (Ex. E, 14). Size can be measured as either a single length or, more reliably, as volume if three dimensions can be determined. (Ex. E, 14). In order to reliably calculate doubling time, there must be ***two***

*measurements* over a period of days, weeks, or months when no treatment is given. (Ex. E, 14).

Dr. Schmidt opined that Mr. McCullough's tumor would have measured 6-millimeters as of June

3, 2016, 9.3-millimeters as of January 4, 2017, and 13-millimeters as of June 22, 2017. (Ex. D, 2,

27, 30). This is based only on one data point, which was the measurement of the tumor at 60-

millimeters (*i.e. 6-centimeters*) on June 28, 2019. (Ex. D, 27, 30).

Dr. Pennington, an oncologist that treated patients during the relevant time, explained two

fundamental errors with Dr. Schmidt's use of doubling time.  First, she did not have the data to

perform it and, in fact, did not calculate Mr. McCullough's cancer's doubling time.  Second, Dr.

Schmidt did not utilize doubling time in the manner commonly accepted in the field.  (Ex. E).

First, Dr. Schmidt attempted to calculate doubling time based on only *one* data point. Dr.

Schmidt's calculation is based only on the measurement of the tumor at 60-millimeters on June

28, 2019. (Ex. D, 30).  However, two data points are required for comparison to perform the

computation.[6] (Ex. E).  Instead of using two data points, such as a previous measurement of the

tumor (which there is none) to calculate the doubling time, Dr. Schmidt made up a doubling time.

Dr. Pennington explains:

> Instead of acknowledging the limitations that prevented a doubling time calculation, Dr.
> Schmidt elected to predict a doubling time to establish the size and stage of OM's cancer
> prior to 2019. She states that the average doubling time for colon cancer is 130-211 days.
> She then calculates the size of the tumor in a retrospective manner using doubling times of
> 112, 130, and 211 days. Using this methodology, she suggests that in June of 2016, OM's
> cancer would have been no less than 0.6cm with a doubling time of 112 days and as large
> as 1.8 cm with a slower doubling time. She then assigns a stage for each date and predicts
> what his probability of cure would be.

(Ex. E, 14).

---

[6] In *Boody v. United States*, the expert presenting evidence on doubling time made clear that, in order to
accurately calculate doubling time, one needs to know the size of the tumor at *two* distinct periods of time.
*Boody v. United States*, 706 F. Supp. 1458, 1461 (D. Kan. 1989).

The fact that Dr. Schmidt manufactured the doubling time is not genuinely disputed. Dr. Schmidt admitted, "[i]f you have two measurements at two different time, you calculate the doubling time. If you have a certain doubling time you're looking for… then you punch in different numbers until you get the diameter that it was according to that doubling time." (Ex. G, 149). Dr. Schmidt did the latter. As she did not have a second measurement, Dr. Schmidt did not calculate the doubling time at all. Instead, she made up a doubling time of 112 days.

No methodology was applied to come to the doubling time of 112 days. She did not use a formula or any calculation to determine the doubling time for Mr. McCullough's colon cancer. With her manufactured doubling time, Dr. Schmidt used an online calculator to find out what Mr. McCullough's primary cancer tumor size may have been **_if his cancer had a doubling time of 112 days_**. (Ex. G, 148-149). Dr. Schmidt withheld her computations until her deposition, which is addressed in Defendants' Renewed Motion to Strike, but at the deposition, counsel inquired as to each computation she performed.

Dr. Schmidt testified that she input different measurements into the online calculator to try and get to a doubling time of 112 days, instead of performing any analysis as to the doubling time of Mr. McCullough's cancer based on his data. (Ex. G, 149-161; *see* 155-156 "we wanted 112 days, so that's the number you get, 9.3." "Q: And 9.3 is not a number you found in the records for the diameter of his cancer? A: No"). To be abundantly clear, the website **_did not calculate Mr. McCullough's cancer's doubling time was 112 days_** as there is no data available to measure Mr. McCullough's cancer's doubling time. Thus, Dr. Schmidt has not conducted a doubling time analysis, and her opinions related thereto must be barred.

Furthermore, Dr. Schmidt lacks foundation to opine as to the methodology she used. Dr. Schmidt does not know the formula the website used. Dr. Schmidt, nor Defendants, can test the

website's accuracy because Dr. Schmidt does not know the formula. Dr. Schmidt acknowledges that if the formula is wrong or if the website incorrectly computes the formula, then her opinions are inaccurate. (Ex. G, 139-145). Furthermore, these computations are not self-evidence or self-explanatory. For from it, the measures Dr. Schmidt provides do not double every 112 days. (Ex. D, 27, 30); (Ex. G, 145-146; 160-165). Dr. Schmidt explains that the doubling time is the amount of time cancer doubles in volume, but she did not have the volume for Mr. McCullough's cancer at any time. (Ex. G, 165-166). Dr. Schmidt believes that the formula somehow converts the diameter of a tumor into a volume, even though a volume requires ***three*** data points for measurement. Dr. Schmidt could not explain how this worked, let alone that it was reliable. (Ex. G, 145-148; 160-168).[7] The numbers as Dr. Schmidt presents them are also inconsistent with the publications she cites as to the average size of tumors at certain stages. (Ex. D, 27).

Ample authority exists requiring the exclusion of an expert opinion when it merely parrots the opinion of other experts and is formed without independent investigation. "[T]he entirety of an expert's testimony cannot be the mere repetition of 'the out of-court statements of others . . . .'" *United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014)) (citations omitted). "An expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy." *Accord Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) ("Rule 703 'was not intended to . . . allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.'" (quoting *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005))); *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("While

---

[7] Dr. Schmidt cannot say how the calculator operates as she doesn't understand the formula used and is "not a mathematician." (Depo, 140:16-142:22). Dr. Schmidt does not know who runs the website. (Depo, 144:1-10). Dr. Schmidt conceded that if the website's formula was inaccurate, it would affect her opinion. (Depo, 143:2-16).

it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts . . . such expert must make some findings and not merely regurgitate another expert's opinion."); *see also Schoen v. State Farm Fire & Cas. Co.*, No. CV 21-00264-JB-N, 2022 WL 16579767, at *6 (S.D. Ala. Nov. 1, 2022) (collecting cases in which experts were excluded for parroting the opinions of other experts or wholesale adopting other experts' opinions without independent analysis).

Here, Dr. Schmidt cannot lay the foundation that 112 days was Mr. McCullough's cancer's doubling time or that, even if it was, that her online inquiry was a reliable method of computing doubling time. Dr. Schmidt's opinions rest on someone else's formula being correct ***and*** someone else's website correctly computing the formula and Dr. Schmidt correctly inputting accurate data from this case, but Dr. Schmidt cannot lay this foundation.  Thus, her opinions are inadmissible on this ground for failure to meet the gatekeeping requirements of Rule 702 and they must be barred.  *See Cnty. of Cook Ill. v. Wells Fargo & Co.*, No. 14 CV 9548, 2022 U.S. Dist. LEXIS 227309, 2022 WL 17752387, at *4 (N.D. Ill. Dec. 19, 2022)("Because no evidence from Dr. Lacefield or others establishes the reliability of the methodology chosen by the statisticians, and because that methodology underlies, and thus is central to the reliability of, Dr. Lacefield's delimiter opinions, those opinions are excluded"), citing *Dura Auto. Sys. of Ind., Inc. v. CTS Corp*., 285 F.3d 609, 615 (7th Cir. 2002).

Second, even if Dr. Schmidt had two data points and properly computed doubling time, doubling time is not a scientifically reliable method to determine the prior size and stage of cancer as cancer grows at different rates at different times. (Ex. E).  Dr. Schmidt should know this as the literature she purported to rely on concluded, "tumor growth rate remains an important under evaluated variable in colorectal cancer… To date, growth rate and doubling time have shown no

23

true correlation with cancer stage or location, with limited studies pairing these parameters with histological analysis." [8]  (Exhibit L, British Journal of Surgery); (Ex. E, 15).  This is because "[s]tudies exploring the doubling time for metastatic lesions of the liver have consistently demonstrated a wide range of doubling times," including from 10 to 387 days.  (Exhibit M, Metastatic Tumor Doubling Time: Most Important Prehepatectomy Predictor of Survival and Nonrecurrence of Hepatic Colorectal Cancer Metastasis, K Tanaka, et al.); (Ex. E).  Even in the same patient, the doubling time is known to vary at different stages and times.  *Id*.  As such, doubling time is not accepted in the field of oncology to stage cancer or retroactively predict prognosis. (Ex. E, citing DeVita VT, Hellman S, Rosenberg SA. Cancer: Principles and Practice of Oncology. 2nd edition. Philadelphia: JB, "such extrapolations are almost certainly erroneous and tend to overestimate the tumor lifespan in the preclinical era.").  Furthermore, Dr. Schmidt admits that a doubling time cannot determine when a cancer metastasizes, which is the predominant factor for both prognosis and curability.  (Ex. G, 173-174).  In other words, Dr. Schmidt is using a formula that does not determine staging or curability to support her opinion on staging and life expectancy, based on a doubling time she made up.

In addition to Dr. Schmidt's own medical literature, there have been a number of cases in which either the court or a testifying expert has criticized the doubling time methodology used to retrospectively determine when a cancer first appeared or for staging of cancer.  These cases conclude doubling time is not generally accepted in the medical community.  *See, e.g., Maher v. Quest Diagnostics, Inc*., 269 Conn. 154, 847 A.2d 978 (2004) (applying *Daubert* standard, the court concluded in cervical cancer case that doubling time is not accepted as a well-established

---

[8] Burke JR, Brown P, Quyn A, Lambie H, Tolan D, Sagar P. Tumor growth rate of carcinoma of the colon and rectum: retrospective cohort study. BJS Open. 2020 Sep 30;4(6):1200–7. doi: 10.1002/bjs5.50355. Epub ahead of print. PMID: 32996713; PMCID: PMC8370463.

principle within relevant community of gynecology or oncology).[9]   Accordingly, even if Dr. Schmidt had two data points and properly computed doubling time, her opinions still rest on the validity of the assumption that doubling time is a reliable method of determining the time of the origin of the tumor and when it metastasized – which it is not. Thus, her opinions are inadmissible on this ground for failure to meet the gatekeeping requirements of Rule 702 and they must be barred.

In sum, Dr. Schmidt did not perform any computation of Mr. McCullough's cancer's doubling time but attempts to offer opinions on doubling time that she cannot lay the foundation for.  Further, she knowingly attempts to utilize doubling time in a manner that is not accepted in the field of oncology.  As such, her opinions related to the doubling time of Mr. McCullough's cancer must be barred. In barring these opinions, the remainder of Dr. Schmidt's opinions with respect to Mr. McCullough's life expectancy (as discussed below) must be barred as they depend on the stage of his cancer that was determined with the doubling time.  For these reasons, Defendants' Motion to Bar Dr. Schmidt should be granted.

---

[9] *See also Keir v. United States*, 853 F.2d 398, 403 (6th Cir. 1988)(expert witness testimony that doubling time for intraocular cancer is "elusive, as some grow quickly and others grow slowly"); *Waffen v. United States Dept of Health & Human Services*, 799 F.2d 911 (4th Cir. 1986)(plaintiff's expert conceded that lung cancer doubling time was not recognized generally by medical community as method for determining prognosis or modality of treatment; defendant's expert indicated that doubling time was "widely unaccepted for prognosis because it was speculative and had essentially no clinical data to validate its application to any one individual"); *Crane v. Scribner*, 369 Md. 369 (2002)(plaintiff's expert testified that doubling times could be used to give theoretical estimate as to date tumor begins growth but that such estimate was not "exact science" because 'many cancers are not truly spherical and … doubling times may not be constant through the process"); *Hebert v. Parker*, 796 So.2d 19 (La. App. 2001)(plaintiff's expert testified that doubling time theory is problematic in that it presupposes that tumors are all homogenous cell type with same growth rate while in reality tumors are heterogeneous with different growth propensities); *Thors v. Boska*, 38 Cal. App. 3d 558 (1974)(expert witness testimony that doubling time theory for plaintiff's breast cancer was unreliable "in any single human case" because many different factors affect growth rate of cancer).

### iii. Dr. Schmidt purports to offer definitive opinions on Mr. McCullough's responsiveness to chemotherapy and life expectancy.

Throughout her deposition and in her written report, Dr. Schmidt repeatedly opined certain outcomes "would have" occurred if Mr. McCullough was diagnosed at different times. Even a lay understanding of the term "would," a tense of the word "will," means an event that expected to occur or be done. To opine that a patient "will" respond or "would have" responded to chemotherapy, or "would have" lived longer, is not supported by any reliable medical principle. Meanwhile, when Dr. Schmidt looked at publications that provide ranges of possible outcomes, Dr. Schmidt's only considered the long end of the estimated ranges. While all possibilities within the range are equally possible, Dr. Schimdt provides a bottom-line opinion that Mr. McCullough "would have" had the best possible result. This is wholly unsupported by any methodology.

Furthermore, Dr. Schmidt's opinions admittedly rely on material assumptions, mainly that Mr. McCullough's cancer was not metastatic and would have been successfully and fully surgically removed. (Ex. G, 193-194; 247-276). As discussed above, no medical principle can determine when a person's cancer metastasized, including doubling time. Further, absolutely no methodology has been provided to show that Mr. McCullough's cancer could have been fully resected at *any* time. Even further, her opinion does not assess recurrence rate, as most tumors recur, and poorly-differentiated tumors, like Mr. McCullough's, recur quicker. (Ex. G, 195-196). Yet again, Dr. Schmidt's opinion is based only on her say-so without application of scientific or reliable principles or methods.

Next, as it relates to whether Mr. McCullough could have lived longer if he was diagnosed in January 2019, this opinion is wholly irrelevant as only one nursing Defendant, who cannot diagnose or treat cancer, saw Mr. McCullough in January 2019. Thus, this opinion can only serve

to confuse and mislead the jury.  Nonetheless, Dr. Schmidt's opinions fly in the face of all the evidence.  Most importantly, whether Mr. McCullough's cancer was responsive to chemotherapy.

> The prognosis of a patient with metastatic colon cancer at the time of diagnosis depends on many factors with the most important factors being the biological aggressiveness of the cancer, performance status of the patient, and whether the cancer is sensitive to chemotherapy. Chemotherapy treatments can decrease the tumor burden by 50% or more in 60 to 70% of patients. Patients whose tumors are sensitive to chemotherapy usually live for 2 or 3 years. Occasionally, some will live as long as 5 years. However, some patients have drug-resistance from the beginning and do not respond to chemotherapy. Those patients usually die within 12 months.

(Ex. E, 16).  Dr. Schmidt cannot speculate as to whether Mr. McCullough's cancer would have responded to chemotherapy because Mr. McCullough was treated with two lines of therapy. Unfortunately, he did not respond to chemotherapy and his oncologist ended the second line therapy early and referred him to hospice.  (Ex. G, 51:16-19).  Dr. Pennington explained, "I would agree with Dr. Schmidt that he could have lived until January of 2021, had OM had a cancer that was sensitive to chemotherapy. But that, unfortunately, was not the case here. OM's cancer did not respond significantly to treatment so death within a year was expected. This is consistent with the publication upon which Dr. Schmidt bases her opinion."  (Ex. E, 16).  This is not an area where educated minds can differ.  Instead, Dr. Schmidt opined that Mr. McCullough would have responded to chemotherapy, even though he did not.  She opined that he would have had the longest possible life expectancy, even though he would not have, because his cancer was not sensitive to chemotherapy.  As such Dr. Schmidt's opinions should be barred as they apply no methodology and come to bottom-line opinions disregarding medical literature and the specific facts of this case.

Lastly, as it relates to life expectancy for Mr. McCullough if he was diagnosed before 2019, Dr. Schmidt's opinions relate to non-defendants that treated him years prior to the Defendants.  Dr. Scott and NP Rector are not defendants in this lawsuit and opinions that they should have

diagnosed Mr. McCullough on accident when assessing his suspect kidney stones and, if they had, Mr. McCullough would have survived colon cancer or would have lived may years longer is beyond speculation, beyond expectation, and beyond deliberate indifference or medical malpractice. As it relates to the claims against the Defendants, it is undisputed that Mr. McCullough's cancer was terminal and non-responsive to chemotherapy. Dr. Schmidt's opinions seek to confuse and mislead the jury, and they cannot be as helpful for the claims actually brought in this matter. For any of these reasons, Defendants' Motion to Bar should be granted.

## IV. Dr. Schmidt offered new opinions at her deposition that were not contained in her written report.

Defendants incorporate by reference their Motion to Strike and Renewed Motion to Strike as if fully stated herein. As more fully briefed there, Dr. Schmidt failed to disclose a 22-page "timeline and thoughts" and publications she relied on in preparing her report. Most notably, Dr. Schmidt's report offers opinions on the doubling time of Mr. McCullough's cancer. As discussed in Section III(B)(ii) above, Dr. Schmidt's usage of an online generator website to compute doubling time is foundationally flawed and was not disclosed to Defendants until her deposition commenced. Dr. Schmidt failed to disclose the computations from this website in advance of her deposition, and it was not until Dr. Schmidt was deposed did Defendants learn that she used the website incorrectly and not in the manner intended. Her opinions on the doubling time of Mr. McCullough's cancer are central to her report and Defendants were deprived of the opportunity to meaningfully prepare for this line of questioning. There can be no real dispute that preparation for an expert's deposition, especially on such nuanced and specialized topics in a case involving allegations of wrongful death, is necessary, and denying Defendants such preparation constitutes significant harm.

If not for the above reasons, for the reason stated in the Renewed Motion to Strike, Dr. Schmidt's documentation and computations withheld from her report and produced at or near her deposition should be barred as untimely. *Dunkin' Donuts Inc. v. N.A.S.T., Inc.*, 2005 U.S. Dist. LEXIS 16703, *5. The purpose of the discovery rules is to prevent what occurred in Dr. Schmidt's deposition. See *Osterhouse v. Grover*, No. 3:04-cv-93-MJR, 2006 U.S. Dist. LEXIS 50282 at *7-9 (S.D. Ill. Jul. 20, 2006). Accordingly, Defendants' Motion to Bar Dr. Schmidt should be granted.

WHEREFORE, for the above reasons, Defendants respectfully request this Honorable Court grant their Motion to Bar Dr. Schmidt, and any such further relief as deemed appropriate.

Respectfully submitted,

CASSIDAY SCHADE LLP

By:  /s/ Jaclyn A. Kinkade
    One of the Attorneys for Defendants
    WEXFORD HEALTH SOURCES, INC.,
    CYNTHIA ROSS, R.J. DUPREY, COURTNEY
    WALKER, JUSTIN YOUNG, and ANGELICA
    WACHTOR

Jaclyn A. Kinkade
ARDC No. 6333722
CASSIDAY SCHADE LLP
100 North Broadway, Suite 1580
St. Louis, MO 63102
(314) 241-1377
(314) 241-1320 (Fax)
jkinkade@cassiday.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2024, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system.  The electronic case filing system sent a "Notice of

E-Filing" to the following:

ATTORNEYS FOR PLAINTIFFS:
Jon I. Loevy
Maria Makar
Loevy & Loevy
311 N. Aberdeen Street, Third Floor
Chicago, IL 60607
jon@loevy.com
makar@loevy.com


/s/ Jaclyn A. Kinkade