UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KEYANA WILEY, Administrator of the Estate of OMAR MCCULLOUGH #K77858,<br><br>**Plaintiff,**<br><br>v.<br><br>JUSTIN YOUNG, C. WALKER, ANGELA WACHTOR, JUSTIN DUPREY, JANE DOE, WEXFORD HEALTH SOURCES, INC., and NURSE CYNTHIA,<br>**Defendants.** | Case Number 3:21-cv-00599<br><br>DWD Judge David W. Dugan |

**PLAINTIFF'S RESPONSE TO DEFENDANTS WEXFORD, ROSS, DUPREY, WALKER, YOUNG, AND WACHTOR'S MOTION TO BAR DR. VENTERS**

Defendants Wexford, Ross, Duprey, Walker, Young and Wachtor seek to disqualify Plaintiff's medical expert, Dr. Homer Venters, from testifying at trial. Their arguments lack merit.

First, Defendants contend that Dr. Venters' correctional administration experience, in addition to his direct patient care background, somehow renders him unqualified to opine on Wexford's systemic deficiencies relevant to Plaintiff's *Monell* claims. Second, after delaying the production of third-party medical records throughout discovery, Defendants now argue that Dr. Venters lacked a sufficient data sample to support his opinions. Unable to claim he had no methodology—only that they failed to properly explore it or that it does not favor their defense—they baselessly assert that it fails to meet the rigors of Federal Rule of Evidence 702.

Next, Defendants present a barrage of critiques meant for cross-examination or rebuttal by their own experts. Finally, by mischaracterizing Dr. Venters' opinions, they argue that the Court must exclude his testimony because he allegedly offered new opinions during his

1

deposition.

None of these arguments withstand scrutiny, and the Court should deny Defendants' motion.

## LEGAL STANDARD

Federal Rules of Evidence 702 and 703, as construed by the Supreme Court in *Daubert*, govern a district court's decision to exclude expert testimony. *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 771 (7th Cir. 2014) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)). An expert by "knowledge, skill, experience, training, or education" may offer opinions if the expert's scientific knowledge would "assist the trier of fact to understand the evidence or to determine a fact in issue." *Daubert*, 509 U.S. at 588 (citing Fed. R. Evid. 702). The Court also emphasized the "liberal thrust" of the Rules and their "general approach of relaxing the traditional barriers to 'opinion' testimony." *Id*. (citation omitted). Under Rule 702, "the rejection of expert testimony is the exception rather than the rule." Advisory Committee's Note to the 2000 Amendment) (citing *Daubert*).

Although courts should serve as gatekeepers to ensure experts' opinions are reliable and relevant, "the district court's role as gatekeeper does not render the district court the trier of all facts relating to expert testimony." *Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 765 (7th Cir. 2013); *see also Lapsley v. Xtec, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) ("A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy."). In other words, the "soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact," and the focus of the Daubert inquiry should remain on the principles and methodology used by the expert, not on the ultimate opinions

2

reached. *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). Rather than exclusion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

  I.  **DR. VENTERS IS QUALIFIED TO RENDER THE OPINIONS CONTAINED IN HIS REPORT**

The Seventh Circuit has repeatedly rejected as "radically unsound" the "notion that *Daubert* . . . requires particular credentials for an expert witness." *Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000); *see Gayton v. McCoy*, 593 F.3d 610, 618 (7th Cir. 2010) ("Ordinarily, courts impose no requirement that an expert be a specialist in a given field ......") (citation omitted); *Olivarius v. Tharaldson Prop. Mgmt.*, 2011 WL 13261842, at *2 (N.D. Ill. Apr. 29, 2011) ("[T]he fact that Dr. Simon is not a specialist in infectious disease does not prevent him from offering an opinion about how plaintiff developed cellulitis in her left leg."). The touchstone of the qualification inquiry is whether an expert has relevant knowledge that can assist the trier of fact. *See Tuf Racing Prods., Inc.*, 223 F.3d at 591.

Defendants cannot seriously deny that Dr. Venters' specialized knowledge and experience provide the adequate foundation on which he can render opinions on Wexford's policies, procedure, oversight and the appropriateness of care provided to Mr. McCullough. Ex. 1 (Dr. Venters CV). Notwithstanding Dr. Venters' qualifications, Defendants try to bar him by arguing that the Illinois medical malpractice statute requires an affidavit from a healthcare professional who "has practiced   within the last 6 years or teaches or has taught within the last 6 years in the same area of health care or medicine" at issue in the lawsuit. Def. Br. at 6. On this score, Defendants muddle a distinction between Dr. Venters' treating of patients in residency and

3

fellowship, and his treating and monitoring of patients as he advanced in his career, apparently implying that the latter is not "active practice." *Compare* Def. Br. at 6 *with* Ex. O, ECF 216 (Venters Dep.) 258:17-260:10.[1] This argument borders on frivolous.

As a threshold matter, whether state law requires an affidavit to be attached to a complaint has no bearing whatsoever on a *Daubert* challenge under Rule 702 to Dr. Venters' qualifications. Defendants even concede that "the federal claims at issue do not have this express requirement." *Id.* Regardless, Dr. Venters *has* practiced correctional medicine in the last seven years and continues to see patients, so the argument is moot anyway. As Dr. Venters testified in his deposition, Dr. Venters treated patients full-time in residency and fellowship, then treated and examined more serious patients as an attending (at some point balancing his time with administrator duties), and now examines and oversees incarcerated patients as an independent monitor. Unsurprisingly, Defendants found no legal support for their suggestion that Dr. Venters' work is not "active practice." In fact, several judges nationwide have independently appointed him as an ongoing expert in correctional settings. Ex. 1 at 1.

Next, Defendants argue that because Dr. Venters "testified that he is not an expert in community standards, hospital systems, or healthcare reform" and did not "research" the standard of care, he cannot opine on Wexford—a company that operates "across 30 facilities, with thousands of staff, to a 40,000 population." Def. Br. at 10–12.[2] This is an unsupported and

---

[1] For ease of reference, Plaintiffs use the same exhibit letters Defendants used in their memorandum in support of their motion for summary judgment. ECF No. 213.

[2] Defendants' example of an expert who cited "research" for the standard of care is Plaintiff's expert Dr. Schmidt's opinions—yet Defendants are seeking to disqualify Dr. Schmidt because of her experience and her research. *See generally* ECF No. 222 (Defendant Wexford, Ross, Duprey, Walker, Young and Wachtor motion to bar Dr Schmidt). This is just one example of Defendants' inconsistent interpretation and use of *Daubert* to avoid the merits and cause delay.

4

conclusory argument and it is waived. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived."). Defendants also introduced arguments—that they did not ultimately make—that the Court should disqualify Dr. Venters because he is not an expert in medical causation, cancer epidemiology, prognosis, radiology, hepatitis C, or nursing practice. Def. Br. at 10 (citing Dr. Venters' Dep.). Since Defendants did not ultimately develop these arguments or provide any support, they are also waived. *See id.*

Even if they had not waived them, Defendants' arguments would fail. First, Dr. Venters is an expert in the areas Defendants enumerated, as explained herein. *See* Ex. K, ECF 214 at 1–3. Second, a physician may render an expert opinion on a nurse's standard of care.[3] *Cooper v. Eagle River Mem'l Hosp., Inc.*, 270 F.3d 456, 463 (7th Cir. 2001) (affirming district court decision that family physician could render an expert opinion of the standard of care that should be practiced by nurse practitioners, although family physician had only limited experience with nurse practitioners and her role was administrative in nature, and only 25 percent of her practice related to area of medicine at issue).

Moreover, Defendants' arguments do not consider that an expert's specialized knowledge and experience can serve as the requisite "facts or data" on which they render an opinion. In *Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010), a patient who had received an elbow replacement sued the prothesis manufacturer, alleging that device defects had caused joint

---

[3] There are no nurse defendants in this case, so Plaintiffs assume that Defendants' (undeveloped and waived) argument is that Dr. Venters cannot opine on a nurse's standard of care for purpose of *Monell*. Relatedly, Plaintiffs highlight again that each treater did not have to be deliberately indifferent or deviate from the standard of care for Wexford to be liable in this case—despite Wexford's improper arguments to the contrary throughout this litigation. *Glisson v. Ind. Dep't of Corr.*, 849 F.3d 372, 849 F.3d 372 (7th Cir. 2017) (en banc) (recognizing the liability of private corporations for constitutional violations caused by deliberate policy choice pursuant to which no one person was responsible for coordinating patient's overall care).

problems requiring several additional surgeries. 598 F.3d at 562. The patient relied on the testimony of Arnold-Peter Weiss, M.D., who opined that polyethylene prosthesis normally lasted between five and fifteen years, and that it was unlikely the plaintiff's joint issues were caused by "overuse, medical malpractice or other factors external to the device." *Id*. at 562–63.

The district court granted the defendant's *Daubert* motion and excluded Dr. Weiss's testimony, concluding that Dr. Weiss failed to base his assumptions on an objective source, as he had neither examined the plaintiff personally, nor cited any corroborating, peer-reviewed publications. *Id*. at 563, 567. The Ninth Circuit reversed, holding that the district court's concerns spoke to the evidence's weight, not reliability. The court emphasized Dr. Weiss's experience and qualifications, the nature of the medical testimony, and the unique issue at hand. *Id*. at 566. Dr. Weiss's "extensive, relevant experience" with prosthetic elbows qualified him to make such a judgment and provided a sufficient foundation for his testimony. *Id*. at 568 ("Given that the judge is 'a gatekeeper, not a fact finder,' the gate could not be closed to this relevant opinion offered with sufficient foundation by one qualified to give it." (internal citation omitted)).

Dr. Venters is an expert in correctional healthcare and correctional healthcare systems administration. It is undisputed that Dr. Venters has a wealth of relevant experience with providing healthcare to incarcerated people, correctional healthcare systems, and correctional healthcare reform. Dr. Venters was the Deputy Medical Director of the New York City Jail Correctional Health Service. Ex. 1 at 2. As the Deputy Medical Director, Dr. Venters provided direct care to individuals detained in 12 jails and was responsible for direct oversight of the medical policies for their care, including chronic care, sick call, specialty referral and emergency

6

care. *Id*. at 2–3. He was later promoted to Medical Director, Assistant Commissioner, and Chief Medical Officer, where he was responsible for all aspects of health services, including physical and mental health, addiction, quality improvement, re-entry, and morbidity and mortality reviews, as well as training and oversight of physicians, nursing staff, and pharmacy staff. In this role, Dr. Venters was responsible for the care of vulnerable patients, including those with chronic health problems. *Id*. at 2.

Dr. Venters' experience in correctional health includes almost nine years visiting detention centers and conducting analysis of physical and mental health policies and procedures for persons detained by the U.S. Department of Homeland Security and Department of Justice. *Id*. at 1. Dr. Venters implemented the nation's first electronic medical record and health information exchange for 1,4000 staff and 75,000 patients in jail and reduced overall mortality in the nation's second largest jail system. *Id.* at 2. He wrote and published a book on the health risks of jail, *Life and Death in Rikers Island*, which was published in early 2019 by John Hopkins University Press and made him a finalist for the Prose Award for Literature. *Id*. Dr. Venters has worked as a medical expert in cases involving correctional health since 2017. *Id.* at 8.

Since April 2020, Dr. Venters has worked on a COVID-19 response in detention settings, including conducting inspections of numerous state, federal, and local detention facilities to assess the adequacy of their COVID-19 responses. *Id.* at 1. Dr. Venters was appointed by former President Biden to serve on the COVID-19 Health Equity Task Force in 2021 to help create standards for improving health services in correctional settings in response to the pandemic. *Id*. Dr. Venters was appointed to serve as an ongoing, independent, court-appointed monitor at

Cumberland County Jail, NJ; Fluvanna Women's Correctional Center, VA; Santa Barbara County Jail, CA; the VI Department of Corrections; HI Department of Corrections; and CT Department of Corrections. *Id.* at 1.

Dr. Venters' history and qualifications make him one of, if not the, leading expert in correctional healthcare in the United States. His established experience and knowledge provide an adequate basis for him to render expert opinions in this case. Defendants' motion should be denied.

Defendants next argue that Dr. Venters cannot opine on deficiencies in any specific Wexford policies, training, or procedures because he did not opine on whether the care Mr. McCullough received from non-defendant community practitioners met the standard of care, and because he did not separately define or rely on experience from a "community" standard of care. In doing so, Defendants misstate the basis for Plaintiff's claim, or any deliberate indifference claim. Plaintiffs allege that Mr. McCullough received inadequate care from Defendants, who were deliberately indifferent to his serious medical need for cancer diagnosis and care. Defendant Wexford, specifically, is liable under a *Monell* theory for their systematic failures causing Mr. McCullough's injuries. *See Glisson*, 849 F.3d at 832 ("A jury could further conclude that Corizon had actual knowledge that, without protocols for coordinated, comprehensive treatment, the constitutional rights of chronically ill inmates would sometimes be violated, and in the face of that knowledge it nonetheless adopted a policy of inaction . . . . Monell requires no more."); *Daniel v. Cook County*, 833 F.3d 728 (7th Cir. 2016) ("The unlawful practice"—the failure to establish adequate systems for scheduling health care, keeping health care records, and addressing inmate grievances about health care— "was so pervasive that acquiescence on the part of policymakers was apparent and amounted to a policy decision.").

Moreover, under the law, the standard of care in prison, with which Dr. Venters is intimately familiar, is the same as that administered in the community. *See Metavante*, 619 F.3d 748, 761 (7th Cir. 2010) ("'An expert's testimony is not unreliable simply because it is founded on his experience rather than on data."). Perhaps this is why Defendants do not cite a single case to support their position.

In any event, if the law (and indeed, the practice of medicine) were different and Dr. Venters had applied some different "community" standard of care without regard to his correctional healthcare experience, that approach would only serve Defendants' position if Dr. Venters applied a *less stringent* standard of care. This would be the very first time undersigned counsel has heard Defendant Wexford take the position that a *more stringent* standard of care should apply in prison than in the community. But in any event, this case is about medical care provided to a prisoner—not a patient out in the community. Of course, Dr. Venters' correctional healthcare experience gives him a deeper understanding of the facts here. Even more confusing is that Defendants make this argument after stating that Dr. Venters is unqualified to opine on the standard of patient care at all. The Court should reject the County's attempt to disqualify Dr. Venters. *See Tuf Racing Prods.*, 223 F.3d at 591.

## II.    DR. VENTERS' OPINIONS HAVE ADEQUATE FOUNDATION.

### A. Defendants' Challenge to the Records Dr. Venters Reviewed Fails Both Factually And As A Matter of Law.

Defendants next argue that Dr. Venters cannot opine on deficiencies in any specific Wexford policies, training, or procedures because he did not review certain medical files and deposition testimony.

For starters, Dr. Venters reviewed hundreds of pages of Mr. McCullough's medical records and lab results, third-party medical records, correspondence, discovery, and expert reports of Wexford's care from the *Lippert* litigation. Ex. K, ECF 214 (Venters Report) at 7–8. And the caselaw is clear that there is no magic number of cases Dr. Venters needs to identify to opine about a systemic deficiency. *Glisson*, 849 F.3d 372, 382 (7th Cir. 2017) ("There is no magic number of injuries that must occur before its failure to act can be considered deliberately indifferent." (citing *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 929 (7th Cir. 2004) ("CMS does not get a 'one free suicide' pass.")).

Dr. Venters also used a spreadsheet provided by Plaintiff's counsel as an administrative tool to navigate through the third-party patient files and identify relevant medical encounters, but he relied on his own review and methodology to formulate his opinions. *See, e.g.*, Ex. O, ECF 215 (Venters Dep. at 51:12- 20). After his review of the records, Dr. Venters concluded in his report:

> Mr. Reed and Mr. McCullough . . . both [] repeatedly sought health care and [] red flags for serious illness and malignancy were ignored, even as they lost weight and their symptoms progressed. Failure to act on abnormal test results and delays in specialty care and diagnostic tests outside the prison system also contributed to the pain and spread of malignancy for both men, worsening their chance for survival, as reflected in the expert reports offered by Dr. Schmidt. Review of medical records for additional patients also reveals gross deficiencies and deviations from the standard of care similar to those in the two aforementioned cases. Specifically, these cases exhibited gross deficiencies in the following areas;
>
> • Unaddressed weight loss
> • Abnormal test results missed/ignored
> • Specialty care delay

10

> Review of the basic findings in the Lippert reports reveals similar and systemic problems with care. My own review of the 2014 and 2018 Lippert reports shows that over half of the deaths involving serious deficiencies in care included at least one of these three problems. Many cases included two or three of these problems. One of the central issues in many of these cases is that patients report a health problem and when the initial assessment and treatment doesn't resolve their issue, Wexford staff simply repeat the same assessment and treatment without stopping to reconsider what the problem is or what the effective treatment should be. For people who received one inconclusive x-ray after another, or those who had persistent gastrointestinal symptoms treated repeatedly with medications for indigestion, the consequences of these gross deficiencies in care include delay of identification and treatment of their malignancy, increased pain and suffering and shortened lifespan. My review of the available information in the cases of Mr. Reed and Mr. McCullough, including their own medical records, my review of 14 additional sets of medical records, as well as review of the Lippert reports and my own assessment of the three specific problems in Lippert report death cases makes clear that these problems in care are systemic in nature and that these deficiencies increase the risk of morbidity and mortality among their patients.

Ex. K, ECF 214 at 38–39 (Venters Report).

Ignoring Dr. Venters' report and testimony, Defendants argue that he should be disqualified because he relied on Plaintiff's counsel or the *Lippert* experts' opinions or methodology. This is belied by the record—including Dr. Venters' repeated explanations of his use of the spreadsheet in his deposition and the explanation of his opinion and its relation to the opinions in the *Lippert* report, as quoted above. Dr. Venters stated throughout his report that his opinions were his own, and that he did his own review of the data provided to him in the spreadsheet and *Lippert* reports. *See, e.g.*, Ex. K, ECF 214 at 11–12, 31 (stating "the opinions presented . . . are based on my own review and assessment") ("I have undertaken my own review of the data included in the *Lippert* reports . . . The table below reflects my own review."). Dr Venters did not rely on the spreadsheet or the *Lippert* reports as the basis for his opinions.

Dr. Venters' reliance on the spreadsheet and *Lippert* reports are perfectly allowed and have been deemed permissible by courts in this Circuit many times. As the Seventh Circuit

11

acknowledged, "it is common in technical fields or an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). The Federal Rules of Evidence confirm that "[a]n expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703.

The *Lippert* reports are such "data" that Dr. Venters' "has been made aware of" based on their review of a broader set of medical records than was made available to Dr. Venters. According to Dr. Venters, "[t]he authors of the 2014 and 2018 reports are highly regarded experts in the field of correctional medicine," and he illustrates why reliance on such data is accepted in the field. Ex. K, ECF 214 at 11–12 ("The 2014 and 2018 Lippert reports comprised two comprehensive, in-depth, independent, and critical reviews of the quality of the healthcare delivered by Wexford Health Sources, Inc. to its patients within the IDOC. The authors . . . were retained not by an interested party, but by a federal district court to assist the court in assessing the adequacy of healthcare delivered within the IDOC."). Dr. Venters' referencing of the reports would not render him a "mouthpiece for Plaintiff's counsel imagination" as Defendants suggest. Def. Br. at 51.

The same goes for the spreadsheet compiled by Plaintiff's counsel team, and the data contained within it. As Dr. Venters explained during his deposition, he used the spreadsheet only to point him toward information contained in the medical files. The spreadsheet served an non-substantive, almost clerical function of listing the files he could access. *He* was the one who selected which files to review, and he alone conducted a substantive analysis of those files. This time of reliance is perfectly allowed and indeed commonplace among experts handling larger volumes of data. *See Wayne v. Boudreau et al.*, 16-cv-01893, ECF No. 589 at 24 (Sept. 30, 2022,

N.D. Ill.) ("In developing the spreadsheet, Kim did not "exercise[] a substantial degree of technical judgment critically relevant to the central contested issues in the case," Equal Emp. Opportunity Comm'n & Bailey, 2016 WL 5796890, at *5 (N.D. Ill. Sept. 30, 2016), and her work preparing the spreadsheet does not otherwise render Bridges's reliance on her work impermissible. In fact, Kim and her team are prototypical "data gatherer[s]" upon whose work reliance is straightforwardly permissible."). *See also Dura Auto. Sys. Of Ind.*, 285 F.3d at 612-13 ("An expert witness is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify."). Ultimately, Dr. Venters "used multiple types or layers of information" and became "confident the[r]e are systemic problems" at Wexford. Ex O, ECF 215 at 182.

Plaintiff's counsel produced the spreadsheet and responded to Defendants' discovery surrounding its creation. It is undisputed that Plaintiff's counsel's team did not "exercise[] a substantial degree of technical judgment critically relevant to the central contested issues in the case," *Equal Emp. Opportunity Comm'n & Bailey v. DHL Express*, 2016 WL 5796890, at *5 (N.D. Ill. Sept. 30, 2016), and the team's work preparing the spreadsheet would not otherwise render Dr. Venters' reliance on it impermissible. Dr. Venters' reliance on such "prototypical data gathers" is "straightforwardly permissible." *Wayne*, 16-cv-01893, ECF No. 589 at 24, citing *Dura Auto. Sys. of Ind., Inc*., 285 F.3d at 613 (quotation marks omitted).

The same argument was rejected by the Court in *Wayne*, where Plaintiff's counsel's employee gathered data into a spreadsheet, upon which the expert actually relied. The Court held:

> At bottom, Defendant's concerns about the quality of the data upon which [the expert] relied goes to the probative weight of that data, not its admissibility. If Defendant can show that the sample of [] files relied upon by [the expert] is not

13

> representative of the broader population of [] files, or that the spreadsheet
> . . . contains inaccurate information about the [] files, [] a jury may be unwilling to
> draw from [the expert] testimony conclusions about Defendant's broader practices.
> But such considerations "go[] to the probative weight of the analysis rather than to
> its admissibility.

*See id.* at 24, citing *Manpower, Inc. v. Pennsylvania*, 732 F.3d 796, 808−09 (7th Cir. 2013) (Whether an expert "selected the best data set to use . . . is a question for the jury, not the judge"), *Jordan v. Dominick's Finer Foods*, 115 F. Supp. 3d 950, 963 (N.D. Ill. 2015) ("[O]bjections as to whether an expert considered certain factors that the opposing side deems irrelevant generally go to the weight."), *Sheldon v. Munford, Inc.*, 950 F.2d 403, 410 (7th Cir. 1991) ("Once the district court has found a sufficient foundation for an expert's testimony, it properly leaves questions concerning his methodology, findings, and expertise to cross-examination."), *Daubert*, 509 U.S. at 596.

In sum, Defendants' critiques of the materials Dr. Venters reviewed and used to support his opinions are quintessentially "fodder for cross-examination, not grounds for exclusion." *Artis v. Santos*, 95 F.4th 518, 527 (7th Cir. 2024); *see also Manpower*, 732 F.3d at 806 ("Whether [the expert] selected the best data set to use . . . does not go to admissibility."); *Sioux Steel Co. v. Prairie Land Mill Wright Servs.*, 2022 WL 17184469, at *10 (N.D. Ill. Nov. 23, 2022) ("[D]isagreements with [expert's] use of underlying facts and assumptions . . . do not warrant his exclusion").

Defendants' examples underscore that their challenges are meant only for cross-examination. For instance, Defendants argue that Dr. Venters opined on the Defendants' care of Mr. McCullough without checking the treater's deposition testimony for their "motivation" and "rationale." Def. Br. at 27. Defendants cite Ms. Stover's deposition, which Dr. Venters did not review. Ms. Stover is not a defendant, so the jury may give little weight to Ms. Stover's after-

the-fact "motivation" as it relates to Dr. Venters' opinions on Wexford's systemic deficiencies. The jury may find weighty, however, Dr. Venters' opinions about Wexford employees' failures to document their medical reasoning and actions in the records Dr. Venters did review. *See e.g.*, Ex. P, ECF 216 at 88:14-89:14 (Venters Dep. at 88–89 ("Q: If a physician doesn't [document], that doesn't mean they didn't do it, it just means we don't know either way, right? A: Yes it is possible it happened. But my experience overseeing physicians is if you review old records and don't document that you reviewed them, it is not useful to the care."). *Daubert* is not meant to move such questions out of the jury's hands into the Court's.

Dr. Venters has presented a reasonable basis for his opinions about Wexford's care. He relied on not only his decades of extensive experience and training as a correctional healthcare provider but also his review of hundreds of pages of available records. Dr. Venters reviewed Wexford's care over several years, to multiple patients, by several treaters across facilities. The holes Defendants seek to poke in his opinions are cross-examination points at best, not grounds for barring the opinion under Rule 702. *See Zambrano v. Sparkplug Capital, LLC*, No. 19 CV 100, 2022 WL 2657224, at *3 (N.D. Ill. July 8, 2022) (rejecting argument that expert's opinions "are unreliable because he did not review certain documents (such as Zambrano's tax returns)"), citing *Africano v. Atrium Med. Corp.*, No. 17-cv-7238, 2021 WL 4264237, at *4 (N.D. Ill. Sept. 20, 2021) ("[O]bjections that [an] expert[] failed to consider facts (or that [he] placed too great an emphasis on certain facts over others) generally go to the weight of the expert's opinion, not its admissibility." (internal quotation marks omitted)); *Wilda v. JLG Indus., Inc.*, No. 16-cv- 10088, 2021 WL 392705, at *3 (N.D. Ill. Feb. 3, 2021) ("[A] failure to look at this or that is not a reason to keep an expert out of a case, unless the materials that an expert reviewed are insufficient without it."); *see also Hale v. State Farm Mut. Auto. Ins. Co.*,

15

2018 WL 3993627, at *4 (S.D. Ill. Aug. 21, 2018) ("Clearly, defendants may cross examine Harrison on why they feel his method is flawed and may cross examine Harrison to point out any discrepancies as to the correctness of Harrison's opinions based upon facts that Harrison may or may not know.").

Unsurprisingly, the cases Defendants cite deal not with similar facts but with experts who did not bother to review any records at all, or who flagrantly ignored all unhelpful data and provided no other basis for their opinions. *See* Def. Br. at 26 (citing *Sommerfield v. City of Chicago,* 254 F.R.D. 317 (N.D. Ill. 2008) (expert reviewed no data, only counsel's summaries of depositions), then citing *Barber v. United Airlines, Inc.*, 17 Fed. Appx. 433, 437 (7th Cir. 2001) (expert ignored pilot's testimony, cherry-picked only the helpful weather data, and provided no other data to support opinion). In stark contrast, Dr. Venters extensively reviewed the available records to conclude Wexford had systematic problems reflected in Mr. McCullough's case. *See* Ex. O*,* ECF 215 (Venters Dep. 210:14-17 "I think that reviewing a larger sample size could be useful. I don't have concerns that this sample size that I reviewed doesn't reflect systematic problems."). Nor do Defendants cite a single case supporting their incorrect contention, improperly raised in this motion, that a *Monell* claim requires a larger sample or greater pattern. The Court should deny Defendants' motion.

Defendants' remaining arguments are: (1) a critique of Dr. Venters' data support for his opinions on Mr. McCullough, Mr. Reed, and third-party patients' care, and (2) a muddling of Dr. Venters' articulated methodology, and a claim that it is unreliable and biased. Def. Br. at 30–53.

As to the first, Dr. Venters has articulated a reasonable basis for his opinions about Wexford's care of Mr. McCullough, Mr. Reed, and the third-party patients. Again, Defendants' critiques are cross-examination fodder at best, not grounds for barring the opinion under Rule

16

702. *See Zambrano*, 2022 WL 2657224, at *3 (citing *Africano*, 2021 WL 4264237, at *4); *Wilda*, 2021 WL 392705, at *3; *see also Hale*, 2018 WL 3993627, at *4.[1]

As to the second, Dr. Venters' methodology was to review available records and compare the care documented in those files against the generally accepted practices he had experience with during the relevant time period. His report and testimony demonstrate that his methodology is scientific and reliable. Of the available third-party records, he focused on patients who had lots of labs, had weight loss issues, or had oncology appointments. Ex. O, ECF 215 at 50:9-20. He did not make a determination about the quality of care until after review of the patient records. *Id.* at 51:8-15 (Q: When you said, I want to examine the records of Ted Williams, did you know that already that you believe there was a delay in specialty care for Mr. Williams? A: No. Not that I recall. I think that I looked for encounter types. And I don't know how many times I can say this. I looked for encounter types. And this spreadsheet. Again, I was not clicking on, this spreadsheet could have had other information in it. But for me, my use of this was to look for encounter types that struck me as relevant, and then also, open up those records and examine them."). Defendants do not cite anything in the record to suggest that Dr. Venters' methodology was unscientific or unreliable, and in any event, their critiques are at best, grounds for cross- examination. *See* Rule 703; *Zambrano*, 2022 WL 2657224, at *3.

---

[1] In addition, given that Wexford took the position that *Monell* discovery should be limited is irrelevant and burdensome, this Court should bar Wexford from making any contrary argument now or at trial. The Supreme Court has explained that judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal quotation marks omitted). Estoppel applies when the party to be estopped—here Wexford—takes a later position that is "clearly inconsistent" with it earlier one; persuades a court to adopt the earlier position; and would "derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019) (quoting *New Hampshire*, 532 U.S. at 750-51).

Rehashing many of the arguments in their prior motion to strike, Defendants also argue that the Court should exclude Dr. Venter's opinions because he disclosed or developed new opinions at her deposition. Dr. Venters properly disclosed his opinions and developed them at his deposition. Defendants' argument misstates the record and relevant law, and the Court can easily reject it for the reasons stated in Plaintiff's response to Defendants' prior motion to strike Dr. Venters' opinions. ECF 222; *see also* Fed. R. Civ. P. 26(e)(2); *In re Sulfuric Acid Antitrust Litig.*, 235 F.R.D. 646, 659-60 (N.D. Ill. 2006) ("If you decide to take an expert deposition, you must be careful what you ask. You may open the door to testimony that would otherwise be precluded . . . .) (citation omitted); *see also Ultratec, Inc. v. Sorenson Commc'ns, Inc.*, 45 F. Supp. 3d 881, 895 (W.D. Wis. 2014) ("Although plaintiffs may renew their motion if defendants seek to rely on such testimony at trial, they should be prepared to discuss why Occhiogrosso's deposition testimony regarding enablement should not be admitted after they opened the door by asking Occhiogrosso about this topic at his deposition."); *Gregory v. Oliver*, 2002 WL 31972165, at *2 (N.D. Ill. Dec. 27, 2002) (citing in agreement legal expert's explanation that deposing the opposing party's expert is risky because it allows the expert to testify on any gaps in his report "rather than relying instead on the inability of the expert to modify, or to go outside of the boundaries of, the opinions that were expressly voiced in his or her Rule 26(a)(2)(B) report").

## CONCLUSION

For the above reasons, the Court should deny Defendants' motion in its entirety.

Respectfully submitted,

/s/ Maria Makar
Attorneys for Plaintiff

Jon Loevy
Maria Makar
Gianna Gizzi
LOEVY & LOEVY
311 N Aberdeen St. Ste 300
Chicago, IL 60607
(312) 243-5900