UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KEYANA WILEY, Administrator of the Estate of OMAR MCCULLOUGH #K77858, | |
| Plaintiff, | |
| v. | Case Number 3:21-cv-00599-DWD |
| JUSTIN YOUNG, C. WALKER, ANGELA WACHTOR, JUSTIN DUPREY, JANE DOE, WEXFORD HEALTH SOURCES, INC., and NURSE CYNTHIA, | Judge David W. Dugan |
| Defendants. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 56.1, Plaintiff Keyana Wiley, through her attorneys, respectfully submits this opposition to Defendants' motion for summary judgment:

**INTRODUCTION**

For years, Defendants disregarded Omar McCullough's serious signs of colon cancer while incarcerated within the Illinois Department of Corrections. The Defendants in this case, prison doctor Justin Young, prison nurses Courtney Walker, Angelica Wachtor, Justin Duprey, Cynthia Ross, and IDOC's healthcare contractor Wexford Health Sources, Inc., had Mr. McCullough within their care, and encountered him when he was showing persistent signs of a chronic, serious health condition. Yet Defendants did not perform complete patient exams, order proper imaging, or refer Mr. McCullough for a colonoscopy or specialist consultation. Mr. McCullough was left in severe pain, with persistent constipation, vomiting, blood in the urine, and nausea for years.

Finally, after Mr. McCullough coded at the prison, an outside medical provider diagnosed him with stage 4 colon cancer. Mr. McCullough's cancer had been growing for years and

1

displaying itself through his persistent symptoms, which Defendants chose to ignore. Defendants neglected Mr. McCullough's repeated complaints of pain and symptoms of a chronic medical issue that mandated medical intervention.

Defendants delayed Mr. McCullough's care, allowed him to remain in severe pain and distress for years, and delayed his eventual cancer treatment, leading to chronic pain, limits on his daily activities, and his preventable, untimely death from colon cancer. These actions, individually and taken together, show deliberate indifference, precluding summary judgment. Each of the Defendants moved for summary judgment, ignoring binding caselaw, Defendants' own testimony, Plaintiff's expert's opinions, and other evidence in the record precluding summary judgment. The Court should deny Defendants' motion in its entirety.

## PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

1.      Omar McCullough came from a tight-knit family in Zion, Illinois. He lived near his parents Linda and Clyde and several siblings, and he had five children of his own: Jalen, Kayla, Cameron, Trinity, and Antoine. Mr. McCullough worked for his family's lawn care business and his friend's lawn construction service. Ex. 11 (Keyana Wiley Dep.) at 13:5–8, 31:24–32:17, 45:2–15, 45:18–22.

2.      In the first months of 2016, Mr. McCullough entered the IDOC at Pinckneyville Correctional Center (PNCC) for a short prison sentence, expecting to be released in July 2019.

3.      On February 19, 2016, Mr. McCullough was 39 years old. (*See* Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000003). During his initial health screening, Mr. McCullough reported a history of GERD and a family history of cancer: his aunt had cancer and his dad had prostate cancer.  *Id.* at 2, Plaintiff 000003; Plaintiff 000213. This information was added to his medical file, which his Wexford providers had access to. *Id.*; Ex. 7 (Rector Dep.) at 52:17–25. The

medical file included Mr. McCullough's list of current and prior health conditions at the top, and was organized in sections, including progress notes, labs, x-rays, physicals, etc. *Id.* at 52:13–17.

4.      Mr. McCullough had an increased risk for colorectal cancer based on his positive family history (two second degree relatives had colorectal cancer) and Black race. Men have a 41.6% lifetime risk to develop an invasive cancer. Patients with 2 second degree relatives affected with CRC (colorectal cancer) have a 1.6 x's increased relative risk which is the same as the risk if one first degree relative has been diagnosed with CRC. Any family history of cancer is applicable to a patient's risk of all types of cancer. Ex. 5 (Schmidt Report) at 2.

5.      GERD is "Gastroesophageal Reflux Disease." Ex. 3 (Schmidt Wiley Dep.) at 100:8–9. The symptoms of GERD are heartburn and chest/upper abdominal pain, and in severe cases, dysphagia, or odynophagia (a feeling that something is stuck and pain when swallowing). *Id.* at 100:8–17; Ex. 6 (Venters Report) at 15. In early 2016, Mr. McCullough's GERD had been ongoing for over 10 years. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000012.

6.      According to the February 19, 2016 medical record, Mr. McCullough's rectal exam was normal. However, it is not likely that a rectal exam was actually performed, as the section was for 40+ males only. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000046. On other records, whether or not the encounter called for a rectal exam, "refused/deferred" is used in this section to note no rectal exam was done because the patient was under 40. *Id.* at Plaintiff 000008.

7.      If the rectal exam was actually performed on February 19, 2016, it may have been the only time Mr. McCullough ever received a proper, complete rectal exam while incarcerated within IDOC. *Id.* at Plaintiff 000046.

8. The Defendants knew how to perform a proper, complete abdominal exam. *See, e.g.*, Ex. 12 (Ross Dep.) at 28:5–10. The Defendants did not perform a rectal exam to check for mass, stool, or obstruction as part of their abdominal exams. Ex. 10 (Duprey Dep.) at 98:8–13.

9. In April 2016, Mr. McCullough weighed 182 pounds. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000012.

10. On June 3, 2016, Mr. McCullough complained of abdominal pain, nausea, and vomiting. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000018–22. Mr. McCullough described the pain as "stabbing" and rated it as 10 out of 10 on the pain scale. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000019. Mr. McCullough was admitted to the infirmary. (Plaintiff 000018). The providers conducted a urine dipstick of Mr. McCullough. The results showed that there was blood in Mr. McCullough's urine. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000021.

11. Mr. McCullough's labs were done on June 3 and June 4, 2016, and Wexford employee Dr. Michael Scott reviewed them. They showed that there was blood in Mr. McCullough's urine. He was also dehydrated, likely from the vomiting. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000269.

12. On June 4, 2016, Mr. McCullough was still experiencing severe abdominal pain and woke up vomiting. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000023. He saw Wexford nurse Peggy Stewart who noted his right quadrant of abdomen was tender upon palpation, and she quoted him in the record: "I hurt so bad." *Id.*

13. The same day, Nurse Practitioner Angel Rector saw Mr. McCullough in the infirmary. Ex. 2 (Plaintiff's IDOC Medical Records) Plaintiff 000023. She observed him kneeling at the side of his bed with his head laying on the bed. *Id.* She notes, "Sleepy—awakes

easily. Patient states he is more comfortable lying in this position. Reports pain to right quad. Yellow-colored emesis [vomiting]. Last emesis ~1 hour ago." *Id.*

14.    She reviewed Mr. McCullough's labs from the previous night and noted that he had an increase in white blood cells. *Id.* NP Rector ordered "repeat labs and monitor for changes." *Id.*

15.    Later that morning of June 4, another nurse noted that Mr. McCullough had hypoactive bowel sounds. Ex. 2 (Plaintiff's IDOC Medical Records) Plaintiff 000025. No weight was recorded on this date. Ex. 2 (Plaintiff's IDOC Medical Records) Plaintiff 000023–30.

16.    On June 5 and 6, 2016, Mr. McCullough was still experiencing abdominal pain, nausea, and vomiting. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000031, Plaintiff 000035-000039. One of the nurses noted his bowel sounds were hypoactive.  Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000038. He was seen by Wexford employees Nurse Rector, Dr. Michael Scott, and Nurse Piersch, who all noted his abdominal pain, nausea, and vomiting. Plaintiff 000037–39. In their progress notes, Nurse Rector quoted Mr. McCullough saying, "I'm in pain, and I'm vomiting," and Nurse Piersch quoted him saying, "I just don't feel that good." *Id.*

17.    On June 6, 2016, Dr. Scott also noted microscopic hematuria (blood in the urine) and constipation. Ex. 2 (Plaintiff's IDOC Medical Records) Plaintiff 000039. Dr. Scott ordered an x-ray, even though the standard of care for evaluation of abdominal pain with microscopic hematuria is a non-contrast CT. Ex. 5 (Schmidt Report) at 29.

18.    On June 6, Mr. McCullough underwent a "KUB," which stands for kidney, ureter, bladder, x-ray.  Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000037. The KUB x-ray

did not identify the cause of Mr. McCullough's symptoms. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000256. Mr. McCullough's weight was not recorded on this date. Ex. 2 (Plaintiff's Medical Records) at Plaintiff 000035-000039.

19.    On June 7, 2016, Mr. McCullough was discharged from the infirmary. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000040–42. His weight was not recorded on this date. *Id.*

20.    Two days later, Mr. McCullough requested to be seen at nurse sick call for "stomach problems" but he was denied because he had an infirmary follow up appointment already scheduled, but not for another week. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000084. No one inquired about his stomach symptoms or recorded his weight. *Id.*

21.    On June 12, 2016, Mr. McCullough went to sick call at 5:30 a.m. and reported severe abdominal pain on his right side and nausea. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000085-88.  Mr. McCullough reported to the nurses that the pain was almost unbearable. *Id.* He also reported that despite having 3 to 4 bowel movements a day, he was unable to completely empty his bowels. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000086. He weighed 178 lbs. *Id.*

22.    Mr. McCullough was brought to the infirmary again where NP Rector monitored him while waiting for additional lab results. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000086. After receiving pain medication, Mr. McCullough reported his pain improved and had not vomited since entering the infirmary. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000088.

23.    NP Rector also ordered a CT scan to compare it to the one conducted on June 6th. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000088. Upon releasing Mr. McCullough

back to the general population, NP Rector instructed Mr. McCullough to drink more water and follow up with the providers in 7 to 10 days. *Id.*

24.     On June 16, 2016, NP Rector informed Dr. Michael Scott of Mr. McCullough's symptoms, labs, and imaging results. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000089; Ex. 7 (Rector Dep.) at 123-24. From that discussion, Dr. Scott planned to request a CT with stone protocol in the next collegial review. *Id.*

25.     On June 17, 2016, NP Rector submitted a request for approval for a CT of the abdomen with stone protocol for Mr. McCullough, as she had seen him multiple times and the repeated KUBs, labs, and urinalysis have not "given [her] any indication of what the problem is or any definitive answer" and "he [was] still have symptoms." Ex. 7 (Rector Dep.) at 123:11- 125:19; Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000089, Plaintiff 000205.

26.     On June 20, 2016, Dr. Scott discussed the request for a CT of the abdominal with Dr. Fisher at the collegial review meeting. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000206.

27.     The Wexford collegial review team denied the CT request. *Id.* Instead, Mr. McCullough was approved for an on-site renal ultrasound. *Id.*

28.     The collegial review team noted the denial of the CT in the request, but someone at Wexford also altered Nurse Rector's portion of the form to make it appear as though she had requested a CT *or* ultrasound. *Id.* at Plaintiff 000205; Ex. 7 (Rector Dep.) at 128:9-19. But Nurse Rector did not agree with the decision to order Mr. McCullough an ultrasound instead of a CT. Ex. 7 (Rector Dep.) at 125:20–129:5 ("I will tell you that 'versus ultrasound' is not my handwriting. I have recommended a CT scan. Somebody has went and added 'versus ultrasound.'"); Ex. 7 (Rector Dep.) at 127:25–128:8 (Q: So no one should add to your

handwriting without an initial to indicate it's not you? A: Correct. Q: And why is that? A: Because basically they changed what I was requesting . . . And I don't—I don't think that—they should have . . . should have declined . . . the CT scan . . . and then approved an ultrasound.").

29.     The standard of care for evaluation of abdominal pain with microscopic hematuria is a non-contrast CT, not ultrasound. CT is 97% sensitive and 95% specific for kidney stones, where an ultrasound is only 54% sensitive. Ex. 5 (Schmidt Dep.) at 29.

30.     On June 23, 2016, Mr. McCullough had a follow-up appointment with NP Rector. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000091. NP Rector ordered labs again and instructed Mr. McCullough to increase his fluid intake. *Id.* Mr. McCullough weighed 172 lbs. *Id.*

31.     Mr. McCullough was not scheduled for the ultrasound until July 15, 2016. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000092, 000094.

32.     The ultrasound did not find any abnormalities that explained the symptoms of abdominal pain, vomiting, or blood in the urine. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000258.

33.     Despite his symptoms and pain, no one at Wexford recommended Mr. McCullough for a colonoscopy. With a colonoscopy done in June 2016, "Mr. McCullough would have been diagnosed with a poorly differentiated T1 N0 Stage I cecal cancer" and "cured with surgery alone with a 92% probability, according to the Memorial Sloan Kettering colon cancer nomograms." Ex. 5 (Schmidt Dep.) at 31.

34.     On December 24, 2016, Mr. McCullough returned to the infirmary and reported that he was unable to eat because of the severity of his abdominal pain. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000099. When asked to describe the pain, Mr. McCullough

reported "feeling movement with pain all the time" and that it was "under umbilicus off/on [for a] couple years." *Id.*

35.     At this appointment, the nurse noted that his bowel sounds were sluggish. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000099. Despite reporting that he had experienced these symptoms on and off for years, the nurse did not refer Mr. McCullough to the doctor but instead told him to change his diet. *Id.* Mr. McCullough weighed 170 lbs*. Id.*

36.     Less than a month later, Mr. McCullough returned to the infirmary, complaining of lower abdominal pain and cramping. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000100-101. Mr. McCullough also reported that he had loose stools and had a feeling of fullness. *Id.*

37.     Upon examining Mr. McCullough, the nurse noted that his abdomen was distended. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000100–101. The nurse recorded Mr. McCullough's weight at 180 lbs. *Id.* The nurse only told Mr. McCullough to change his diet and come back if symptoms persisted. *Id.*

38.     On January 8, 2017, Mr. McCullough returned to the infirmary, again reporting severe abdominal pain, bloating, gas, cramping, and a constant feeling of being full. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000102.  NP Rector noted that Mr. McCullough is "convinced something is wrong" despite his normal exam. *Id.* She also noted that he had reported these symptoms in the past. *Id.* NP Rector directed Mr. McCullough to increase his fluid intake and exercise, and NP Rector referred Mr. McCullough to the MD Call. The nurse recorded Mr. McCullough's weight at 182 lbs. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000102.

39.     On January 13, 2017, Mr. McCullough was seen by Dr. Scott. Ex. 2 (Plaintiff's
IDOC Medical Records) at Plaintiff 000103. Mr. McCullough explained to Dr. Scott that he
was experiencing progressively worse pain and cramping in abdomen. *Id.* Dr. Scott noted that
his abdomen was mildly distended. *Id.* Dr. Scott ordered another KUB x-ray and more labs. *Id.*
Dr. Scott also prescribed laxatives for Mr. McCullough. *Id.*

40.     Five days later, Mr. McCullough underwent another x-ray. Ex. 2 (Plaintiff's IDOC
Medical Records) at Plaintiff 000104.

41.     On January 27, 2017, Dr. Scott reviewed Mr. McCullough's most recent x-ray
images and lab results and determined they were normal. Ex. 2 (Plaintiff's IDOC Medical
Records) at Plaintiff 000104. Dr. Scott informed Mr. McCullough of these results and
prescribed him more laxatives. *Id.* Mr. McCullough still weighed 182 lbs. *Id.*

42.     By January 2017, Mr. McCullough would have likely had T2 N0 Stage I cancer,
which would have been "cured with surgery alone with a 90% probability, according to the
Memorial Sloan Kettering colon cancer nomograms." Ex. 5 (Schmidt Dep.) at 31.

43.     The standard of care in this circumstance, for persistent progressive and now
constant abdominal pain, would have been to order a CT abdomen/pelvis and a GI consultation
for EGD/colonoscopy. *Id.* at 30. A colonoscopy would be utilized to evaluate signs and
symptoms of possible colonic or distal small bowel disease. *Id.*

44.     On June 1, 2017, Mr. McCullough returned to the infirmary again with abdominal
pain, aching, and tenderness. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000107- 108.
He reported to the staff that he had difficulty urinating and defecating. *Id.* He also reported to
the nurse that he had abdominal pain in the past, and this time it had been going on for a few

weeks. *Id.* Mr. McCullough weighed 170 lbs. *Id.* The nurse referred Mr. McCullough to the
MD Call. *Id.*

45.     On June 22, 2017, Mr. McCullough had his follow-up appointment with the nurse
practitioner. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000110-111. Mr. McCullough
explained to the practitioner that he has been suffering from abdominal pain for about a year,
with episodes of constipation and diarrhea. *Id.* Without ordering any tests, the nurse practitioner
concluded that the cause of Mr. McCullough's constipation must be diet-related and prescribed
more laxatives. *Id.*

46.     In June 2017, Mr. McCullough most likely had stage II T3 N0 poorly
differentiated colon cancer and likely would have had high risk factors. Ex. 5 (Schmidt Report)
at 31. Those stage II colon cancer patients with high risk factors may be offered adjuvant
chemotherapy, which may have up to a 5% survival benefit. *Id.* According to various trial data,
Mr. McCullough's five-year overall survival rate would be approximately 80% or 87% with
treatment. *Id.*

47.     On December 22, 2017, Mr. McCullough asked to see a doctor for a prostate
exam. He reported a slow urine stream, prostate enlargement, feeling of fullness, and urgency in
bladder. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000113. On January 3, 2018, Mr.
McCullough complained again of a slow stream. *Id.* at Plaintiff 000114. He reported, "Last year
I was peeing blood." *Id.* His prostate was smooth, tender, and enlarged upon exam. *Id.*

48.     On February 28, 2018, Mr. McCullough was transferred from Pinckneyville to
Danville. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000119. On the transfer
summary sheet, staff noted Mr. McCullough's only significant medical history was "acid
reflux." Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000118.

49.     At the time, Dr. Young was the Danville Medical Director. Ex. 13 (Young Dep.) at 20:1–16. He remained in that position during Mr. McCullough's entire incarceration at Danville. *Id.* As the Medical Director, he was the only doctor at Danville, unless someone was covering for him on vacation. *Id.* at 20:18–21:6.

50.     In May and June 2018, Mr. McCullough sought treatment from the nurse sick call for a rash. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000122-123, Plaintiff 000164.

51.     By June 2018, Mr. McCullough would have likely had stage III colon cancer and according to various trial data, his five-year overall survival rate would be 70% with surgery and adjuvant chemotherapy regimens. Ex. 5 (Schmidt Dep.) at 31.

52.     On January 1, 2019, Mr. McCullough experienced severe constipation and abdominal pain. Due to a lockdown, Mr. McCullough called a Code 2 or 3 to be seen by the medical staff for his symptoms. *Id.* Then Mr. McCullough was seen by Nurse Angela Wachtor. *Id.* Mr. McCullough weighed 178 lbs. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000168.

53.     Mr. McCullough described his pain as radiating from the right and left lower quadrants and rated it an 8 out of 10 on the pain scale.  Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000166-168. Mr. McCullough also reported to Nurse Wachtor that he had diarrhea a few days earlier. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000168. Nurse Wachtor noted that Mr. McCullough's bowel sounds were hypoactive.  *Id.*

54.     Nurse Wachtor referred Mr. McCullough to the nurse practitioner for a follow up on January 3, 2019. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000168.

55.     On January 3, 2019, a nurse practitioner saw Mr. McCullough for his follow-up. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000166-168. Mr. McCullough reported

that he had decreased bowel movements the past few weeks. *Id.* The nurse practitioner prescribed him laxatives and ordered a KUB x-ray.  Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000167. Mr. McCullough weighed 176 lbs. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000166.

56.     On January 8, 2019, Mr. McCullough underwent another KUB x-ray. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000170.

57.     On January 24, 2019, Mr. McCullough had a follow-up appointment with the nurse practitioner. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000170. He reported he was having daily bowel movements now. *Id.* The nurse practitioner noted that Mr. McCullough's recent x-ray suggested constipation. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000260. Mr. McCullough weighed 179 lbs. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000170.

58.     By January 2019, Mr. McCullough more likely than not had metastatic colon cancer, with an overall survival rate estimated to be 24.5 months. Ex. 5 (Schmidt Report) at 31. With a metastatic colon cancer diagnosis in January 2019, Mr. McCullough would have been expected to live until January 2021. Ex. 5 (Schmidt Report) at 33.

59.     On February 13, 2019, Mr. McCullough underwent a routine physical examination, during which his weight was not recorded. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000173.

60.     A week later, Mr. McCullough returned to the infirmary due to stabbing pain in his abdomen. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000174- 176. Mr. McCullough reported that this has been a chronic problem for over a year. *Id.* Defendant Nurse Cynthia recorded that he had diminished bowel sounds. *Id.* He weighed 177 lbs. *Id.*

61.     On April 12, 2019, Mr. McCullough sought treatment through the nurse sick call for abdominal pain again. The nurse did not record his weight. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000179.

62.     On May 13, 2019, Mr. McCullough was experiencing nausea, vomiting, and gas pain and was seen by Nurse Wachtor. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000180. Mr. McCullough reported that he was unable to pass gas, that he had been experiencing these symptoms for 2 to 3 years, and treatment has not been effective from the nurse sick call. *Id.* Nurse Wachtor conducted a visual rectal exam and noted the presence of hemorrhoids and bleeding. *Id.* He weighed 166 lbs. at this time. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000180.

63.     At this visit, Nurse Wachtor referred Mr. McCullough to the MD Call. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000180.

64.     On May 20, 2019, Mr. McCullough saw Dr. Young, who ordered labs and another x-ray. Mr. McCullough weighed 168 lbs. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000181.

65.     Dr. Young reviewed Mr. McCullough's labs. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000340.

66.     On May 30, 2019, after eating breakfast, Mr. McCullough started experiencing chest pain and tightness, so he went to the waiting room of the infirmary. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000183-186. After observing Mr. McCullough in the waiting room, Nurse Wachtor conducted an examination and performed an EKG on him. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000184.

67.     During that same visit, Mr. McCullough was seen by Nurse Practitioner Justin

Duprey. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000186-188. NP Duprey noted

that Mr. McCullough reported experiencing increased gas the past few months. *Id.* NP Duprey's

only concern was ruling out whether Mr. McCullough was actively having a heart attack. He

ordered an EKG, Mr. McCullough's second EKG that day. *Id.*

68.     Duprey did not take any steps to determine the cause of Mr. McCullough's

symptoms, learn his family or patient history, or refer Mr. McCullough to a doctor for a

possible medical condition or complication with his GERD. *Id.* Ex. 10 (Duprey Dep.) at 85:20–

87:10.

69.     On June 17, 2019, Mr. McCullough requested an appointment with the nurses

again because he was suffering from nausea, vomiting, and a headache. Ex. 2 (Plaintiff's IDOC

Medical Records) at Plaintiff 000188-000190. Mr. McCullough weighed 161 lbs on this date.

*Id.*

70.     Two days later, a nurse recorded that a "Code 3" was called for Mr. McCullough.

Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000191-000197. Mr. McCullough was dry

heaving, experiencing nausea, abdominal pain, weakness, and a headache. *Id.* Mr. McCullough

reported that his pain exceeded a 10 out of 10.  *Id.* Additionally, Mr. McCullough told staff he

was having hot and cold flashes. *Id.*

71.     Upon assessing Mr. McCullough, Dr. Young ordered "NPO" (nothing by mouth),

23-hour observation, and labs. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000191-

197. Mr. McCullough was admitted to the infirmary and now weighed 156 lbs. *Id.*

72.     While in the infirmary, a doctor ordered Mr. McCullough to undergo another

KUB x-ray. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000198- 199.

73.     On June 21, 2019, Mr. McCullough complained of a cough and constant
abdominal pain. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000200-202. The
radiologist determined that a mild degree of constipation could be seen, but no suspicious
calcification noted. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000262. Mr.
McCullough's chest x-rays showed "diffuse reticular nodular densities in both lungs," which
may be seen in metastatic disease. *Id.*

74.     On June 22, 2019, at 10:00 p.m., when Defendant Nurse Courtney Walker was
hanging fluids, she saw Mr. McCullough shaking in pain. She noted, "Abdomen palpated and pt
was in extreme pain. Pain radiated to back from right lower quadrant." She at some point
crossed out "to back." Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000203. At her
deposition, Walker testified that she knew abdominal pain required referral to an MD. Ex. 9
(Walker Dep.) at 31–44, 45.

75.     On the same day, Walker quoted Mr. McCullough saying, "It hurts when I
cough." Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000202-204. She called Dr.
Young, who ordered Mr. McCullough be sent to an outside emergency room. *Id.* Walker failed
to properly note that Mr. McCullough's vomiting was persistent, even though knew it was
important to gather all information possible to get an accurate patient assessment.

76.     Mr. McCullough was transferred to Carle Hospital. ECF 213-2. He received a
colonoscopy that revealed a cancerous mass in his colon. ECF 213-3 at 9.

77.     Less than a week later, Mr. McCullough underwent surgery to remove part of his
colon.  Ex. 3 (Carle Medical Records) at Plaintiff 000512-519. Based on the operation, the
doctors determined that Mr. McCullough had an obstructing tumor in part of his colon. *Id.*

78.     On July 17, 2019, one of the treating physicians from Carle Hospital informed Dr.

Young that Mr. McCullough would likely remain at the hospital through July 24th. Ex. 2

(Plaintiff's IDOC Medical Records) at Plaintiff 000204, Ex. 3 (Carle Medical Records) at

Plaintiff 000758-782.

79.     On July 25, 2019, Mr. McCullough began chemotherapy treatment. Ex. 3 (Carle

Medical Records) at Plaintiff 000892-914.

80.     Due to Defendants' delay in treating him, Mr. McCullough's cancer had

metastasized to his liver and lungs by the time he was transferred to Carle Hospital in June

2019. Ex. 3 (Carle Medical Records) Plaintiff 000459.

81.     On March 28, 2020, Mr. McCullough succumbed to the cancer and died. Ex. 1;

Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000001, Plaintiff 006874-6894.

**Wexford's Failure to Provide Medical Care of Mr. McCullough**

82.     After two visits occurring on June 3, 2016 and June 12, 2016 where Mr.

McCullough presented with abdominal pain and microscopic hematuria among other symptoms,

the Pinckneyville providers opted for an abdominal ultrasound. Ex. 5 (Schmidt Report) at 29.

According to Plaintiff's oncology expert, the "standard of care for evaluation of abdominal pain

with microscopic hematuria is a non-contrast CT, not ultrasound." *Id.*

83.     Between December 24, 2016 and January 13, 2017, Mr. McCullough was seen

three separate times by medical providers after presenting with multiple symptoms, including

constant abdominal pain.  Ex. 5 (Schmidt Report) at 30. Twice after these encounters, the

providers referred Mr. McCullough for labs and a KUB x-ray. *Id.* "The standard of care in this

setting would have been to order a CT abdomen/pelvis and a GI consultation for EGD

colonoscopy." *Id.*

84.     According to Plaintiff's oncology expert, Mr. McCullough's colon cancer been diagnosed between June 2016 and June 2018, he should have been cured of his colon cancer. Ex. 5 (Schmidt Report) at 31.

85.     By at least January 2017, Mr. McCullough should have been diagnosed with localized colon cancer after presenting with a six-month history of "intermittent almost unbearable abdominal pain with nausea and vomiting." Ex. 5 (Schmidt Report) at 33. Instead, Mr. McCullough was not diagnosed with colon cancer until June 2019. *Id.* With his symptoms and increased risks from his family history of cancer and Black race, his "PNCC providers should have recommended CT abdomen/pelvis and GI referral for EGD/colonoscopy according to the standard of care."

86.     Had Mr. McCullough experienced a timely diagnosis with localized colon cancer per the standard of care, he would have been cured and avoided the "dreadful symptoms" arising from metastatic disease, including early death. Ex. 5 (Schmidt Report) at 32.

87.     Due to the negligent delay in colon cancer diagnosis by his Illinois Department of Corrections/Wexford Health Sources, Inc. providers, Mr. McCullough's life was shortened by at least 32 years. Ex. 5 (Schmidt Report) at 32.

88.     Due to Mr. McCullough's weight loss when he presented with stage IV metastatic colon cancer in June 2019, he would have been expected to live 44% shorter than someone with metastatic colon cancer and no weight loss, and expected to live approximately 10.78 months until approximately May 22, 2020. Ex. 5 (Schmidt Report) at 32.

89.     "Due to the negligent delay in metastatic colon cancer diagnosis by his Illinois Department of Corrections/Wexford Health Sources, Inc. providers, Mr. McCullough would

have lived approximately 10 months longer with his metastatic cancer had he been diagnosed and treated with palliative chemotherapy starting in January 2019." Ex. 5 (Schmidt Report) at 33.

90.    Mr. McCullough "suffered with many dreadful symptoms of metastatic cancer for months." Ex. 5 (Schmidt Report) at 33.

**Facts Relating To Wexford's *Monell* Liability**

91.    Medical care provided by Wexford was more limited than medical care in the community. Ex. 7 (Rector Dep.) at 40:1-42:1.

92.    Every medical encounter a provider had with a prisoner should be documented in an Offender Outpatient Progress note. Ex. 7 (Rector Dep.) at 64:3-6.

93.    It was well known amongst healthcare providers at IDOC facilities that inmate complaints were not always taken seriously. Ex. 7 (Rector Dep.) at 25:4-16. IDOC and Wexford would want to provide the most cost-effective treatment that was medically necessary. Ex. 7 (Rector Dep.) at 25:4-16.

94.    Some of the healthcare providers at IDOC facilities did not thoroughly and accurately work up patients. Ex. 7 (Rector Dep.) at 29-30.

95.    Whenever a patient needed a test or procedure that Wexford did not offer onsite, the medical staff had to fill out and submit a collegial form, which included the type of medical service that they were requesting and the rationale for the service. Ex. 7 (Rector Dep.) at 48. Then once a week, the onsite doctors would present the case/collegial request to the Wexford doctors who were offsite, and then the "collegial review person would either approve or deny the testing or whatever was being requested." Ex. 7 (Rector Dep.) at 48.

96.    Cancer can cause abdominal pain. Ex. 7 (Rector Dep.) at 57.

97.     When a patient presents with acute abdominal pain, there are several possible

causes for that pain–some emergent and some not. Ex. 7 (Rector Dep.) at 72-73.

98.     Because involuntary weight loss can indicate multiple serious medical conditions,

it is the standard of care to measure and document a patient's weight at virtually every routine,

patient encounter. Ex. 6 (Venters Report) at 23. Moreover, it is the standard of care that at an

appointment, the provider will review the patient's weight and compare it to previously recorded

weights. *Id.*

99.     After reviewing the medical records of Mr. McCullough, Mr. Reed, and fourteen

other patients under the care of Wexford in IDOC facilities, Dr. Venters—an expert on

correctional healthcare administration, internal medicine, and epidemiology—concluded that

care under Wexford is grossly deficient in several key areas. Specifically, Dr. Venter concluded

that Wexford's systemic deficiencies include the (1) failure to recognize/act on weight loss; (2)

delay in specialty care/failure to exclude; and (3) failure to act on abnormal test results. Ex. 6

(Venters Report) at 23-24.

100.     Additionally, Dr. Venters opined, "These deficiencies appear to be systemic, they

span across numerous facilities and across time and types of care." Ex. 6 (Venters Report) at 23.

101.     According to Dr. Venters from his review, "there is a broad pattern of patients

returning over and over to see medical personnel who, over time, show histories of weight loss.

And consistently, such weight loss is not noted, investigated, or acted upon. Involuntary weight

loss is a red flag for numerous serious medical conditions, including cancer." Ex. 6 (Venters

Report) at 23.

102.     Dr. Venters opined that "across multiple patients and often among multiple

practitioners seeing the same patient, weight loss is not noted or acted upon, often until their

serious illness has progressed so severely that they are experiencing other red flag symptoms that reach catastrophic levels. This reflects a serious departure from the standard of care, and it indicates a systematic problem with the review and response to information that Wexford health staff collects." Ex. 6 (Venters Report) at 23.

103.    Based on his review of several patients' IDOC medical records, Dr. Venters determined that Wexford's failure to recognize/act on weight loss is not the result of variations in individual clinical judgment but of "systemic problems with delivery of care." Ex. 6 (Venters Report) at 23-24.

104.    Regarding a delay in specialty care/failure to exclude, Dr. Venters opined, "over and over, patients exhibit symptoms that call for referral to specialty care, including symptoms like repeated abdominal pain, but limited efforts are made to diagnose them…patients are seen and returned to their housing areas without a clear diagnosis, or with a presumed diagnosis that does not exclude potentially serious causes of a condition, even when the patient presents with the symptoms multiple times."  Ex. 6 (Venters Dep.) at 24.

105.    Moreover, Dr. Venters concluded that Wexford's "diagnostic efforts are often limited and inconclusive, but are essentially abandoned without excluding potentially serious causes of a symptom…even in the face of diagnoses or indications of a serious condition, the records indicate slow or improper follow-up, often with the result that needed care is delayed and the patient's outcomes worsen." Ex. 6 (Venters Report) at 24.

106.    Notably, these delays in specialty care occurred across different facilities and different patients, including on multiple occasions and multiple practitioners with the same patient. Ex. 6 (Venters Report) at 24. Thus, Dr. Venters concluded that repeated instances of

such dramatic departures from the standard of care indicate a systematic problem with the
provision of adequate medical care. Ex. 6 (Venters Report) at 24.

107.    Conducting timely follow up for patients with abnormal test results is a basic
element of any primary care practice and critical for identifying and preventing against the
worsening of serious medical conditions. Ex. 6 (Venters Report) at 25.

108.    For patients in Wexford's care at IDOC facilities, abnormal test results are often
not followed up on in a timely manner.  Ex. 6 (Venters Report) at 25. This indicates "another
dramatic departure from the standard of care." *Id.*

109.    According to Dr. Venters's review of these cases and several other patients'
records, the deficiencies related to Wexford's failure to act on abnormal test results is not the
result of variations in individual clinical judgment, "but systemic problems with delivery of
care." Ex. 6 (Venters Report) at 23-24.

110.    Dr. Venters confidently opined that systemic problems of care exist amongst
Wexford's medical care in IDOC facilities concerning unaddressed weight loss, abnormal test
results missed/ignored, and delays in providing specialty care.  Ex. 6 (Venters Report) at 38

111.    The 2014 and 2018 Lippert Reports arose from a pending injunctive class action
case where the court periodically appointed different experts in correctional medicine to examine
and monitor IDOC's delivery of healthcare. Dr. Venters reviewed the reports' findings on
systemic deficiencies related to how worsening health problems are ignored or addressed
incompetently. Venters concluded that these reports "indicate grave and systemic problems in
the care provided by Wexford, and an alarming failure to address these deficiencies once
reported to them in the initial report." Ex. 6 (Venters Report) at 30-31. Dr. Venters reviewed the
Lippert reports data for details regarding deaths with the presence of the following three

variables: unaddressed weight loss, abnormal test results missed/ignored, and specialty care delay.  Ex. 6 (Venters Report) at 31.

    a.  In the 2014 report, Venters found 21 total deaths with one of these 3 problems, which represents 33% of the total deaths reviewed, but 56% of the deaths with serious deficiencies.  Ex. 6 (Venters Report) at 32.
    b.  In the 2018 report, Venters found 24 total deaths with one of these 3 problems, which represents 55% of the total deaths reviewed, but 95% of the deaths with serious deficiencies.  Ex. 6 (Venters Report) at 32.

112.    Wexford's discovery responses in this case indicate that leadership did not use the information in the Lippert reports to improve the quality of care and address the systemic problems with care identified in the Lippert reports. Ex. 14 (Wexford's Responses to Plaintiffs' Sept. 27, 2023 Interrogatories). If true, Wexford ignored an identification of serious deficiencies in its delivery of care that "would be a substantial departure from the standard that is expected in the administration of correctional medical care."  Ex. 6 (Venters Report) at 36-37.

## LEGAL STANDARD

At summary judgment, the moving party must establish that the case presents no genuine issues of material fact which require a trial to resolve. *Ponsett v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010). When deciding whether a genuine dispute of fact exists, the Court must view the facts in the light most favorable to Plaintiff, resolving all evidentiary conflicts and credibility issues in her favor. *Conley v. Birch*, 796 F.3d 742, 746 (7th Cir. 2015); *Williams v. City of Chicago*, 733 F.3d 749, 752 (7th Cir. 2013); *Hansen v. Fincantieri Marine Grp., LLC*, 763 F.3d 832, 836 (7th Cir. 2014); *see also Miller v. Gonzalez*, 761 F.3d 822, 828 (7th Cir. 2014) ("Deciding which inference to draw from [a] conversation is the task of a fact finder."). Circumstantial evidence is entitled to equal weight. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (*en banc*).

**ARGUMENT**

To prevail on her claims, Plaintiff must prove that McCullough suffered from an objectively serious medical condition, and that Defendants acted with deliberate indifference to the condition. *Petties*, 836 F.3d at 728 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A serious medical need is one that either a physician has diagnosed as mandating treatment or is so obvious that even a lay person would know a doctor's attention is required. *See Lewis v. McLean*, 864 F.3d 556, 563 (7th Cir. 2017). Extreme pain is an objectively serious medical condition. *Gutierrez v. Peters*, 111 F.3d 1364, 1369-72 (7th Cir. 1997) (significant pain may constitute objectively serious medical condition) (collecting cases); *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir.1996) (objectively serious medical condition requires an "illness or injury . . . [which] is sufficiently serious or painful to make the refusal of assistance uncivilized") (emphasis added); *see also Johnson v. Corizon Med. Servs. Inc.*, 2015 WL 1648208, at *5 (S.D. Ind. Apr. 14, 2015) ("Severe pain constitutes a serious medical need sufficient to satisfy the first element of the deliberate indifference test.") (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). "[W]hile the "deliberate indifference standard does not permit claims for mere negligence or claims alleging that a reasonable medical judgment unfortunately led to a bad result, a prisoner is not required to show that he was literally ignored." *Sherrod v. Lingle*, 223 F.3d 605, 611–12 (7th Cir. 2000).

In this case, Defendants do not dispute that McCullough had a serious medical condition by May 2019. Mem. at 19. Although the record shows McCullough's serious medical condition presented long before May 2019 as significant pain, persistent constipation, nausea, vomiting, and developing cancer, Defendants' motion centers solely on whether they acted with deliberate indifference to McCullough's serious medical need. Deliberate indifference requires a factfinder to inquire into the Defendants' subjective state of mind, a topic particularly ill-suited for resolution

at summary judgment. *Conley*, 796 F.3d at 747 ("[S]tate of mind is an 'inquiry that ordinarily cannot be concluded on summary judgment.'"). To establish deliberate indifference, a plaintiff must show that a defendant was aware of and disregarded a substantial risk of harm to the plaintiff. *Farmer*, 511 U.S. at 835; *Ortiz v. Webster*, 655 F.3d 731, 734 (7th Cir. 2011). Because prison officials "[r]arely if ever" admit that they acted with deliberate indifference, prisoners typically establish it through circumstantial evidence. *Petties*, 836 F.3d at 728.

The Seventh Circuit has identified multiple ways that a plaintiff can prove deliberate indifference through circumstantial evidence. First, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005) (quoting *Farmer*, 511 U.S. at 842). A prisoner may also show deliberate indifference through evidence that "the defendant's chosen 'course of treatment' departs radically from 'accepted professional practice,'" providing an inference that "no exercise of professional judgment actually occurred." *Diggs v. Ghosh*, 850 F.3d 905, 909 (7th Cir. 2017). And when medical staff persist in a course of treatment they know is ineffective, choose an "easier and less efficacious treatment[,]" or refuse to follow advice from a specialist, an inference of deliberate indifference at summary judgment is appropriate. *Petties*, 836 F.3d at 729–30; *Arnett v. Webster*, 658 F.3d 742, 753–54 (7th Cir. 2011).

Finally, an "inexplicable delay in treatment" which "exacerbate[s] the [plaintiff's] injury or unnecessarily prolong[s] [his] pain" warrants denial of summary judgment. *Petties*, 836 F.3d at 730-31; *see also Grieveson v. Anderson*, 538 F.3d 763, 779-80 (7th Cir. 2008) (delay in providing care actionable under the Eighth Amendment if evidence permits inference that plaintiff endured "many more hours of needless suffering for no reason").

Several of these situations indicating deliberate indifference are present here. At this stage,

the Court must view the evidence, as well as all reasonable inferences drawn from that evidence, in the light most favorable to Plaintiff. Based on the record, Defendants were deliberately indifferent to McCullough's pain and cancer symptoms in the years leading up to his death. The Court should deny Defendants' motions for summary judgment.

### I.    The jury must decide whether Wexford is liable under *Monell*.

Wexford offers five reasons why it is entitled to summary judgment on Plaintiff's Eighth Amendment claim:

First, Wexford argues that there was no constitutional violation supporting the Eighth Amendment claim against Wexford because Plaintiff cannot establish an underlying constitutional violation by any individual defendant. Second, Wexford argues that the alleged constitutional violation was due to non-defendant actions that fall outside the statute of limitations and that, in any event, involved appropriate medical care. Third, Wexford argues there is no evidence that any person acted or failed to act because of a Wexford policy or practice. Fourth, Wexford argues that none of Mr. McCullough's providers are final policymakers to support *Monell* liability. Fifth, Wexford argues that Plaintiff has not shown evidence of a constitutionally deficient policy or pattern that was the moving force behind Mr. McCullough's injuries. Each argument fails.

Private corporations like Wexford are subject to the standard for section 1983 liability articulated in *Monell v. Department. of Social. Services*, 436 U.S. 658 (1978). *See Shields v. Illinois Dep't of Corrections*, 746 F.3d 782, 789 (7th Cir. 2014). A reasonable jury could conclude that Mr. McCullough's death was caused by Wexford's policies and practices of providing inadequate medical care, despite being on notice of its dangerous practices. *See* PSOF 82-90. Ex. 6 (Venters Report) at 39. Plaintiff's claim against Wexford must proceed to trial.

### 1.    A reasonable jury could find Wexford liable regardless of the individual Defendants' liability.

Wexford argues that it cannot be liable under *Monell* because Plaintiff has failed to establish Mr. McCullough was deprived of a constitutional right by any individual defendant. Mem. 30–35. As explained below, however, a reasonable jury could find that the Nurse Defendants and Dr. Young were deliberately indifferent. Accordingly, Wexford cannot obtain summary judgment on this ground.

Even if the Nurse Defendants and Dr. Young were not deliberately indifferent, moreover, a reasonable jury could find Wexford liable because other, non-defendant Wexford personnel also violated Mr. McCullough's constitutional rights. For instance, in 2016–2018, Mr. McCullough was seen by Wexford staff at Pinkneyville (PNCC) including Dr. Scott, NP Rector, NP Moton, and Nurse Stewart.

As Plaintiff's expert Dr. Schmidt explained, Mr. McCullough presented with symptoms and a family history that called for Mr. McCullough's Pinkneyville providers to recommend CT abdomen/pelvis and GI referral for EGD/colonoscopy, which would likely have led to his diagnosis and cure. Dr. Schmidt's report states:

> Mr. McCullough should have diagnosed with localized colon cancer by at least January 2017 when he presented with a 6 month history of intermitted almost unbearable abdominal pain with nausea and vomiting. His symptoms were likely from colon cancer. He had an increased risk for colon cancer based on his positive family history and Black race. His PNCC providers should have recommended CT abdomen/pelvis and GI referral for EGD/colonoscopy according to the standard of care. In January 2017 he most likely would have been diagnosed with a T2 N0 stage I colon cancer and been cured with surgery alone with a 90% probability.

*See* PSOF 85. ECF 213-4 (Dr. Schmidt Report) at 33. She continues, "Mr. McCullough should have been cured of his colon cancer had it been diagnosed between June 2016 and June 2018." *See* PSOF 84.

Wexford's argument also fails for a more fundamental reason. It is possible that Wexford

could be found liable under Monell even if no Wexford employee is individually liable for an

Eighth Amendment violation. The Seventh Circuit explained why *Monell* organizational liability

does not rise and fall with individual liability, in *Glisson v. Indiana Department of Corrections*:

> [T]his case well illustrates why an organization might be liable even if its
> individual agents are not. Without the full picture, each person might think that
> her decisions were an appropriate response to a problem; her failure to situate the
> care within a broader context could be at worst negligent, or even grossly
> negligent, but not deliberately indifferent. But if institutional polices are
> themselves deliberately indifferent to the quality of care provided, institutional
> liability is possible.

849 F.3d 372, 378 (7th Cir. 2017) (en banc). Accordingly, it is only where "the plaintiff's

theory of *Monell* liability rests entirely on individual liability"—such as when a plaintiff alleges

that the defendant is a final policymaker and offers no other *Monell* theory—that "negating

individual liability will automatically preclude a finding of Monell liability." *Whiting v.*

*Wexford Health Sources, Inc*., 839 F.3d 658, 664 (7th Cir. 2016). That is not the case here.

   In sum, there are triable issues as to Dr. Young and the Nurse Defendants. But even if a

jury ultimately concludes that Dr. Young and the Nurse Defendants acted reasonably given the

facts known to them at the time, that jury could still reasonably conclude that Wexford's

unconstitutional practices and customs still created constitutional liability. *See* ECF 145 at 7

(Order Denying Defendants' Motion to Bifurcate Plaintiff's *Monell* Claim) ("Wexford may be

liable under Monell, even where the Individual Defendants are not.") (citations omitted).

### 2.    A reasonable jury could find that Wexford's practices and customs were deficient.

   Wexford argues that Plaintiff has not adduced evidence of a policy, custom, or practice

sufficient to satisfy *Monell*. But a reasonable jury could find several Wexford practices or customs

that contributed to Mr. McCullough's prolonged pain, delayed diagnosis, decreased lifespan, and

death. These include Wexford's policies, customs, and practices of: (1) leaving weight loss

unaddressed, (2) ignoring/missing abnormal test results, (3) delaying in specialty care and diagnostic testing, (4) repeating ineffective treatment, (5) failing to escalate care based on symptoms, (6) failing to document and treat pain and persistent symptoms, (7) neglecting red flags for serious illness, (8) a lack of comprehensive patient evaluation, (9) institutionalized apathy toward patient complaints, (10) failing to follow standard medical protocols, and (11) having structural barriers to accessing adequate healthcare. By these policies, customs, and practices, Wexford delivered inadequate healthcare, increased patient pain, and shortened patients' lifespan due to deficient care, all despite being on notice of its dangerous practices. Dr. Venters explains these systemic issues in his report:

> Review of the deaths of Mr. Reed and Mr. McCullough show that both men repeatedly sought health care and that red flags for serious illness and malignancy were ignored, even as they lost weight and their symptoms progressed. Failure to act on abnormal test results and delays in specialty care and diagnostic tests outside the prison system also contributed to the pain and spread of malignancy for both men, worsening their chance for survival, as reflected in the expert reports offered by Dr. Schmidt. Review of medical records for additional patients also reveals gross deficiencies and deviations from the standard of care similar to those in the two aforementioned cases. Specifically, these cases exhibited gross deficiencies in the following areas;
>
> - Unaddressed weight loss
> - Abnormal test results missed/ignored
> - Specialty care delay
>
> Review of the basic findings in the *Lippert* reports reveals similar and systemic problems with care. My own review of the 2014 and 2018 *Lippert* reports shows that over half of the deaths involving serious deficiencies in care included at least one of these three problems. Many cases included two or three of these problems. One of the central issues in many of these cases is that patients report a health problem and when the initial assessment and treatment doesn't resolve their issue, Wexford staff simply repeat the same assessment and treatment without stopping to reconsider what the problem is or what the effective treatment should be. For people who received one inconclusive x-ray after another, or those who had persistent gastrointestinal symptoms treated repeatedly with medications for indigestion, the consequences of these gross deficiencies in care include delay of identification and treatment of their malignancy, increased pain and suffering and shortened lifespan. My review of the available information in the cases of Mr. Reed

and Mr. McCullough, including their own medical records, my review of 14 additional sets of medical records, as well as review of the *Lippert* reports and my own assessment of the three specific problems in *Lippert* report death cases makes clear that these problems in care are systemic in nature and that these deficiencies increase the risk of morbidity and mortality among their patients.

*See* PSOF 111. Ex. 6 (Venters Report) at 39.

Each of those practices came to bear in Mr. McCullough's own case, which showed evidence of unaddressed weight loss, denied specialty care and imaging (CT scan), and other deficiencies identified by Dr. Venters.

Wexford argues that Dr. Venters' review cannot evidence a widespread practice because he "sub-sampled only 14 cases to review" and found "1–2" examples of Wexford's systematic deficiencies in addition to Mr. McCullough and Mr. Reed's cases. Mem. at 14, 15. That is factually inaccurate: Venters' review revealed these problems in several cases, *See* PSOF 111. Venters' includes pages of summaries of other patients' cases evidencing Wexford's systematic deficiencies. For example:

- H.C: "This patient had multiple reports of gastrointestinal and abdominal complaints starting in October 2017 before he was finally assessed and diagnosed with cancer in 2018.14 During this time, the patient reported nausea and vomiting with eating and during his multiple sick call encounters, he was noted to have significant weight loss, including 20 lbs. in one month from late October to late November 2017. Despite these concerning clinical signs and laboratory tests that indicated some metabolic or gastrointestinal process, medical staff attempted to treat the patient with manual hernia reduction instead of obtaining further imaging of his gastrointestinal tract. After this approach failed to resolve the patient's symptoms, he was sent to a local emergency room where CT scan showed inflammation of the small intestine and recommended follow up with a surgeon. The patient continued to have multiple encounters with health staff who documented ongoing weight loss, now 30 lbs. by Jan 2018. He was seen by a surgeon on the 25th of January 2018, which resulted in observation that he was jaundiced and that he has liver function tests consistent with an abdominal pathology. He was sent for inpatient admission and diagnosed with cholangiocarcinoma and treated as an inpatient for 2 months but returned to the prison setting with a terminal diagnosis due to metastatic malignancy. The care of this patient was grossly deficient in that his significant weight loss, lack of appetite, and abnormal laboratory tests in late November should have prompted admission

for a more thorough diagnostic assessment. This patient was discussed in the 2018 Lippert Report as Dixon Patient Identifiers – Infirmary - Patient #2.

- C.J. This patient was diagnosed with likely pancreatic cancer in October 2016, during a hospitalization. She was subsequently transferred to prison where her she was informed that her initial biopsy had not contained adequate sample. The Wexford medical staff failed to order an urgent repeat biopsy or specialist encounter, resulting in an approximately three month delay. This patient was confirmed to have pancreatic cancer, which is both extremely aggressive and associated with severe pain, requiring careful pain management. At one point, the physician documents "Consider CT guided biopsy when she is stronger." This patient's known pancreatic mass and inadequate biopsy should have resulted in immediate repeat of her biopsy, even if achieving this required inpatient hospital admission. This patient was discussed in the 2018 Lippert Report as IDOC Mortality Review Patient Identifiers - Patient #20.

- John Joynt. (Hill CC) This patient's medical records show that he experienced weight loss over several years with difficulty eating. He was known to have an esophageal abnormality that made swallowing difficult and despite his weight dropping approximately 100 lbs., half of his body weight, over several years without surgical intervention. During this time, medical staff gave him dietary supplements but failed to refer him for surgical repair, which is the standard of care when symptoms are moderate to severe. This condition is amenable to dietary management when mild, but in cases as severe as this patient's, surgical intervention should have occurred far earlier.

Ex. 6 (Venters Report) at 11-22.

Taking a step back, moreover, Wexford's argument misapprehends what the law requires here. It is well settled that there is no magic number of cases Dr. Venters needs to identify to opine about a systemic deficiency. *Glisson*, 849 F.3d at 382 ("There is no magic number of injuries that must occur before its failure to act can be considered deliberately indifferent." (citing *Woodward v. Corr. Med. Servs.*, 368 F.3d 917, 929 (7th Cir. 2004) ("CMS does not get a 'one free suicide' pass.")). *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 654 (7th Cir. 2021) (instructing there is no "bright-line rule" as to the "quantity, quality, or frequency of conduct needed to prove a widespread custom or practice under *Monell*"); *see also Thomas v. Cook County Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) ("[W]e do not adopt any bright-line rules defining a 'widespread

custom or practice[.]'"); *Cosby v. Ward*, 843 F.2d 967, 983 (7th Cir. 1988) (similar). [1]

In addition, Dr. Venters conducted a review of the *Lippert* reports, which revealed even

more instances of the Wexford patterns he opined contributed to Mr. McCullough's death. *Dura

Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002) ("[I]t is common in

technical fields for an expert to base an opinion in part on what a different expert believes on the

basis of expert knowledge not possessed by the first expert."). The Federal Rules of Evidence

confirm that "[a]n expert may base an opinion on facts or data in the case that the expert has been

made aware of or personally observed." Fed. R. Evid. 703.

### 1. Plaintiff has introduced sufficient evidence from which a jury could find that Wexford's practices and customs were deficient.

Dr. Venters conducted a review of Mr. McCullough's case, Mr. Reed's case, and 14 other

patients (selected from 25 patients) and concluded that, similar to Mr. McCullough, Wexford had

repeatedly failed to provide adequate care because of the systemic issues listed above. *See* PSOF

99. Further, although Wexford attacks Dr. Venters' review for not following arbitrary statistical

standards, *see* Mem. 43, statistical evidence is ***not*** required for a *Monell* claim to proceed to trial.

To "survive summary judgment," the Seventh Circuit has stressed, a plaintiff "need not present a

full panoply of statistical evidence showing the entire gamut of a defendant's past bad acts to

---

[1]        In addition, given that Wexford took the position that *Monell* discovery should be limited is
irrelevant and burdensome, this Court should bar Wexford from making any contrary argument now or at
trial. The Supreme Court has explained that judicial estoppel "protect[s] the integrity of the judicial
process by prohibiting parties from deliberately changing positions according to the exigencies of the
moment." *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001) (internal quotation marks omitted)
("Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that
position, he may not thereafter, simply because his interests have changed, assume a contrary position,
especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by
him."). Estoppel applies when the party to be estopped—here Wexford—takes a later position that is
"clearly inconsistent" with it earlier one; persuades a court to adopt the earlier position; and would
"derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."
*Martineau v. Wier*, 934 F.3d 385, 393 (4th Cir. 2019) (quoting *New Hampshire*, 532 U.S. at 750-51).

establish a widespread practice or custom." *Davis v. Carter*, 452 F.3d 686, 694 (7th Cir. 2006).

Instead, "it is enough that a plaintiff present competent evidence tending to show a general pattern

of repeated behavior." *Id*. That is what Plaintiff has done here.

Relying on these principles, district courts in this Circuit have denied summary judgment

in cases like this one, where Plaintiff has provided evidence of other incidents where patients

received constitutionally inadequate medical care. In *Awalt v. Marketti*, 74 F. Supp. 3d 909, 939

(N.D. Ill. 2014), the district court denied summary judgment to HPL, a private medical care

company, after the plaintiff provided evidence of six other detainees who were provided

inadequate medical care. Similarly, in *Piercy v. Warkins*, 2017 WL 1477959, at *12-13 (N.D. Ill.

Apr. 25, 2017), the district court denied summary judgment to ACH, another private medical care

company, after the plaintiff provided evidence that seven other detainees were denied adequate

medical care.

These cases, and many others, establish that summary judgment is unavailable where

plaintiff presents other examples of deficient care—even when those allegations concern medical

conditions not identical to the one at issue in the case. *See also Abreu v. City of Chicago*, 2022 WL

1487583, at *17 (N.D. Ill. May 10, 2022) (explaining that the Seventh Circuit has "warned against

overstating Plaintiff's burden" and concluding that four complaints were sufficient to create a

genuine issue in light of the record as a whole); *Spalding v. City of Chicago*, 186 F. Supp. 3d 884,

917 (N.D. Ill. 2016) (reiterating that there are no "bright-line rules" at summary judgment and

explaining that a defendant's demand for statistical evidence of a widespread custom or practice

"fails to persuade"); *Warfield v. City of Chicago*, 2009 WL 10739474, at *1 (N.D. Ill. Feb. 18,

2009) (holding that evidence of "up to nine witnesses who were allegedly mistreated" was

sufficient to warrant trial and explaining that defendant's arguments that those incidents did not

occur or were "isolated" and "outside of [their] control" are "not arguments amenable to summary judgment").

Accordingly, even if the Court were to count each patient as a single additional piece of evidence in support of Plaintiff's *Monell* claim, summary judgment would be inappropriate. As Dr. Venters explains in detail in his report, each patient's medical record reflects *several* instances of inadequate medical care and *several* examples of the widespread practices that caused Mr. McCullough's death. *See* PSOF 99; *see also* Ex. 6 (Venters Report) at 11-22. As Dr. Venters testified, a single patient's outcome, such as a missed cancer diagnosis, can be evidence of a systemic problem, not just an individual problem. *See* PSOF 100. ECF 216 (Venters Dep.) at 64:18– 25. (describing a "never event"). Counting just the instances noted by Dr. Venters in his "Review of Wexford care to additional patients" (which does not include Mr. McCullough or Mr. Reed and does not come close to encompassing the total number of instances in which he identified inadequate care), Plaintiff has offered dozens of separate instances of the widespread practices she contends caused Mr. McCullough's prolonged pain, delayed diagnosis, shortened lifespan, and death. There can be no meaningful dispute that dozens of examples of a widespread practice is enough.

**2.    A reasonable jury could find that Dr. Young was a final policymaker and express policies led to Mr. McCullough's death.**

In moving for summary judgment, Wexford contends that Dr. Young is not a final policymaker, and that Plaintiff has not identified any "express policies" responsible for Mr. McCullough's death. Plaintiff does not need to prove either theory for a viable *Monell* claim. *See, e.g.*, *Daniel v. Cook County*, 833 F.3d 728, 734 (7th Cir. 2016) ("An unconstitutional policy can include both implicit policies as well as a gap in expressed policies."); *Woodward*, 368 F.3d at 927

(entity's "actual practice," as opposed to its "written policy," was inadequate). And in any event, several express policies are at issue—including one of Wexford's barriers to healthcare: its collegial review process. *See* PSOF 73. In addition, there is ample evidence in the record that Dr. Young was a final policymaker as the Medical Director of Danville and co-head of collegial review. *See* PSOF 49. But even without it, as explained above, there is sufficient evidence in the record of Wexford's deficient customs, policies, and practices to withstand summary judgment.

### E.    A reasonable jury could find that Wexford's practices or customs were the moving force in Mr. McCullough's death.

In addition to disputing that a custom or practice exists, Wexford claims that there is no evidence that the customs or practices Plaintiff has identified were the "moving force" in Mr. McCullough's death. This is another question that the Court cannot resolve at summary judgment. "[C]ausation is not a mechanical exercise like working a math problem and getting an answer, but instead requires jurors to view evidence in its totality, draw on their life experiences and common sense, and then reach reasonable conclusions about the effects of particular action and inaction" *J.K.J. v. Polk Cnty.*, 960 F.3d 367, 384–85 (7th Cir. 2020) (en banc). Moreover, "there is no rule demanding that every case have only one proximate cause." *Whitlock v. Brueggemann*, 682 F.3d 567, 583 (7th Cir. 2012).

Courts have recognized that "a reasonable jury could find that pervasive systemic deficiencies in the detention center's healthcare system were the moving force behind" a plaintiff's injury in circumstances very similar to those here. *Dixon v. County of Cook*, 819 F.3d 343, 349 (7th Cir. 2016); *see also, e.g.*, *Daniel*, 833 F.3d at 740-42 (denying defendant's summary judgment motion where testimony from jail medical staff describing inadequate record-keeping practices and scheduling difficulties, "viewed in the light most favorable to Daniel, raise[d] a genuine issue of material fact as to whether his injury resulted from systemic, gross deficiencies in the Jail's

medical care"); *Piercy*, 2017 WL 1477959, at *14 ("If a jail has a widespread practice of providing

inadequate care, it is a highly predictable consequence that, faced with a possibly serious medical

condition, medical personnel would fail to inquire further, provide necessary medications, or seek

the assistance of a specialist."); *Roland v. Dart*, 2016 WL 4245524, at *7 (N.D. Ill. Aug. 11, 2016)

(denying defendants' motion for summary judgment on prisoner's *Monell* claim and noting that

even where the "causation chain is a long one, and it may be difficult for a jury to conclude that

Defendants were a but-for cause of Plaintiff's injury . . . a jury, not the court, should make the

determination whether Defendants' policies or practices—whether understaffing or generally

allowing delayed processing of HSR forms—were the cause and 'moving force' behind Plaintiff's

injury"). Just as in these cases—systemic problems like documentation practices in *Daniels* and

delayed processing of forms in *Roland*—Wexford's systemic problems caused Mr. McCullough's

delayed and deficient care.

Likewise, with respect to Wexford's failure to implement policies and procedures to

provide comprehensive patient care, a reasonable jury could find that the absence of such a policy

made it likely and foreseeable that prisoners with persistent, red-flag symptoms, like Mr.

McCullough, would face grave risk of harm. *See Glisson*, 849 F.3d at 382 ("A jury could further

conclude that Corizon had actual knowledge that, without protocols for coordinated,

comprehensive treatment, the constitutional rights of chronically ill inmates would sometimes be

violated, and in the face of that knowledge it nonetheless 'adopt[ed] a policy of inaction'").

 Defendants' arguments also fail on the law, as argued in Plaintiff's opposition to

Defendants' motions to bar Plaintiff's experts. ECF 232 and 233. Plaintiff reincorporates those

arguments here. But as an example, Wexford cites *Ross v. Black & Decker, Inc.*, 977 F.2d 1178,

1185 (7th Cir. 1993), for the proposition that patients whose care is "not substantially similar to

Mr. McCullough' care" are "inadmissible." Mem. at 48. *Ross* is a products liability case addressing when evidence of other accidents involving the product and post-dating the injury to the plaintiff can be admitted to show notice, existence, or cause. It has nothing to do with *Monell* liability (or, for that matter, Rule 702) or deliberate indifference.

Also inapposite, Wexford highlights the decision in *Armbruster v. Shah*, 2019 WL 5874335 (S.D. Ill. July 23, 2019), where Magistrate Judge Beatty granted summary judgment to Wexford on *Monell* claims—but not on "moving force" grounds. In *Armbruster*, the court found genuine issues of fact as to the treating Wexford physician and the nurse but granted summary judgment on the *Monell* claims because the plaintiff's evidence was not enough for a reasonable jury to find a widespread custom or practice. *Id*. at *15–17. In reaching this determination, the court contrasted the evidence in *Armbruster*—grievance records from ten other prisoners complaining that they had received inadequate medical care from the same physician—with the *Awalt* and *Piercy* cases discussed above, where the plaintiffs (as here) had hired physicians as expert witnesses to review medical files and records. The court explained that the plaintiff in *Armbruster* had "not offered any competent evidence regarding the quality of the medical care these ten other inmates received." *Id*. Here by contrast, Plaintiff has offered just such evidence from Dr. Venters. The Court should deny Wexford's motion.

## II.    The claims against Dr. Young should proceed to trial.

Defendants argue that Dr. Young, the Medical Director at Danville, is entitled to summary judgment because he did not see Mr. McCullough until a month before his cancer diagnosis and he worked him up for gallstones. But Mr. McCullough was under Dr. Young's care during his entire stay at Danville, and a jury could find Dr. Young deliberately indifferent even though Mr. McCullough received some care.

Even if Dr. Young was not physically present for each exam while Mr. McCullough deteriorated and the cancer grew, a reasonable jury could still find him liable for deliberate indifference. To be liable for deliberate indifference under section 1983, a defendant must have personal involvement, but that does not mean the defendant must have been physically present and providing care. Rather, as one of the cases Wexford cites in its brief expressly recognizes, it is enough if the defendant "create[d] the peril facing" the plaintiff," "increased the peril," or "made it harder for . . . anyone else[] to solve the problem." *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009); *see also Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) ("an official satisfies the personal responsibility requirement of section 1983 if the conduct causing the constitutional deprivation occurs at his direction or with his knowledge and consent") (cleaned up). "Direct participation" is not necessary, only a showing that the defendant "acquiesced in some demonstrable way in the alleged constitutional violation." *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003).

Dr. Young oversaw and was responsible for the medical program at Danville and was responsible for operating those programs in accordance with accepted standards of practice. As practitioners testified, however, that there were limitations on patient care at Danville. *See* PSOF 91-92. These problems negatively affected Mr. McCullough's health in the last few years of his life. Based on the evidence in the record, a jury could conclude that Dr. Young knew of and increased the peril facing Mr. McCullough or, at a minimum, made it harder for those treating him to solve the problem.

Moreover, Plaintiff has presented evidence that Dr. Young acted with the culpable state of mind necessary to show deliberate indifference when he did examine Mr. McCullough, since "it is enough to show that the defendants knew of a substantial risk of harm to the inmate and

disregarded the risk." *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). That standard is satisfied whenever prison officials "unreasonably delay a prisoner's treatment such that it prolongs his suffering," or "contin[ue] a treatment known to be ineffective." *Foster v. Ghosh*, 4 F. Supp. 3d 974, 979-80 (N.D. Ill. 2013); *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976) ("denial of medical care" that results in pain and suffering does not serve a penological purpose and violates the Eighth Amendment); *Gulley v. Ghosh*, 864 F. Supp. 2d 725, 729 (N.D. Ill. 2012) (stating "[o]bviously, the refusal to provide access to a doctor or the denial of necessary medical treatment constitutes deliberate indifference," in the context of failure to treat pain from sciatica); *Gil v. Reed*, 381 F.3d 649, 652 (7th Cir. 2004) (finding that there was a factual issue related to whether a prison doctor was deliberately indifferent to a prisoner's medical needs when he did not follow a specialist's recommendation for post-rectal-prolapse-surgery medication, allegedly prolonging the patient's pain, rectal bleeding, and difficulty with urination and defecation for ten days).

Here, Dr. Young—as the direct practitioner—delayed Mr. McCullough's cancer diagnosis and treatment for at least a month at Danville, while Mr. McCullough remained in pain and discomfort and showed abnormal lab results, including a high white blood cell count indicating cancer. *See* PSOF 13, 14. A jury could reasonably look past Dr. Young's justifications and see them as pretextual, hindsight-driven, or cost-conscious, evidencing deliberate indifference. *Foster*, 4 F. Supp. 3d 974 at 984 ("Choosing a treatment for a prisoner based on cost and not efficacy is evidence of deliberate indifference."); *Perez*, 792 F.3d at 777 (deliberate indifference can occur when a prison official "acts in a manner contrary to the recommendation of specialists . . . or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering").

Based on the evidence, a jury could reasonably infer that Dr. Young's involvement in Mr. McCullough's lack of treatment at Danville—as a direct provider and as the overseeing medical

director—despite his persistent, serious symptoms, caused Plaintiff pain, severe discomfort, and

constipation, and vomiting for years. *See Perez*, 792 F.3d at 781-82 ("In other words, prisoner

requests for relief that fall on 'deaf ears' may evidence deliberate indifference"); PSOF 74. "The

decision of a medical professional to do nothing, even though she knows that a patient has a serious

medical condition requiring prompt treatment that the professional is capable of and responsible

for providing, amounts to deliberate indifference." *Dobbey v. Mitchell-Lawshea,* 806 F.3d 938,

940 (7th Cir. 2015).  The Court should deny Dr. Young's motion.

### III.    Plaintiff's claims against the Nurse Defendants should proceed to trial.

Defendants make three collective arguments for why summary judgment should be granted

for the Nurse Defendants Duprey, Walker, Wachtor, and Ross.

The Defendants argue that the Court should grant summary judgment for the Nurse

Defendants because (1) for Ross and Wachtor only, they were nurses and therefore could not

diagnose Mr. McCullough and could defer to physicians; (2) Plaintiff's experts did not opine that

the Nurse Defendants deviated from the standard of care, nor could they; and (3)  no intervention

could save Mr. McCullough.

### A.    The Nurse Defendants have waived all arguments at summary judgment.

As an initial matter, as the Nurse Defendants did not move for summary judgment based

on individualized arguments, any arguments about their personal liability, personal conduct, or

individual deliberate indifference are waived. *See United States v. Berkowitz*, 927 F.2d 1376,

1384 (7th Cir.1991) ("[P]erfunctory and undeveloped arguments, and arguments that are

unsupported by pertinent authority, are waived."). When a group of defendants "did not argue

before the district court that *individual* officers were entitled to qualified immunity based on the

officer's *individual* actions, but instead asserted collective qualified immunity defenses," a court

is not required nor expected to "identify[] and resolv[e] in their favor individual liability arguments that [they] themselves did not raise." *Gilliam v. Sealey*, 932 F.3d 216, 229 (4th Cir. 2019).

The Nurse Defendants' arguments are also waived for failure to cite to pertinent authority. *See Berkowitz*, 927 F.2d at 1384. For each argument, they cite no authority (argument 1); a single, inapposite case from this Circuit, as explained below (argument 2); or only irrelevant Illinois state medical malpractice law and caselaw (argument 3). Most notably, there are zero citations to the facts in this section of the argument. Mem. 23–28. The Court should deny the Nurse Defendants' motion on that basis alone. Local Rule 56.1(f).

### B.   Even if not waived, each of the Nurse Defendants' arguments would fail.

#### 1.   The Nurse Defendants were deliberately indifferent to Mr. McCullough's known, serious medical need.

First, Ross argues she is entitled to summary judgment because Plaintiff's claim against her "is not based on nursing standard or her scope of practice," and colon cancer is a "diagnosis she could not make." Mem. at 25. Wachtor similarly argues, "As a nurse is not licensed to diagnose or treat medical conditions, there is no logical argument that Ms. Wachtor was deliberately indifferent to Mr. McCullough by referring him to a medical provider." Mem. at 23. Even if all Nurse Defendants had made this argument, it would fail.

The Seventh Circuit has rejected the argument that a health care worker "cannot, as a matter of law, be held liable for Eighth Amendment violations where they allegedly lacked authority to provide particular forms of medical care" to prisoners. *Perez v. Fenoglio*, 792 F.3d 768, 779-80 (7th Cir. 2015) (citing *Berry v. Peterman*, 604 F.3d 434, 443 (7th Cir. 2010)). Nor can a member of the health care team blindly defer to a physician where there is a clear risk to the prisoner's safety or health. *See Rice v. Correctional Med. Servs.*, 675 F.3d 650, 683 (7th Cir.

2012) ("[A] nurse may not unthinkingly defer to physicians and ignore obvious risks to an inmate's health.").

"Under some circumstances when a nurse is aware of an inmate's pain and the ineffectiveness of the medications, a delay in advising the attending physician or in initiating treatment may support a claim of deliberate indifference. Nurses, like physicians, may thus be held liable for deliberate indifference where they knowingly disregard a risk to an inmate's health." *Brown v. Osmundson*, 38 F.4th 545, 554–55 (7th Cir. 2022) (concurring) (citing *Lewis*, 864 F.3d at 564–65; *Holloway v. Del. Cnty. Sheriff*, 700 F.3d 1063, 1075 (7th Cir. 2012) (citation omitted); *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) In this case, Plaintiff presented expert evidence that the Nurse Defendants violated the standard of care by not providing care within their scope as nurses. There is therefore a factual dispute material to the question of whether the Nurse Defendants were deliberately indifferent to Mr. McCullough's serious medical need: namely, his nearly unbearable abdominal pain with nausea and vomiting that was known to the Nurse Defendants. As Plaintiff's expert Dr. Schmidt explained, Mr. McCullough presented with symptoms and a family history that called for Mr. McCullough's providers to recommend CT abdomen/pelvis and GI referral for EGD/colonoscopy, which would likely have led to his diagnosis and cure. Dr. Schmidt's report states:

> Mr. McCullough should have been diagnosed with localized colon cancer by at least January 2017 when he presented with a 6 month history of intermitted almost unbearable abdominal pain with nausea and vomiting. His symptoms were likely from colon cancer. He had an increased risk for colon cancer based on his positive family history and Black race. His PNCC providers should have recommended CT abdomen/pelvis and GI referral for EGD/colonoscopy according to the standard of care. In January 2017 he most likely would have been diagnosed with a T2 N0 stage I colon cancer and been cured with surgery alone with a 90% probability.

*See* PSOF 85; Ex. 5 (Schmidt Report) at 33. Dr. Schmidt specifies that he should have been

diagnosed before he even left Pinkneyville, but she makes clear that her opinions concerning his

delay in care and his providers' deviation from the standard of care continued at Danville. *See*

PSOF 82, 84; Ex. 5  Schmidt Report) at 33. The Defendant Nurses' representation that Plaintiff's

experts did not opine that the nurses deviated from the standard of care, Mem. at 26, is wrong.

Dr. Schmidt opined:

> Due to the negligent delay in metastatic colon cancer diagnosis by his Illinois
> Department of Corrections/Wexford Health Sources, Inc providers, Mr.
> McCullough would have lived approximately 10 months longer with his
> metastatic cancer had he been diagnosed and treated with palliative chemotherapy
> starting in January 2019.

*See* PSOF 89. Schmidt also made clear how the Nurse Defendants contributed to the delays in

care Mr. McCullough experienced, and specifically stated, "His PNCC providers should have

recommended CT abdomen/pelvis and GI referral for EGD/colonoscopy according to the

standard of care." *See* PSOF 43.

Next, the Nurse Defendants argue that Plaintiff's experts, two physicians, lack the

foundation to opine on nurses' standard of care.  This, too, has been rejected by this Circuit. A

physician may render an expert opinion on a nurse's standard of care. *Cooper v. Eagle River

Mem'l Hosp., Inc*., 270 F.3d 456, 463 (7th Cir. 2001) (affirming district court decision that

family physician could render an expert opinion of the standard of care that should be practiced

by nurse practitioners, although family physician had only limited experience with nurse

practitioners and her role was administrative in nature, and only 25 percent of her practice related

to area of medicine at issue).

## 2.  There is evidence that this indifference caused Mr. McCullough's death.

Besides disputing knowledge and indifference, the Nurse Defendants dispute causation.

Specifically, the Defendant Nurses argue it is undisputed that Mr. McCullough's cancer "was

asymptomatic until he had stage 4 cancer," and "no intervention by Defendants could have affected

his outcome." Mem. at 31. Specifically, they argue that "by February 2019, Mr. McCullough had

stage 4 colon cancer that was terminal, and any intervention after February 2019 would not have

affected Mr. McCullough's prognosis or life span." Mem. 26. In a section 1983 case, however,

causation is almost always "a question to be decided by a jury." *Gayton v. McCoy*, 593 F.3d 610,

624 (7th Cir. 2010). It is only in the "rare instance" that a plaintiff "can proffer no evidence that a

delay in medical treatment exacerbated an injury" that summary judgment should be granted "on

the issue of causation." *Id*. This is not one of those instances. Indeed, both Dr. Schmidt and Dr.

Venters directly opine that the Nurse Defendants lack of care contributed to Mr. McCullough's

unnecessary and prolonged pain, shortened lifespan, and death. *See* PSOF 86 and 105.

First, it is hotly disputed that Mr. McCullough was "asymptomatic," so on that basis alone

summary judgment is improper here.

Second, the Nurse Defendants interacted with Mr. McCullough prior to his cancer

becoming terminal, and their liability remained after it became terminal if a jury finds they

prolonged or exacerbated his pain or shortened his lifespan. Gayton, 593 F.3d 610 at . Moreover,

the factual assertion that there was no cure for Mr. McCullough, nor help to be provided, is

unsupported and disputed. *See* Resp. to Wexford SOF 66.

Indeed, Wexford does not cite any specific facts to support its assertion that Mr.

McCullough's cancer was asymptomatic and no intervention could have affected his outcome. In

its statement of material facts, Wexford asserts that "all oncologists agree that by February 2019,

Mr. McCullough had stage 4 colon cancer that was terminal and any intervention after February

2019 would not have affected Mr. McCullough's prognosis or life span." Resp. to Wexford SOF

10. But that is false. Plaintiff's oncology expert, Dr. Judy Schmidt, does not agree that any

intervention after February 2019 would not have affected Mr. McCullough's prognosis or life span. Ex. 8 (Schmidt Dep.) at 254. Wexford's experts may believe that, but resolving these disputes requires trial. *See, e.g.*, *Godinez v. City of Chicago*, 2019 WL 5597190, at *2 (N.D. Ill. Oct. 30, 2019) ("It is not for this Court to make credibility determinations on the expert opinions [regarding cause of death] on summary judgment.").

In any case, even if there were no "antidote," that would not mean that the Nurse Defendants could not have provided monitoring and stabilization to prevent a catastrophic outcome like the one that occurred on June 22, 2019 when Mr. McCullough was convulsing and rushed to the emergency room. *See* PSOF 74.

The fact that Mr. McCullough supposedly had terminal cancer already when he came into contact with the Nurse Defendants would simply underscore why it was critical for them to ensure that he had appropriate monitoring and care. *See Cobige v. City of Chicago*, 651 F.3d 780, 782 (7th Cir. 2011) (holding that it was appropriate to hold police officers liable for ignoring a prisoner's need for medical attention where the officers' indifference "combined with a pre-existing heart condition" to "cause[]" the prisoner's death).[8]

Moreover, this argument is internally inconsistent. Defendants repeatedly stress that Mr. McCullough was exercising and playing basketball. But Defendants themselves admit that patients who can exercise must still be screened for medical issues, and may still need medical care. Ex. 10 (Duprey Dep.) at 73:16–22 (Q. Okay. So [Mr. McCullough playing basketball] would help eliminate a cardiovascular problem as the cause of the pain that Mr. McCullough is experiencing, right? A. It wouldn't eliminate it. I mean, high school basketball players fall over all the time.). This argument is a poor attempt to distract and shift blame.

In addition to expert opinion, there is ample evidence in the record from which a jury could

conclude that the Nurse Defendants' indifference to Mr. McCullough's need for medical treatment was one of the causes of Mr. McCullough's prolonged pain, shortened lifespan, and death. Although the Nurse Defendants failed to do so in their Memo, Plaintiff addresses each Nurse Defendants' knowledge and indifference, causing his injuries, below.

### a. There is evidence that Ross was deliberately indifferent, causing Mr. McCullough's injuries.

Ross argues that "no reasonable jury could find that RN Ross should have had more insight that Mr. McCullough had colon cancer, a rare condition for a man of his age, than all subsequent physicians." Mem. at 25. Not only is the rarity of his cancer in dispute, but Dr. Schmidt opined that the standard of care required the Nurse Defendants to refer Mr. McCullough out based on his symptoms and family history, as explained above.

Moreover, a defendant does not need to have actual knowledge of the specific ailment that caused a prisoner to need care to be liable for deliberate indifference. What the law requires, as Wexford admits, is simply "actual knowledge of impending harm easily preventable." Mem. 16 (quoting *Thomas v. Walton*, 461 F. Supp. 2d 786, 793 (S.D. Ill. 2006)). "A medical need is 'serious' if it is one that a physician has diagnosed as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention, and if untreated could result in further significant injury or unnecessary pain, and that significantly affects the person's daily activities or features chronic and substantial pain." *Id.*

Whatever the reason for his condition, Mr. McCullough repeatedly went to Ross for radiating pain, constipation, and nausea. *See*, *e.g.*, PSOF 85. A reasonable jury could conclude that Ross knew of or strongly suspected that Mr. McCullough needed immediate care and referral, even if she did not know the specific cause of his condition. *See Gomez*, 680 F.3d at 865-66 (plausible deliberate indifference claim based on four-day delay in treatment that prolonged plaintiff's pain,

even though delay did not exacerbate injury).

Here, there is sufficient evidence in the record to create a factual dispute as to Ross's awareness of and conscious disregard for McCullough's serious medical needs. First, there is evidence that Ross knew about McCullough's serious pain and symptoms. McCullough had obvious signs of a serious injury: he reported stabbing abdominal pain. Ex. 12 (Ross Dep.) at 18. *See* PSOF 10, 60. He returned a month later and the severe pain had not resolved, *See* PSOF 10. Ross knew Mr. McCullough was in severe pain and had serious symptoms that were resistant to the chosen course of treatment, and the first prong of deliberate indifference is satisfied.

Second, with this knowledge, Ross disregarded Mr. McCullough's serious medical need. Ross ignored Mr. McCullough's complaints, with the hindsight justification that he did not act the way she would act if she were in serious pain, because he let her conduct the partial abdominal examination. Ex. 12 (Ross Dep.) at 18 ("If I was having stabbing pain, I would react differently." "He did not react severely when I palpated."). Mr. McCullough was seeking medical care for his pain. It seems logical that he did not interfere with the exam. If he had interfered, Ross might use the hindsight justification that he had refused the exam. He would be in a catch-22.

Ross' reliance on *Whiting*, apparently for the proposition that she could defer to Wexford doctors, is unavailing. *See* Mem. 25 (citing 839 F.3d 658). In that case, the Seventh Circuit stated that a correctional officer may be "entitled to defer to the judgment of jail health professionals" so long as the officer does not "ignore" the prisoner. *Id*. at 1018. But Ross was a health professional, not a correctional officer, and in this case had independent ability and responsibility to treat Mr. McCullough. *See, e.g.*, PSOF 8. Thus, a jury could infer that she was deliberately indifferent if her conduct represented such a "substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a

judgment." *King*, 680 F.3d at 1018-19 (quoting *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996)). Additionally, even non- medical personnel can be liable for deliberate indifference if they "have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Arnett*, 658 F. 3d at 755.

### b. There is evidence that Walker was deliberately indifferent, causing Mr. McCullough's injuries.

Walker seeks summary judgment because she "ensured a physician was consulted for Mr. McCullough." Mem. at 57. Wexford again does not cite any record evidence or a material fact to support this contention. Regardless, Plaintiff need not show that Mr. McCullough "was 'literally ignored'" to prevail on her Eighth Amendment claim. *Id.* (quoting *Greeno*, 414 F.3d at 653; *see also Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016) (en banc) ("[W]e have rejected the notion that the provision of some care means the doctor provided medical treatment which meets the basic requirements of the Eighth Amendment[.]"). There is substantial record evidence that Walker was aware of Mr. McCullough emergent state but did not take meaningful action—action for which she was primarily responsible as the individual chiefly responsible for care for patients in crisis and primarily responsible for coordinating care—to ensure that he was assessed and provided the care he desperately needed. *See* PSOF 75. At a minimum, this evidence raises factual disputes for trial.

Walker also argues that she is entitled to summary judgment because she saw Mr. McCullough on June 17, 2019, when he reported nausea and vomiting, and five days later when he was shaking in pain—"***days*** before" his cancer diagnosis. Mem. at 28. For this reason, Defendants go as far to say, "Plaintiff's continued prosecution of the claim is a blatant refusal to follow FRCP 11." *Id.*

As Defendants well know, this is incorrect. Mr. McCullough received his cancer diagnosis

10 days after Walker first saw him and five days after her second visit. Seventh Circuit precedent establishes that her disregard of his emergent nausea, vomiting, and pain, causing prolonged pain and a 10-day delay in care, is sufficient to create a jury question on Walker's deliberate indifference. *See Gomez v. Randle*, 680 F.3d 859, 865–66 (7th Cir. 2012) (plausible deliberate indifference claim based on four-day delay that prolonged plaintiff's pain); *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 830–32 (7th Cir. 2009) (same); *Grieveson*, 538 F.3d at 779–80 (same); *Edwards v. Snyder*, 478 F.3d 827, 830–31 (7th Cir. 2007) (two-day delay may be sufficient).

Despite Defendants' assertions, there is sufficient evidence in the record that Walker denied Mr. McCullough proper care and knowingly caused him pain. Walker knew that abdominal pain required referral to an MD. PSOF 74. She knew there was a separate process, which she did not follow, to refer a patient to a specialist (or specifically, a GI/colonoscopy referral). Walker failed to properly note that Mr. McCullough's vomiting was persistent, and failed to ask or note pain, even though knew it was important to gather all information possible to get an accurate patient assessment. *See* PSOF 74.

All this evidence establishes Walker's disregard for McCullough's serious pain and persistent, serious symptoms. Mr. McCullough complained about his emergent symptoms to Walker at both encounters, so a jury could infer that Walker knew that her regime for Mr. McCullough was not working, or knew he was not receiving proper care. *See Greeno*, 414 F.3d at 655 (persisting in a course of treatment known to be ineffective supports inference of deliberate indifference). Walker's failure to develop any referral or pain management plan despite knowing that her initial plan to notify other staff was ineffective is itself sufficient to permit an inference of deliberate indifference. *Petties*, 836 F.3d at 729-30; *Greeno,* 414 F.3d at 655; *Berry v. Peterman*,

604 F.3d 435, 441 (7th Cir. 2010) (collecting cases).

Moreover, Walker's disregard for McCullough's injuries, including her failure to order proper imaging or referral, delayed McCullough's care and chemotherapy. That delay alone is enough to establish deliberate indifference. *See Gomez*, 680 F.3d at 865-66 (plausible deliberate indifference claim based on four-day delay in treatment that prolonged plaintiff's pain, even though delay did not exacerbate injury). Not only did the delay cause severe pain, but Dr. Schmidt opined that the Nurse Defendants' deviation from the standard of care by failing to get him the proper referral worsened his lifespan and increased his pain. *See* PSOF at 86 Ex. 5 (Schmidt Report) at 32. These facts preclude summary judgment. *See Thomas v. Illinois*, 697 F.3d 612, 615 (7th Cir. 2012) (discussing "probabilistic harm" and "loss of chance" theory in the § 1983 context); *Moore v. Wexford Health Services, Inc.*, No. 19-cv-3892 2023 WL 4492118 (N.D. Ill., 2023) (denying summary judgment even where there was a "miniscule but possible" chance that treatment would have been more effective without the defendant's delay).

### c. There is evidence that Wachtor was deliberately indifferent, causing Mr. McCullough's injuries.

Mr. McCullough saw Wachtor at least three times:



☐ On January 1, 2019, Mr. McCullough had constipation so severe that correctional staff at Danville called a medical emergency "code" and sent Omar to the infirmary. He explained that it had been five days since his last bowel movement, and that he had pain radiating from his back. His bowel sounds were recorded as hypoactive, a sign of a dangerous health problem and indicative of cancer.

☐ On May 13, 2019, Mr. McCullough was seen by Wachtor in nurse sick call for constipation and gas pain. He reported vomiting and an inability to pass gas. He reported not being very active. He had a visual rectal exam that revealed hemorrhoids. Mr. McCullough was given Milk of Magnesia, Fiber tabs, Mylanta, and Colace.

☐ On May 30, 2019, Wachtor saw Mr. McCullough in the waiting room in the healthcare unit and Mr. McCullough reported left sided chest tightness. She performed an EKG. She called Dr. Young, who ordered Norvasc to reduce Mr. McCullough's elevated blood pressure.

(Ex. B at 115).

As with the other Nurse Defendants', Wachtor's disregard for McCullough's persistent symptoms, including her failure to order proper imaging or referral, delayed McCullough's care and chemotherapy. PSOF 89. That is enough to establish deliberate indifference. *See Gomez*, 680 F.3d at 865–66; *Thomas*, 697 F.3d at 615; *Moore*, 2023 WL 4492118.

### d. There is evidence that Duprey was deliberately indifferent, causing Mr. McCullough's injuries.

It is undisputed that Duprey blindly deferred to the medical director, Dr. Young. Ex. 10 (Duprey Dep.) at 68 (Q: Would you look to try to understand why that [x-ray] order was put in if someone's complaining of upper abdominal pain? A: No. Because if I didn't do it, it means the medical director did it, and he is under the care of the medical director."). Duprey seems to have done this for all non-emergent medical issues at Danville, even if Duprey had not referred a patient to the medical director or made him aware of an issue. Ex. 10 (Duprey Dep.) at 78–79 (Q: And you don't know whether a doctor is going to look at these notes that you've made at any point, if you're not referring him to a doctor . . . ? . . . A: Correct. I don't know what somebody else is looking at); Dep. at 80 ("So in that case, you're doing the chest and you're relying on Dr. Young for the rest?" ). A member of the health care team cannot blindly defer to a physician where there is a clear risk to the prisoner's safety or health. *See Rice*, 675 F.3d at 683 ("[A] nurse may not unthinkingly defer to physicians and ignore obvious risks to an inmate's health.").

It is undisputed that Duprey made no attempt to determine what was wrong with Mr. McCullough. *See* PSOF 68. He compared Mr. McCullough's office visits to ER or urgent care visits, and said he did not check his family history or recent medical visits, or look for the cause of his symptoms. *See* PSOF 68. On May 30, 2019, Duprey saw Mr. McCullough for chest pain. *See* PSOF 66; Ex. 2 (Plaintiffs IDOC Medical Records) at Plaintiff 000187. Due to his pain, the

scheduler bumped up Mr. McCullough's appointment on Duprey's schedule. *See* PSOF 67. The notes indicated that Mr. McCullough's pain increased with movement and palpitation. He stated he had increased gas for several months. *See* PSOF 67; Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff 000187. He diagnosed him with unspecified chest pain and also noted his GERD diagnosis. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff000188. He recommended follow up in three months. *Id.*

Duprey inquired about cough and blood in the stool, which he said could have helped confirm Mr. McCullough's stated history of GERD as the cause of the pain. Ex. 10 (Duprey Dep.) at 53. Mr. McCullough had neither. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff000187. Duprey performed a partial abdominal exam without a rectal exam. Ex. 2 (Plaintiff's IDOC Medical Records) at Plaintiff000187; Ex. 10 (Duprey Dep.) at 97:8-13 (What do you do when performing an abdominal examination? I typically am going to push on quadrants. I'm going to push at certain points and then I will – I will always listen to bowel sounds as well, but I will always generally palpate at least the four quadrants as well.). Duprey testified his only concern was determining whether Mr. McCullough was having a heart attack and he would rely on Dr. Young to handle the rest. Ex. 10 (Duprey Dep.) at 80, 89:3-21. He did not read Mr. McCullough's other prescriptions to check for possible interactions or determine his medical history, did not look in his history for other complaints of abdominal pain, and did not view any of Mr. McCullough's lab or test results, even though the chart was accessible to him. PSOF 68; Ex. 10 (Duprey Dep.) at 28.

Duprey does not remember Mr. McCullough, but in his deposition, he makes a hindsight justification referencing Mr. McCullough playing basketball days before the visit—first as evidence that his pain could not be that bad, then as evidence that the pain is from the basketball.

But Duprey otherwise claims to have not considered the other information in the record or not to have known if he considered it. Ex. 10 (Duprey Dep.) at 70. Duprey also claims to consider Mr. McCullough's history of GERD, but never considers his family history of cancer. Duprey's justifications for his failure to treat Mr. McCullough are questions of fact for the jury.  Ex. 10 (Duprey Dep.) at 53.

Finally, to the extent the record does not reflect the full scope of Duprey's personal involvement, that is because he failed to document his encounters in a way he could decipher later, and then professed to remember no specifics about his interactions with Mr. McCullough when he was deposed. *See* Ex. 10 (Duprey Dep.) at 19-20 (denying any recollection of Mr. McCullough based on memory or his documentation); 41 (testifying he has "no idea" which EKG his note is referring to); 41–42, 44 (testifying he has "no idea" looking at his note whether the EKG he requested was the first or second one performed that day); 41, 43 (testifying he has "no idea" from his note if he would have known or been told about the other EKG performed that day); 63 (testifying he has "no idea" if he looked at the x-ray ordered two days prior); 42-46, 64 ("no idea" if he had the results of the EKGs); 67 ("I have no idea" what the KUB x-ray was for.); 76 ("I have no idea" if I would have reviewed his medical records from a few hours prior); 91 (having "no idea" what would be in the medical file when); 92 ("I have no idea" if I would have seen his 5/30/19 Dr. Young lab reports.); Then later in the deposition, Duprey says he would have gone back a page or two, and seen that Mr. McCullough was playing basketball. 94.

Duprey is not entitled to summary judgment on this claim. *Cf. Hoskins v. Mezo*, 2018 WL 3869633, at *3 (S.D. Ill. Aug. 15, 2018) (improper to award summary judgment on conditions-of-confinement claim where defendants claimed to have "no memory" of the plaintiff's complaints and relied instead on generalized evidence or evidence post-dating the incident to defeat summary

judgment).

    **IV.      The jury must decide whether Defendants failed to intervene.**

In Counts II, Plaintiff brings failure to intervene claims under section 1983 against all Defendants. ECF 32 ¶¶ 64–68.

The elements of a failure to intervene claim are that (1) a constitutional violation has been committed by a state actor; and (2) the defendant had a realistic opportunity to intervene to prevent the harm from occurring. *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005). "A failure to intervene claim generally presents questions of fact appropriate for the jury; a court should not decide it at summary judgment if the underlying [constitutional] claim remains unresolved." *Fleriage v. Village of Oswego*, 2017 WL 5903819, at *9 (N.D. Ill. Nov. 30, 2017).

Wexford makes two main conclusory arguments: (1) there is no evidence that Defendants were aware that Mr. McCullough's constitutional rights were being violated and had an opportunity to intervene, and (2) Plaintiff's claim is duplicative of the deliberate indifference claim and no Defendant was deliberately indifferent.

First, a reasonable jury could find the Defendants were aware that Mr. McCullough's Eighth Amendment rights were being violated, and that each had the opportunity to intervene, as argued above. There is ample evidence in the record that the Defendants failed to take action or provide the necessary information to enable effective lifesaving, or pain-reducing, treatment despite knowing of the serious risk of harm facing Mr. McCullough (and knowing it was not being adequately addressed).

Even if Defendants' failure to act was not deliberately indifferent, a reasonable jury could find that it amounted to an unlawful failure to intervene. *See Winchester v. Marketti*, 2012 WL 2076375, at *6 (N.D. Ill. June 8, 2012) (nurse was liable for failing to intervene when she knew

doctor's response was inadequate to prevent patient harm and failed to confront or report him). Summary judgment on this claim is therefore unwarranted.

### V. The state law claims must proceed to trial.

In Counts III and IV of the First Amended Complaint, Plaintiff brings wrongful death and survival claims against Defendants under the Illinois Wrongful Death Survival Acts. ECF 32 ¶¶ 69–82. Because a reasonable jury could find that Wexford, the Nurse Defendants, and Dr. Young violated Mr. McCullough's Eighth Amendment rights, a jury necessarily could find that these Defendants were willful and wanton under the Wrongful Death Act and Survival Act as well. *See Williams v. Rodriguez*, 509 F.3d 392, 404 (7th Cir. 2007) (stating that the "willful and wanton [standard] is 'remarkably similar' to the deliberate indifference standard"); *Bragado v. City of Zion/Police Dep't*, 839 F. Supp. 551, 554 (N.D. Ill. 1993) ("The definition of 'willful and wanton [under Illinois law] is essentially the same as the definition of 'deliberate indifference' under the federal constitutional law.").

### A. Wexford owed a duty to Mr. McCullough and breached it.

Wexford concedes that Illinois permits institutional liability for medical negligence but claims that there is no evidence of Wexford's duty or breach. Mem. 58. Dr. Venters and Schmidt both identify Wexford's institutional decisions affecting Mr. McCullough's treatment, including the collegial review process denying him proper imaging. *See* PSOF 102. They also offer extensive evidence on the standards for adequate care in the correctional context and the ways in which Wexford's care of Mr. McCullough fell short. *See* PSOF 102, 106. As the *Longnecker* case cited by Wexford states, the standard of care "may be shown by a wide variety of evidence, including, but not limited to, expert testimony, hospital bylaws, statutes, accreditation standards, custom and community practice" and can "also be determined without expert testimony in some cases." *Longnecker v. Loyola Univ. Med. Ctr.*, 383 Ill. App. 874, 885 (Ill. 2008). And even if Plaintiff

cannot proceed directly on an institutional negligence theory, Wexford remains liable for medical

negligence by its agents and employees under the theory of *respondeat superior*.

Wexford's argument is that "[t]here has been no evidence that a medical request was

ignored." Mem. 59. Wexford also argues that Plaintiff should not be permitted to proceed on claims

due to acts of non-defendants. But Illinois permits a plaintiff to maintain *respondeat superior*

claims against an employer even if the responsible employees are not named. For instance, in a

suit under state law where the plaintiff named an unknown police officer but failed to identify the

defendant before discovery closed, the Seventh Circuit held that the City of Chicago could not

escape vicarious liability for the now-dismissed unknown officer's conduct. *Williams v.

Rodriguez*, 509.

### B.    A reasonable jury could find causation.

The proximate cause standard on the state law claims requires the plaintiff to show, through

expert testimony offered to a "reasonable degree of medical certainty," that the defendant's failure

to comply with the standard of care proximately caused an injury. *Miranda v. Cnty. of Lake*, 900

F.3d 335, 348 (7th Cir. 2018). Wexford argues that there is no evidence that its agents or

employees' conduct caused Mr. McCullough's death. However, "[q]uestions concerning

proximate cause are factual matters for the jury to decide." *Espinoza v. Elgin, Joliet & Eastern Ry.

Co.,* 165 Ill.2d 107, 114 (Ill. 1995). There is ample evidence here that would permit a jury to find

for Plaintiff.

In attempting to show otherwise, Wexford rehashes the arguments in their motions to bar

Plaintiff's experts. As explained in Plaintiff's oppositions to those motions, her experts are

qualified to offer cause of death opinions and opinions on proximate cause. Plaintiff will not repeat

every basis for that conclusion here but will offer an example.

Wexford asserts that Dr. Schmidt's opinions related to chemotherapy are "speculative at best." Mem. at 56. But Dr. Schmidt stated, "My opinions are stated within a reasonable degree of medical certainty, meaning more likely than not." Ex. 5 (Schmidt Report) at 34. Much less equivocal language has been found to be consistent with the relevant legal standard. *See Wise v. St. Mary's Hospital*, 64 Ill. App. 3d 587, 590 (1978) ("While medical testimony is usually couched in terms of art such as 'based upon a reasonable degree of medical certainty,' etc., it is not objectionable for the medical expert to testify in terms of percentages so long as it is clear that the opinion expressed is not the product of mere speculation or conjecture."); *Galvin v. Olysav*, 212 Ill. App. 3d 399, 405 (1991) (declining to exclude evidence where a "doctor testified in terms of percentages" without repeating the words "reasonable degree of medical certainty").

Wexford's substantive disagreements with Dr. Schmidt's conclusions present at most "a factual question for trial." *Jones v. Wexford Health Sources, Inc.*, 2021 WL 323792, at *7 (N.D. Ill. Feb. 1, 2021) (denying motion for summary judgment on causation grounds where "[t]he defendants frequently claim that [an expert] 'does not offer a single opinion to a reasonable degree of medical certainty'" but the expert's report "concludes by stating that his opinions are offered with 'a reasonable degree of medical and orthopedic surgical certainty'").

In sum, a reasonable jury could conclude that Wexford's misconduct amounted to the proximate cause of Mr. McCullough's death. *See, e.g.*, *Miranda*, 900 F.3d at 348 (expert opinion that "the medical defendants' inaction contributed" to the defendant's death was not "impermissibly conclusory" and was sufficient to find causation). Of course, Wexford is free "to cross-examine the experts about what led them to draw their conclusions." *Id*. (citing *Wilson v. Clark*, 84 Ill. 2d 186, 194 (1981)). But this is not an issue for summary judgment.

## VI.    Wexford's pleading arguments are meritless.

Finally, Wexford argues that the Court should disregard the factual record because it does

not match the Amended Complaint. Mem. at 42. The Court should reject this argument.

### A.    Plaintiff's position at summary judgment is fully consistent with the pleadings.

Wexford argues that Dr. Venters' identified systemic issues "are new allegations" not

alleged in the Amended Complaint and "should be disregarded." Mem. at 42. Plaintiff alleged,

among other things, that Mr. McCullough died as a result of Wexford's systemic issues,

including: "(1) healthcare personnel commonly fail to respond or follow up on complaints by

prisoners about their health status; (2) healthcare personnel fail to review relevant medical records

as part of a patient's treatment plan; (3) healthcare personnel fail to follow appropriate diagnostic

procedures, favoring instead cheaper procedures even if they are demonstrably ineffective; (4)

healthcare personnel fail to schedule or approve follow-up appointments deemed appropriate by

members of the medical staff; (5) healthcare personnel fail to take action to secure appropriate

continuity of care for complicated and urgent conditions like cancer within the IDOC and other

healthcare providers; (6) inadequate levels of health care staffing are maintained; and (7)

healthcare personnel fail or refuse to arrange for prisoners to be treated in outside facilities, even

when an outside referral is necessary or proper , or even that the determination of a "probable

intoxication" (which leaves room for other causes on its face) was correct." ECF 32 at ¶ 59. This

is consistent with Dr. Venters' opinions.

Moreover, a plaintiff "need not plead detailed factual allegations" to support a claim at the

start of a case. *Jackson v. Wexford Health Sources, Inc.*, No. 20-CV-0900-DWD, 2021 WL

2456530, at *2 (S.D. Ill. June 16, 2021) (J. Dugan) (citing *EEOC v. Concentra Health Servs.*, 496

F.3d 773, 776 (7th Cir. 2007)). The Federal Rules require only a "short and plain statement of the

claim" (Fed. R. Civ. P. 8(a)) because a "full description of the facts that will prove the plaintiff's

claim comes later, at the summary-judgment stage or in the pretrial order." *Chapman v. Yellow*

*Cab Coop.*, 875 F.3d 846, 848 (7th Cir. 2017); *see also Bartholet v. Reishauer A.G. (Zurich)*, 953

F.2d 1073, 1078 (7th Cir. 1992) (a complaint merely "limns the claim" and "details of both fact

and law come later, in other documents"). Contrary to Wexford's current position, "elaborating on

the complaint is exactly what plaintiffs are supposed to do in discovery." *Prayitno v. Nextep*

*Funding LLC*, 2020 WL 3414955, at *5 (N.D. Ill. June 22, 2020). Defendants' argument is

unpersuasive. *See Holt v. Lewsader*, 2020 WL 10976625, at *23 (C.D. Ill. Sept. 30, 2020) ("the

court is not persuaded that Plaintiff is making the sort of 'new argument' that is impermissible at

summary judgment, because Plaintiff's position is firmly rooted in the Amended Complaint and

in Plaintiff's and Lewsader's deposition testimony, so even if it reflects a change of tack,

Defendants had fair warning of it, and the change is not the sort of fundamental alteration of the

factual basis for the claim that puts the argument out of bounds").[2]

**VII.    Plaintiff's claims are timely.**

Wexford asks the Court to bar any claims based on conduct by Pinckneyville practitioners

as claims against those individuals would be barred by the statutes of limitation and repose. Mem.

59–60. To start, Wexford waived the statute-of-limitations and -repose affirmative defenses in

---

[2]        Here, of course, Plaintiff is not pursuing her factual theory for the first time in opposition to
Wexford's motion. See supra p. 41-42. But even if Plaintiff were, the Court should simply allow
constructive amendment, as there is no conceivable prejudice when Defendants have been able to conduct
extensive fact and expert discovery on this issue. *See Schmees*, 77 F.4th at 490 (stating that, in deciding
whether to allow constructive amendment at summary judgment, a court "should apply the familiar
standards governing when leave to amend should be granted, paying particular attention to the potential for
prejudice to other parties"); *Dealer Management Systems*, 680 F. Supp. 3d at 938 (even assuming the
plaintiff was asserting a new factual basis, amendment would be permitted on the grounds of no prejudice
where defendants' experts "had an opportunity to rebut" them, plaintiff's experts "were deposed
extensively" and "subject to *Daubert* challenges," and defendants "have not identified any specific material
that could have been revealed, had they explored those topics, and have not asked the court to reopen
discovery on these topics"). Wexford has not articulated any prejudice, and has waived any prejudice
argument. *Berkowitz*, 927 F.2d at 1384.

their Answers to the Amended Complaint. This Court should accordingly reject Wexford's statute-of-limitations arguments at the outset because they were expressly and knowingly waived. *See United States v. Gaona*, 697 F.3d 638, 641 (7th Cir. 2012) (waiver occurs when a defendant "intentionally relinquishes or abandons a known right").

Even if this Court does not enforce Wexford's waiver, the arguments fail. Under well-settled precedent, a "violation is called 'continuing,' signifying that a plaintiff can reach back to its beginning even if that beginning lies outside the statutory limitations period, when it would be unreasonable to require or even permit him to sue separately over every incident of the defendant's unlawful conduct." *Heard v. Sheahan*, 253 F.3d 316, 319–20 (7th Cir. 2001). As in *Heard*, Mr. McCullough's death was "the consequence of a numerous and continuous series of events," and thus the entire series of events can therefore be the subject of suit. *Id*.; *see also Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 517 (7th Cir. 2019); *Turley v. Rednour*, 729 F.3d 645, 651 (7th Cir. 2013). For a *Monell* claim, so long as the claim is filed timely, the plaintiff can and often does reach back before the start of the accrual date to prove an unconstitutional policy, practice, or custom. *See Golodner v. City of New London*, 2016 WL 1048746, at *6 (D. Conn. Mar. 11, 2016) ("[A]ny claim arising out of the 2006 and 2008 incidents is barred by the statute of limitations. But the 2006 and 2008 incidents can still be considered in deciding whether there was a policy of deliberate indifference that caused the 2011 incidents").

Indeed, it is "well established" as a general principle that conduct outside the limitations period can always be admitted if it is relevant "as background evidence in support of a timely claim." *Hum. Rts. Def. Ctr. v. Jeffreys*, 2022 WL 4386666, at *5 (N.D. Ill. Sept. 22, 2022); *Beard v. Don McCue Chevrolet, Inc.*, 2012 WL 2930121, at *3 (N.D. Ill. July 18, 2012) (although some alleged misconduct is not actionable under Title VII and § 1981 statutes of limitations, allegations

are still relevant because time-barred prior acts can serve as background evidence); *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038 (2d Cir. 1992) (explaining that a statute of limitations does not preclude the introduction of evidence from before the commencement of the statute of limitations that is relevant to events during that period). Accordingly, Wexford's arguments about the statute of limitations and repose are misplaced. All the evidence in the record is appropriately considered in deciding Plaintiff's claims. The Court should deny Wexford's motion.

**CONCLUSION**

The Court should deny Defendants' motion for summary judgment in its entirety.


Respectfully submitted,

/s/ Maria Makar
*Attorneys for Plaintiff*


Jon Loevy
Maria Makar
Gianna Gizzi
LOEVY & LOEVY
311 N Aberdeen St. Ste 300
Chicago, IL 60607
(312) 243-5900

## <u>CERTIFICATE OF SERVICE</u>

I, Maria Makar, an attorney, hereby certify on February 22, 2025, I caused the foregoing to be filed using the Court's CM/ECF, which effected service on all counsel of record.

/s/ Maria Makar
*Attorney for Plaintiff*